1  COLT / SINGER / BEA LLP
       Benjamin L. Singer (Bar. No. 264295)
2      bsinger@coltsinger.com
       Renee B. Bea (Bar No. 268807)
3      rbea@coltsinger.com
       Douglas S. Tilley (Bar No. 265997)
4      dtilley@coltsinger.com
   235 Montgomery Street, Suite 907
5  San Francisco, CA  94104
   Telephone:      (415) 500-6080
6  Facsimile:      (415) 500-6080

7  *Attorneys for Telesocial Inc.*

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11 TELESOCIAL INC.,                          CASE NO. 3:14-CV-03985-JD

12             Plaintiff,                     **FIRST AMENDED COMPLAINT FOR
                                              VIOLATIONS OF THE COMPUTER
13 v.                                         FRAUD AND ABUSE ACT, THE
                                              CALIFORNIA COMPREHENSIVE
14 ORANGE S.A., a French Corporation;         COMPUTER DATA ACCESS AND
   ANNE BENRIKHI, an individual;              FRAUD ACT, THE CALIFORNIA
15 DIMITRI DELMAS, an individual;             UNIFORM TRADE SECRETS ACT,
   OLIVIER GODINIAUX, an individual;          BREACH OF CONTRACT, BREACH OF
16 GUILLAUME GUIMOND, an individual;          COVENANT OF GOOD FAITH AND
   FABRICE PETESCH, an individual;            FAIR DEALING, AND VIOLATION OF
17 JACQUES VIEL, an individual;               CALIFORNIA UNFAIR COMPETITION
   BARBARA BOBILLIER, an individual;          LAW**
18 BENOIT AMET, an individual;
   THOMAS LESENECHAL, an individual;          DEMAND FOR JURY TRIAL
19 FLORIAN DE SA, an individual;
   ANTOINE LECOUTTEUX, an individual;
20 and SYLVAIN JAUDRY, an individual.

21             Defendants.

22

23

24

25

26

27

28

colt/singer/bea LLP

Plaintiff Telesocial Inc. states on information and belief its Amended Complaint against defendants Orange S.A., Anne Benrikhi, Dimitri Delmas, Olivier Godiniaux, Guillaume Guimond, Fabrice Petesch, Jacques Viel, Barbara Bobillier, Benoit Amet, Thomas Lesenechal, Florian de Sa, Antoine Lecoutteux, and Sylvain Jaudry and alleges as follows:

**THE PARTIES**

1.       Plaintiff Telesocial Inc. ("Telesocial") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 39 Mesa Street, Suite 102, San Francisco, California 94129.

2.       Defendant Orange S.A. ("Orange"), formerly known as France Télécom S.A., is a French multinational telecommunications corporation organized and existing under the laws of France, with its principal place of business at 78 rue Olivier de Serres, Paris, 75015, France.  Orange has an office in San Francisco, California where it houses "the Bay Area division" of Orange [1] known as Orange Silicon Valley ("OSV"), and its accelerator program, Orange Fab, which actively scouts out Bay Area-based start-up companies "that could be a good fit with Orange."[2]  Orange Fab entices start-ups with promises of funding, networking, and office space, and the prospect of a trip to Paris to bring their inventions to Orange directly and meet the "top decision makers of Orange and key executives of other major brands."[3] Thus, if and to the extent OSV and/or Orange Fab are corporate entities formally distinct from Orange, then OSV and/or Orange Fab are the alter ego and/or agents of Orange.

3.       Defendant Anne Benrikhi is in individual who, upon information and belief, resides at 3 rue du Pont d' Amour, Clamart, 92140, France.

4.       Defendant Dimitri Delmas is an individual who, upon information and belief, resides in France or the United Kingdom.

5.       Defendant Olivier Godinieaux is an individual who, upon information and belief, resides at 263, rue Lecourbe, Paris, 75015, France.

---

[1] *See* Who is Orange, available at http://orangefab.com/about.html.
[2] *See* FAQ, available at http://orangefab.com/faq.html.
[3] *See* http://orangefab.com/index.html

6. Defendant Guillaume Guimond is an individual who, upon information and belief, resides in France or the United Kingdom.

7. Defendant Fabrice Petesch is an individual who, upon information and belief, resides in France or the United Kingdom.

8. Defendant Jacques Viel is an individual who, upon information and belief, resides in France or the United Kingdom.

9. Defendant Barbara Bobillier is an individual who, upon information and belief, resides in France or the United Kingdom.

10. Defendant Benoit Amet is an individual who, upon information and belief, resides at 38-40, rue du Général Leclerc, Issy Moulineaux Cedex 9, 92794, France.

11. Defendant Thomas Lesenechal is an individual who, upon information and belief, resides in France or the United Kingdom.

12. Defendant Florian de Sa is an individual who, upon information and belief, resides in France or the United Kingdom.

13. Defendant Antoine Lecoutteux is an individual who, upon information and belief, resides in France or the United Kingdom.

14. Defendant Sylvain Jaudry is an individual who, upon information and belief, resides in France or the United Kingdom.

15. The Defendants referenced in Paragraphs 3 through 14 are individually and collectively referred to as the "Individual Defendants," and at all relevant times acted at the direction of, as employees or agents for, and/or with the consent and knowledge of Orange and/or OSV.

//
//
//
//
//
//
//

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, over Telesocial's claims under the Computer Fraud and Abuse Act, codified at 18 U.S.C. § 1030. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Telesocial's claims arising under California law.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs, and the action is between Telesocial, a citizen of California, and Orange, a citizen of France, and the Individual Defendants, citizens of France or England.

17.     This Court has personal jurisdiction over each Defendant because he, she, or it has (i) committed acts of computer fraud in this judicial District; and/or (ii) regularly does and/or has done business, solicits or has solicited business, engages or has engaged in other persistent courses of conduct, and/or derives or has derived substantial revenue from products and/or services provided to persons in this District and in this State; and/or (iii) has an alter ego or agent domiciled in this judicial District such that the jurisdictional contacts of that alter ego or agent are imputed to each such Defendant.  This Court's personal jurisdiction over at Defendants is additionally established by California Penal Code § 502(j), which provides that "a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." As described below, Defendants unlawfully accessed Telesocial's computers, computer systems, or computer networks—all of which have been located in Emeryville, California at all times relevant to this Amended Complaint.  Further, each Defendant knew that Telesocial's computers, computer systems, and computer networks were located in California; that Telesocial was located in San Francisco, California; and that Telesocial would suffer damages in California.

18.     Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391(b) and/or (c) because a substantial part of the events giving rise to the claims occurred in this judicial District, a substantial part of the property that is the subject of this action (Telesocial's computer servers and computer code) is situated in this judicial District, and/or because the Court has personal jurisdiction in this judicial District over each Defendant. Defendants have, as set forth below, committed acts of

computer fraud and misappropriation of trade secrets within this District; and Telesocial resides in and suffered damages in this District. Venue is additionally proper pursuant to California Penal Code § 502(j), which provides that "a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." As described below, Defendants unlawfully accessed Telesocial's computers, computer systems, and computer networks located within the Northern District of California.

**FACTUAL BACKGROUND**

19.     On November 21, 2012, during a highly publicized press showcase, Chief Executive Officer of Orange, Stéphane Richard, and Chief Operating Officer of Facebook, Sheryl Sandberg, appeared on an international stage to claim credit for developing a revolutionary new social calling product they dubbed "Party Call." But it was Telesocial, a San Francisco-based start-up company, and not Orange or Facebook, that invented, designed, and developed this social calling innovation, which even today represents a new frontier in technology and communication.

20.     The twisted path that led to Stéphane Richard and Sheryl Sandberg being on stage together that day was paved with concerted deceit, misappropriation, old-fashioned theft, and, above all, remarkable hubris. Just six months earlier, Telesocial and Orange were deep into negotiations to partner in bringing this social calling product to market. Orange had long understood the important role social calling would play in the future of their industry, but its multi-year effort to develop something in-house had been an abject failure. Then, along came Telesocial and a series of meetings that confirmed that everyone at every level of Orange loved what Telesocial had built—right up to Orange's CEO.

21.     But instead of partnering with Telesocial, Orange used Telesocial's ideas and intellectual property to secure the coveted mobile innovation partnership with Facebook that had eluded them for years. Banding together, these tech industry giants decided to steal Telesocial's social calling technology, and arrogantly cast Telesocial aside believing they had duped the small start-up company into disclosing the information they needed to copy Telesocial's products. There was just one problem. When Orange and Facebook went to execute on their scheme, they

discovered Telesocial's innovations were not easily replicated, and certainly not in time for the planned international announcement by their senior-most executives. What they did next gives rise to this lawsuit.

22.     Desperate to launch their copy of Telesocial's technology, and instead of partnering with the true inventor of the technology, Orange, a partially state-owned French telecommunications leviathan, and Facebook, a global social networking goliath, resorted to simply stealing what they needed to get the job done. Orange hacked Telesocial's computer servers over and over again, raided Telesocial's proprietary code and functionality, and used that unlawfully obtained information to reverse engineer a knock-off product that Orange and Facebook would later claim they developed together from scratch.

23.     November 21, 2012, should have been a coronation of sorts for Telesocial. That magic, transformative moment that every start-up exists to chase, where valuations are catapulted overnight into the stratosphere. Instead, it was the day that Telesocial learned that it had been swindled. Orange did not kill the switch on Telesocial because it found a better partner or product, or because Telesocial's price was too great (an excuse they would use later). Rather, Orange conceitedly believed that it was above the law and that, with Facebook on its side, it could do with the small start-up as it pleased. Orange almost got away with it too, only this time, the little start-up caught them red-handed.

## I.     TELESOCIAL DEVELOPS A PROPRIETARY SOCIAL CALLING TECHNOLOGY

24.     Telesocial was founded in 2008 by co-founders Bill Waytena ("Waytena") and Eric Stone ("Stone"). The company spent many years developing technology and related processes in anticipation of a shift in the telecommunications industry away from the traditional networks and calling plans defined solely by phone numbers that we all have now, and toward broader offerings that would leverage the more expansive social network graph.

25.     Telesocial developed a software application ("Call Friends") based on a custom application programming interface ("API") that lets users of social networks (such as Facebook) place carrier-based telephone calls to their "friends." Specifically, Call Friends offers mobile subscribers a direct phone connection to people in their social network through "social identities"

instead of traditional phone numbers, while still experiencing the connection as a phone call where mobile phones ring and callers are connected voice-to-voice with "pin-drop" sound quality. In addition to one-to-one calls, Telesocial's Call Friends also allows users to initiate virtual conference call rooms, enabling multiple people in a social network to connect to each other simultaneously, much like a traditional conference call only without a single a phone number.

26. Call Friends was built from the ground up to provide an integrated Facebook experience. As a result, it offers a number of user-friendly and commercially attractive social network features, including, without limitation, the following:

    a. the Telesocial Call Friends application can (i) determine which of a Facebook user's friends are participating in a call; (ii) inform the user's friend via the friend's Facebook timeline that the user is participating in a call with others; and (iii) invite and enable the user's friend to join the call; and

    b. the Telesocial Call Friends application can read the contact information from the user's phone, and integrate that contact information with the user's Facebook account, to enable the user to initiate individual and group calls on the user's phone to his or her combined social and telephone friend networks.

27. The telephony backbone of Call Friends is Telesocial's proprietary software switch, or "softswitch," that handles call routing and execution. By layering the social network graph onto a telecommunications carrier's infrastructure through the sophisticated softswitch, Call Friends offered subscribers the consistent, "pin-drop" quality experience that was previously available only over traditional mobile carrier networks. This advancement offered significant reliability and call quality improvements over existing voice over internet protocol ("VoIP") technologies.

28. Telesocial's social calling platform represents a quantum leap forward with respect to integrating the businesses and business models of mobile carriers and social networks. It meant that carriers, like Orange, were no longer limited to providing service only to direct mobile-to-mobile connections because now they could drive social network calling traffic through their mobile infrastructure and capture billing events and the associated revenue in real time. And it meant that

social networks, such as Facebook, had a near turn-key solution that would allow them to capture and share revenue associated with calls originating from within their products.

## II.    TELESOCIAL'S DISCUSSIONS WITH ORANGE

29.    Like so many United States based start-ups, Telesocial was initially introduced to Orange through OSV's Orange Fab.  Talks between the two companies began in February 2012 and ensued at a torrid pace.  Telesocial's founders first spoke with Pascale Diaine, the lead for Orange Fab in the San Francisco Bay Area.  The next month, March 2012, Telesocial met Yann Kandelman, OSV's Head of Digital Development with responsibility for overseeing Orange's internet and mobile partnerships with major market players, including Facebook and Twitter.  In early April 2012, Telesocial met with two Orange executives, Benoit Amet and Catherine Le Drogo-Ferrari.  At each of these meetings, Telesocial gave a feature-level presentation of what it had built and where it was going next.  And each time the Orange audience responded with excitement and escalated the process.

30.    With Telesocial having passed all of Orange's pre-screening, Amet emailed Waytena on April 24, 2012, to offer that Orange "would like to go deeper with the Telesocial service and get some more details about the following items: Technical (platform architecture overview, scalability, mobile applications developments, Facebook API used, integration with Orange networks & IS, …)[;] Marketing (features, customer path, roadmap, …)[;] Legal (voice flows, legal obligations, …)[;] Business (business model based on the additional revenue is not clear for us)."

31.    A series of technical and business meetings ensued that lasted through July 31, 2012, and Telesocial also fielded countless phone calls and emails from Orange employees and/or agents. Orange participants in the various meetings and communications during that time frame included: Xavier Perret, Benoit Amet, Catherine Le Drogo-Ferrari, Fabrice Petesch, Guilhem Caumel, Philippe Streiff, Olivier Godiniaux, Yann Kandelman, Pascale Diaine, Frederic Martelli, Laurent Castaignet, Anne Benrikhi, Barbara Bobillier, Bertrand Guisnet, Emmanuelle Desodt, and Eva Charbonnier.

32.    Orange's technical deep-dive of Telesocial's products occurred in June 2012. This meeting lasted for several hours and was attended by Orange's mobile business executives, social

colt/singer/bea LLP

calling team, research and development team, and key decision makers from Orange France (the customer side of Orange's business). To the extent Telesocial was willing to disclose it, Telesocial presented the information Amet had requested, and fielded numerous technical questions from Orange employees regarding Call Friends, the API, and the softswitch technologies. Members of Orange's team probed Waytena and Stone for technical and other details about the Call Friends application and even took photos of the illustrations Telesocial drew during the meeting. Orange also asked about the customer experience on Orange's platform, including, for example, questions about billing capabilities and whether Telesocial could work within Orange's billing parameters. Orange even asked about branding, and Telesocial told them that it had successfully market tested the name "Party Call."

33. The key technical aspects of what Telesocial had built that Orange expressed particular amazement and interest in include:

  i.  the ability for mobile customers to call their social network contacts on platforms such as Facebook, Google+, and Twitter without needing to know that contact's phone number;

  ii.  the ability to make calls to a mobile phone from an application that can be used on multiple platforms, including desktop computers, tablets, laptops, and smart phones;

  iii.  the option to make one-to-one calls or group calls, and to elect whether those calls would be public or private while still operating within Facebook;

  iv.  the notification triggered on a user's Facebook wall when that user places a phone call;

  v.  the ability for a user to join an ongoing call by simply clicking on the notification that appears in the Facebook newsfeed/log; and

  vi.  the potential to identify Facebook users with a mobile phone subscription from Orange and differentiate between such users and others accessing the application in terms of billing or preferred access to special features.

colt/singer/bea<sub>LLP</sub>

34.     Orange's team was visibly excited and provided Telesocial with enthusiastic feedback. Orange informed Waytena and Stone that Orange's social calling team had been under immense pressure for two years to come up with a social calling solution, but had been unable to deliver, and certainly had not thought of the features Telesocial's technology offered.  Guilhem Caumel, Head of Mobile Digital Services at Orange France, who was identified as a key decision maker, told Waytena and Stone that he loved what they had done.  Confirming the obvious, Orange advised Telesocial that it was a huge hit with their CEO, Stéphane Richard, and, with Orange France.

35.     During all of this interaction, Waytena and Stone were responsive to Orange's requests and provided the information that Orange required to perform its due diligence.  But, consistent with Telesocial's ordinary business practices of not giving the shop away, Telesocial was willing to disclose some of the features of their social calling platform but now how those features were specifically implemented.  Telesocial elected to keep that information confidential unless and until Orange memorialized their intent to partner with Telesocial in an executed agreement.

36.     There can be no doubt that Orange was, at that point, committed to launching Telesocial's social calling product.  Orange's CEO, Stéphane Richard, had chosen Telesocial's product to be a key innovation introduced as part of a social calling initiative he intended to announce in November 2012.  On July 4, 2012, Amet told Waytena that Telesocial was being offered a Production Contract—the golden development deal any technology start-up shoots for—and that the contract would need to be negotiated quickly, by July 31, 2012.

37.     Although Telesocial did not know it at the time, what was actually going on is that Orange—at the very same time they were "negotiating" with Telesocial—was trying to build their own application to mimic the feature set they had seen in Call Friends.  In fact, Orange had even been pitching Telesocial's technology to Henri Moissinac, Facebook's then-Director of Mobile (and also a former France Telecom employee), a key industry player that Orange had been unsuccessful in courting with its prior iterations of social calling concepts.  Orange shared Telesocial's screen shots and other confidential information with Facebook, without Telesocial's knowledge or consent, to sell them on the product.  Moissinac and other mobile technology leaders at Facebook, including Bruce Hazan and Fergal Walker, immediately saw the value in Telesocial's innovation and not only

agreed to partner with Orange, but also dedicated a team of engineers to assist Orange in its efforts to launch these exciting social calling features.

38.     Within days of convincing Facebook to become their social calling partner, Orange backpedaled on their commitment to Telesocial.  Rather than the promised production contract, Orange now told Telesocial that it would have to work under a less appealing, short-term proof of concept contract *and* grant Orange exclusivity.  Orange, nevertheless, continued to hold out the golden carrot of a possible production contract to prolong discussions with Telesocial.

39.     Eventually, once Orange was assured it would have Facebook's assistance in building a Call Friends imitation, Orange cast Telesocial aside.  After Telesocial and Orange had engaged in a series of meetings and communications dedicated to hammering out the details of the proposed proof of concept contract, Orange abruptly cut off negotiations claiming that Telesocial's price of € 850,000 (roughly $1 million) was a "no go."  Telesocial knew immediately that the price dispute was a false pretext because Waytena told Amet and Le Drogo-Ferrari in a prior meeting, on July 18, 2012, that the price of what Orange was proposing would have to be $1 million or more and they responded that they understood and it would be fine because "our CEO wants the product."

### III.    ORANGE STEALS FROM TELESOCIAL

40.     Under tight pressure to deliver to Orange's CEO on an expedited timeline, Defendants faced a high-stakes and Herculean task.  On August 30, 2012, Defendant Godiniaux wrote to another Orange employee that Orange's "FUT [(first user test)] still planned for 11/20, which is a very tight schedule because we will not be able to use a turnkey solution (since Telesocial wants €850K!!) and so we will have to develop everything."  (Dkt. 26-2, Exhibit 2 to Defendants' Request for Judicial Notice at Paragraph 98 of Certified Translation.)

41.     Presumably realizing that they were not going to be able to meet this goal even with Facebook's help, Defendants decided that stealing from Telesocial was the perfect shortcut. Beginning on August 31, 2012, and continuing throughout the entire period that Orange and Facebook worked to develop a social calling application, Defendants were accessing Telesocial's Call Friends application hosted on the Emeryville servers without authorization in a furious effort to collect clues that would allow them to recreate the key features of Telesocial's product.

colt/singer/bea LLP

colt/singer/bea LLP

42.     Specifically, between August 31, 2012 and December 19, 2012, Defendants registered and accessed Telesocial's application and Emeryville computer servers without authorization repeatedly, sometimes several times in a single day, using a variety of user names and corresponding telephone numbers as follows:

| Assumed Real Name | Account Name(s) Created by User | Telephone Number Registered by User | Dates of unauthorized access of Telesocial's application and computer servers (2012) |
|---|---|---|---|
| Anne Benrikhi | Anne Orange; Anne Benrikhi; Anne Myne Anne Dornier | +33 6 07 48 87 07 +33 6 43 05 08 52 +33 6 79 84 03 63 | September 6, 10, 11, 12, 13, 19, 20, 24, 25; October 16, 25, 29; November 16, 20, 23, 30 |
| Dimitri Delmas | Dimitri Delmas | +33 6 84 03 92 99 | September 19 |
| Olivier Godiniaux | Karl Tangerine | +33 6 78 76 05 71 | August 31; September 5, 6, 10, 11, 12, 13, 19, 25; October 16, 25, 29; November 16 |
| Guillaume Guimond | Guillaume Guimond | +33 6 30 76 34 94 | September 10, 12, 13 |
| Jacques Viel | Jacque Viel | +33 6 64 89 72 68 | September 6, 13, 19, 20; October 25; November 20 |
| Barbara Bobillier | Barbara Testbis | +33 6 33 65 92 36 | August 31; September 5, 6, 10, 11, 12, 13, 19, 20, 24; October 16, 25; November 30 |
| Fabrice Petesch | Fab Thefabulousfab | +33 6 74 49 38 67 | September 6 |
| (unknown) | Mila Lemon | +33 6 40 71 97 45 | August 31, September 5, 6, 10, 11, 12, 13 |
| Thomas Lesenechal | Thomas Lesenechal Thomas Orange | +33 6 33 65 92 36 | Thomas Lesenechal: September 7, November 16, December 19th

Thomas Orange: September 6, 7, 10, 12, 13, 19, 20, 24 October 25, 29 November 24, 25, 26, 28, 30, December 4 |
| Benoit Amet | Benoit Amet | +33 6 71 60 95 77 | September 10, 13 |
| Florian De Sa | Florian De Sa | n/a | September 7, 12, October 12, November 23 |
| Antione Lecoutteux | Antione Lecoutteux | n/a | September 17, 24 October 18 |
| Sylvain Jaudry | Sylvain Jaudry | n/a | December 4 |

43.    Several of these user names or fictitious identities correspond with known agents and employees of Orange who were involved with Telesocial and/or are responsible for marketing, social calling development, ergonomics, creative direction and design, and technical and software engineering for Orange.

44.    Given Orange's termination of discussions with Telesocial one month prior, Defendants did not have permission to access Telesocial's application and they knew it.  To evade detection, Defendants used fictitious Facebook accounts and aliases to register for and download the Call Friends application.  Through this fraud, Defendants were able to access Telesocial's Emeryville servers and all of the information the application presents to the user.  Moreover, Telesocial's records show that Defendants made dozens of test phone calls and executed various routines and functions so that they could obtain information about Telesocial's platform.

45.    In addition, Defendants used unauthorized hacking tools—the software analog of a crowbar or a lock pick—to gain unauthorized access to Telesocial's proprietary information and trade secrets that could not be accessed without such tools.  Defendant Guimond referenced such tools when he suggested he would forward to Defendant Godiniaux a copy of "code to Telesocial's webpage containing the 'join the conference' button" corresponding to Telesocial's conference calling function that he copied from Telesocial's server, "if [Godiniaux] thinks it's worth inspecting their pages in greater detail and if you have *tools to go into greater detail/depth.*"  (Dkt. 26-2, Exhibit 2 to Defendants' Request for Judicial Notice at Paragraph 92 of Certified Translation (emphasis added).)  Following up on that communication, Mr. Godiniaux confirmed that he did, in fact, examine Telesocial's web pages housed on its computer servers in greater detail "to identify a bit how the webapp is designed."  (*Id.* at Paragraph 93.)  Given that special tools and programs were required to to access this information, Defendants knew they did not have authorization to access it.

46.    Most troubling, Defendants' illicit activity spiked in the first week of September 2012, precisely when Orange had scheduled a "Facebook Hack Session" in London with "Facebook' dedicated engineers," the original purpose of which, according to Orange, was to develop custom features for Orange's planned launch of Call Friends in November 2012.

47.     Through their repeated unauthorized access to the Telesocial's application and computer servers, Defendants obtained information regarding the logic flow—the specific combination of modules and routines used in Telesocial's technology—and whole-sale copied the code responsible for Call Friends' most important and valuable features and/or obtained clues that allowed it to reverse engineer the same.  For example, Defendants copied and/or obtained information that enabled them to reverse engineer the software code by which the Telesocial application announced a conference call on Facebook users' timelines, and to invite those users to join those calls.  Defendants also copied and/or obtained information from which they were able to reverse engineer the software code that enabled users to integrate their contact information from their mobile devices with the Telesocial application.  In other words, Defendants stole the very information Waytena and Stone choose not to voluntarily disclose to Orange.

48.     Defendants further caused the Telesocial application to execute routines and functions, such as the Join Call invitation that appears on a user's Facebook timeline, so that Defendants could access Telesocial's specific combination of modules and routines used to create that functionality, and copy and/or set clues that would allow it to reverse engineer the software code responsible for such features.

49.     As part of their efforts to misappropriate Telesocial's intellectual property, Defendants also placed or caused to be placed approximately 97 unauthorized international long-distance telephone calls via Telesocial's application—including a number of conference calls—between the dates of August 31, 2012 and December 19, 2012.  The total duration for these calls was approximately 266 minutes. As Defendants knew they would be, the charges for the calls were billed to Telesocial.

50.     The calls were placed from telephone numbers corresponding to the following Orange employees or agents: Ms. Benrikhi, Ms. Dornier, Mr. Godiniaux, Mr. Guimond, Mr. Viel, Ms. Bobillier, Mr. Lesenechal, and "Mila Lemon."

51.     In addition, Defendants tested various other features of the Telesocial application, such as adding individuals to existing telephone calls.  Several of the Individual Defendants who registered to use the Telesocial application, including Mr. Petesch and Ms. Benrikhi, uploaded

mobile phone book data to Telesocial's servers, thereby altering and/or adding data to Telesocial's servers. Defendants also investigated how Telesocial's application integrated with Facebook's social networking systems through this unauthorized access by testing and initiating several of the application's Facebook interactive features.

52.     Defendants' unauthorized activities were done at the direction and with the knowledge and consent of high-level managers of Orange, OSV, and Facebook, who knew and intended that Telesocial's confidential software code was being copied, downloaded, distributed, and reverse engineered by Defendants.

53.     Defendants and any other engineers that participated in the activity and events recited herein, including any Facebook engineers who received the fruits of Defendants' looting, were actively involved in the copying and/or reverse engineering of Telesocial's application and related technologies, and/or agreed and intended that such copying and reverse engineering should occur to enable Defendants to copy Telesocial's social calling technology without Telesocial's knowledge, consent, or participation.

## IV. ORANGE AND FACEBOOK PUBLICLY ANNOUNCE A COPY OF TELESOCIAL'S SOCIAL CALLING APPLICATION

54.     On November 21, 2012, at Orange's Hello! conference for its shareholders and customers, Orange's CEO, Stéphane Richard, announced that Orange had been working with Facebook on a social calling initiative. Mr. Richard introduced Sheryl Sandberg, who offered remarks through a video conference screen expressing Facebook's excitement at partnering with Orange in the social calling space and announcing "a new set of features launching as the result of our collaboration between Facebook and Orange." During this same press event, following Sheryl Sandberg's appearance, Orange announced it would be launching a new social calling technology with Facebook that they had remarkably dubbed, of all things, "Party Call"—the same name that Telesocial had specifically disclosed to Orange.

55.     According to Mr. Richard, Party Call was to have the same features as Telesocial's Call Friends application—including features that Orange personnel stated Orange engineers had not even conceived of prior to their talks with Telesocial—the same features that Defendants had copied

and/or illegally reverse engineered through their unlawful access of Telesocial's servers and proprietary information. For example, Mr. Richard described the Party Call application as being capable of both posting on a Facebook user's timeline an invitation to join a call that their friends were participating in and integrating users' contact information from their mobile devices with the Party Call application.

56. Although Orange knew and Facebook knew or should have known that these and other features of the Party Call application were carbon copies of Telesocial's technology, and that Orange was unable to even replicate them before robbing Telesocial's intellectual property, Orange and Facebook brazenly and publicly claimed all the credit for the Party Call application.

57. Orange's Xavier Perret was quoted in a November 21, 2012 article written by Ingrid Lunden for TechCrunch as saying: "When we approached Facebook with this idea they were pretty excited," and "[i]t's different for them than just an application." Perret claimed that "key developers both at Orange and Facebook" were solely responsible for developing Party Call, without ascribing any credit to Telesocial. Citing Perret as the source, the article went on to cite features of Party Call that are central to Telesocial's innovation, including that:

> Party Call is not an IP calling service similar to what Orange's new VoIP service Libon, or Skype, offer. Instead, it routes calls directly to Orange's voice network. As such, it becomes a bridge between the social network and legacy voice services to offer "group calling within the Facebook environment.

58. Since the initial announcement of Party Call, Orange has introduced to market a service called "Evercall," which incorporates some of the features of the pilfered Party Call product presented on November 21, 2012. Orange has also launched what it calls "Party Call Lite," which incorporates a subset of the features disclosed by Telesocial during the course of the negotiation period including: (i) the ability to make social calls that are either private or publicly announced; (ii) the ability for users to see in real time who is participating in a conference call; and (iii) the ability to identify and join an ongoing conversation through a notification that appears on a user's Facebook news feed.

59. Telesocial did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants had engaged in the wrongful copying,

misappropriation, and/or reverse engineering of Telesocial's confidential information until Orange's and Facebook's joint announcement of Party Call on November 21, 2012. Further, it was not until nearly a year later that Telesocial began to suspect—and an investigation confirmed—that Defendants had unlawfully accessed Telesocial's secure servers without authorization in order to copy, misappropriate, and/or illegally reverse engineer Telesocial's trade secrets and technology.

60. Defendants' actions have caused significant harm to Telesocial. By accessing Telesocial's computer servers without authorization, and thereafter using the information obtained through that access to copy and reverse engineer Telesocial's proprietary application and related technologies, Defendants were able to effectively commandeer Telesocial's technology and rebrand it with the Orange and Facebook brands. As a result, Orange and Facebook are perceived as the inventors and developers of social calling features that were actually invented and developed by Telesocial. Due to Defendants' actions described herein, Telesocial has been unable to license or otherwise commercialize its application, causing it to lose substantial revenue and business opportunities.

## COUNT ONE: VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT

### 18 U.S.C. §1030

### (Against All Defendants)

61. Telesocial realleges and incorporates by reference the above paragraphs of this Amended Complaint as though fully set forth herein.

62. At all relevant times, the software code responsible for the operation of the Telesocial Call Friends application, the Telesocial API, and the softswitch were stored on and executed by secure computer servers located in Emeryville, California.

63. The Telesocial computers that Defendants accessed without authorization are protected computers because they are used in and affect interstate and foreign commerce and/or communication. In particular, the Telesocial computers are designed to be accessed, and were accessed by Defendants, globally, including from locations in France and England. In addition, the Telesocial computers are designed to be used, and were used by Defendants, to place and route telephone calls throughout the United States and the world.

64.     Telesocial restricted access to its social calling application, which resides on its computer servers.  This application was only available to users that had a valid Facebook account associated with authentic user identification information.  Telesocial also required users to accept its Terms of Use, including the restrictions on access contained therein, prior to, and as a condition of, being permitted to access their application.  Telesocial also reserved the explicit right to terminate user access for violations of its restrictions on access.

65.     The Telesocial application was restricted by and subject to Telesocial's Terms of Use.  As such, even legitimate users were only permitted to access the information that the application presented on the user interfaces.  This does not include any information about the Telesocial API, the softswitch, or how they communicate with each other or Facebook over a network.  At no point did Telesocial grant access to any of this information, which was only available through hacking tools or direct access to Telesocial's servers, which required credentials, i.e. a login and password, known only to Telesocial's internal engineers like Stone.  Telesocial's servers were also protected by technological barriers, including firewalls, to prevent unauthorized access through the internet.

66.     At the time they accessed Telesocial's computer servers, Defendants, all sophisticated and experienced in matters of technology, knew access to Telesocial's computer servers was not authorized and employed measures both to circumvent access barriers and to evade detection for doing so.  Defendants access was without authorization and/or in excess of authorization for, at least, the reasons that: (i) Defendants created fictitious Facebook accounts and provided fake user information (*see, e.g.,* "Thomas Orange") to avoid detection and circumvent Telesocial's access requirements; and/or (ii) Defendants fraudulently, and with no intent of complying, circumvented Telesocial's contractual barrier to unauthorized access by assenting to Telesocial's access conditions and restrictions even though, at the time of assent, they were not in compliance with the same; and/or (iii) Defendants employed hacking tools to circumvent technological barriers and gain access to code and other information on Telesocial's servers that could not be accessed without the use of such tools.

colt/singer/bea LLP

67.    Through its investigation, Telesocial has identified the following incidents:

    i.   Ms. Benrikhi, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about October 4, 13, and 25, 2012; and November 20, 23 and 30, 2012. In addition, Ms. Benrikhi, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about September 10, 19, and 20, 2012; October 29, 2012; and November 20, 23 and 30, 2012.

    ii.   Mr. Delmas, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 19, 2012.

    iii.   Mr. Godiniaux, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about August 31; September 10, 11, 12, 13, 19, 20, and 25, 2012; October 16, 25, and 29, 2012; and November 16 and 23, 2012. In addition, Mr. Godiniaux, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about August 31, 2012; September 5, 6, 11, 12, and 13, 2012; and November 24, 2012.

    iv.   Mr. Guimond, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 10 and 12, 2012. In addition, Mr. Guimond, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about September 12 and 13, 2012.

    v.   Mr. Petesch without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 6, 2012.

colt/singer/bea LLP

vi. Mr. Viel, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 6, 13, 19, and 20, 2012; October 25, 2012, and November 20, 23, and 30, 2012. In addition, Mr. Viel, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about September 6 and 13, 2012, and November 20, 2012.

vii. Ms. Bobillier, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about August 31, 2012; September 5, 6, 10, 11, 12, 13, 19, 20, and 24, 2012; October 16 and 25, 2012, and November 30, 2012. In addition, Ms. Bobillier, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about September 10, 2012, and October 29, 2012.

viii. Mr. Lesenechal, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 6, 7, 10, 12, 13, 19, 20, and 24, 2012; October 25 and 29, 2012; November 16, 24, 25, 26, 28, and 30, 2012; and, December 4 and 19, 2012. In addition, Mr. Lesenechal, without Telesocial's authorization and/or in excess of authorized access, placed and/or joined telephone calls using Telesocial's computer servers on or about September 6 and 13, 2012, and November 20, 2012.

ix. Mr. Amet, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 10 and 13, 2012.

x. Mr. De Sa, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 7 and 12, 2012; October 12, 2012; and, November 23, 2012.

xi. Mr. Lecoutteux, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about September 17 and 24, 2012; and October 18, 2012.

xii. Mr. Jaudry, without Telesocial's authorization and/or in excess of authorized access, accessed the Telesocial application and computer servers on or about December 4, 2012.

68. Although Telesocial's investigation is ongoing, Telesocial is not aware of the true identity of all of the individuals who gained unauthorized access to Telesocial's server. In particular, at precisely the same time as Defendants' looting, Telesocial's was somehow accessed by users that had "ghost" Facebook accounts for which no underlying user can be identified.

69. Defendants intentionally accessed Telesocial's protected computers without authorization and/or in excess of authorized access, and: (i) thereby obtained information from those protected computers including, without limitation, information regarding how Telesocial's application, API, and softswitch work, and how those components communicate with each other and Facebook; and/or (ii) as a result of such conduct, caused damage and loss to Telesocial as described further below.

70. Defendants knowingly and with intent to defraud accessed Telesocial's protected computers without authorization and/or in excess of authorized access and by means of such conduct furthered the intended fraud and obtained from Telesocial its proprietary software code and other confidential information, such code and information being worth more than $5,000 in one or more 1-year periods between August 31, 2012 and the present, including without limitation the 1-year period from August 31, 2012 to August 31, 2013. Defendants used deceit and trickery to circumvent Telesocial's access barriers and restrictions to obtain unauthorized copies of Telesocial's code and to execute various programs, routines, and functions on Telesocial's computer servers so that they could steal the information necessary to create a social calling application embodying Telesocial's innovations that they would later falsely claim they developed independently.

71. Defendants knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage, without authorization, to a

protected computer. Defendants intentionally executed commands, including placing numerous phone calls, joining calls, and colliding calls designed to cause errors and failures on Telesocial's computer servers. Defendants also uploaded data and employed hacking tools, thereby transmitting programs, information, code, and/or commands intended to dissect Telesocial's code and cause failures in Telesocial's Call Friends application and softswitch. The full extent of the damage caused by Defendants activities remains unknown, but at a minimum caused network congestion, degraded performance, and forced repeated in person visits by Telesocial's engineers to the Emeryville, California server location to assess security breaches, diagnose and repair the system, and/or restore service to Telesocial's authorized users.

72.    At all relevant times, the Individual Defendants acted with the knowledge and consent of Orange, and/or as agents of Orange.

73.    Each of the Defendants, between and among themselves: (i) conspired and agreed to participate in a scheme to access Telesocial's computer servers without authorization and/or in excess of authorization for the purpose of obtaining Telesocial's proprietary information and code; (ii) committed acts or engaged in wrongful conduct in furtherance of that scheme including by creating fictitious Facebook accounts and aliases to conceal their conduct, accessing Telesocial's computer servers and obtaining proprietary information and code from those servers, and using hacking tools to access proprietary information and code from Telesocial's servers; and, (iii) Telesocial was harmed and suffered damages as a result of Defendants' conduct.

74.    As a result of Defendants' actions, Telesocial has suffered economic damages and losses in an amount not yet ascertained, but aggregating at least $5,000 in value, over one or more 1-year periods between August 31, 2012 and the present, including without limitation the 1-year period from August 31, 2012 to August 31, 2013. The damage included, without limitation, the theft of Telesocial's proprietary trade secrets and technology, damage and service interruptions to Telesocial's products and computer servers requiring Telesocial to repair the same, the placement of international phone calls that were charged to Telesocial, and the costs associated with conducting an investigation into Defendants' unauthorized access and the resulting damages. Telesocial is

entitled to recover damages adequate to compensate it for Defendants' illicit activities in an amount to be determined at trial.

## COUNT TWO: VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT

Cal. Pen. Code § 502

(Against All Defendants)

75.     Telesocial realleges and incorporates by reference the above paragraphs of this Amended Complaint as though fully set forth herein.

76.     As described throughout this Amended Complaint, Defendants violated the California Comprehensive Computer Data Access and Fraud Act because:

      i.   Defendants knowingly accessed and without permission altered, damaged, and used the data, computer(s), computer system(s), and computer network(s) of Telesocial to either wrongfully control and/or obtain Telesocial's property and/or data.

      ii.   Defendants knowingly accessed and without permission took, copied, and/or made use of data from Telesocial's computer(s), computer system(s), and/or computer network(s), and/or took or copied supporting documentation residing on such computer(s), computer system(s), and/or computer network(s).

      iii.   Defendants knowingly and without permission used Telesocial's computer services, and/or caused them to be used.

      iv.   Defendants knowingly accessed and without permission added, altered, and/or damaged the data, computer(s), software, and/or computer programs that resided on Telesocial's computer(s), computer system(s), and/or computer network(s).

      v.   Defendants knowingly and without permission provided and/or assisted in providing a means of accessing Telesocial's computer(s), computer system(s), and/or computer network(s).

vi.  Defendants knowingly and without permission accessed or caused to be accessed Telesocial's computer(s), computer system(s), and/or computer network(s).

77.  Each of the Defendants, between and among themselves: (i) conspired and agreed to participate in a scheme to knowingly access Telesocial's computer servers without permission for the purpose of altering, damaging, taking, copying, using Telsocial's data or computers to obtain Telesocial's proprietary information and code; (ii) committed acts or engaged in wrongful conduct in furtherance of that scheme including by creating fictitious Facebook accounts and aliases to conceal their conduct, accessing Telesocial's computer servers and obtaining proprietary information and code from those servers, using hacking tools to access proprietary information and code from Telesocial's servers, and using Telesocial's application and computer servers in violation of the Terms of Use and/or in a manner intended to harm Telesocial; and, (iii) Telesocial was harmed and suffered damages as a result of Defendants' conduct.

78.  At all relevant times, the Individual Defendants acted with the knowledge and consent of Orange, and/or as agents of Orange.

79.  As a result of Defendants' actions, Telesocial has suffered damages as described above in an amount not yet ascertained. Telesocial is entitled to recover damages adequate to compensate it for Defendants' illicit activities in an amount to be determined at trial.

80.  Telesocial is further entitled to recover attorney fees pursuant to California Penal Code Section 502(e)(2).

81.  Telesocial is also entitled to recover punitive or exemplary damages pursuant to California Penal Code § 502(e)(4) because Defendants' violations, as more fully set forth above, were willful, and were committed with oppression, fraud, and/or malice.

## COUNT THREE: BREACH OF CONTRACT

### (Against All Defendants)

82.  Telesocial realleges and incorporates by reference the above paragraphs of this Amended Complaint as though fully set forth herein.

83. In registering to obtain access to Telesocial's application, Defendants agreed to the Telesocial Terms of Use. Prior to gaining access to the application, users were directed to a pop up screen that provides a blue "Go to App" or gray "Cancel" button at the top right, and just below those buttons a line of grey text informs the user that, "[b]y proceeding you agree to Call Friend's Terms of Use and Privacy Policy." The phrases "Terms of Use" and "Privacy Policy" provided prospective users with active links to Telesocial's Terms of Use and Privacy Policies, and identified themselves as hyperlinks through their distinguishing blue font.

84. Telesocial abided by the Terms of Use.

85. The Terms of Use state: "All use of the Telesocial API, its code, any docs, SDK™, content, and related materials made available to you is subject to and must comply with these Terms of Use."

86. The Terms of Use require, in Section 1, that registered users agree "not [to] enable the following":

> "[s]elling, renting, leasing, subleasing, sub licensing, distributing, reselling or in any other way publishing the Telesocial API or service to any third parties which may develop derivative works without our approval";

> "use [of] the service in any competitive purpose"; and

> "use of the service in any way that is unlawful."

87. The Terms of Use further provide, in Section 2, restrictions on "Use of the Telesocial Network" as follows:

> "Use of the Telesocial service should not include reverse engineering the system or service or doing malicious things to our features, functionality and service via our API and SDK. You will not attempt to sabotage the Telesocial service, interfere with it, attempt to disrupt or disable any of our API servers or conduct any attacks. Your use of the Service may be terminated at any time for any reason whatsoever, and you must respect the Intellectual Property contained within our site and Service."

88. The Terms of Use is a fully integrated agreement, and provides that "[b]y using the Services, You agree that the laws of the State of California will govern this Agreement and any dispute of any sort that might arise between You and Telesocial."

89.     Defendants breached the Terms of Use by failing to abide by the provision that prohibits "[s]elling, renting, leasing, subleasing, sub licensing, distributing, reselling or in any other way publishing the Telesocial API or service to any third parties which may develop derivative works without our approval."  In particular, the Defendants sold, leased, subleased, sublicensed, distributed, resolved, and/or otherwise published the Telesocial API and/or service to Facebook, as well as to Facebook users who are Orange customers.  In addition, the Individual Defendants sold, leased, subleased, sublicensed, distributed, resolved, and/or otherwise published the Telesocial API and/or service to Defendant Orange.

90.     Defendants also breached the Terms of Use by violating the provision prohibiting "use [of] the service in any competitive purpose."  Defendants used the service to make unauthorized copies of, and access confidential information regarding, Telesocial's products so that Orange, with Facebook's help, could use Telesocial's technology in competition with Telesocial and Telesocial's other prospective business partners.

91.     Defendants further breached the Terms of Use by violating the provision prohibiting "use of the service in any way that is unlawful."  In particular, Defendants used the service in violation of the Computer Fraud and Abuse Act, the California Comprehensive Computer Data Access and Fraud Act, and the California Uniform Trade Secrets Act, as more fully set forth herein.

92.     Defendants further breached the Terms of Use by: reverse engineering the system or service; doing malicious things to Telesocial's features, functionality and service, including tampering with Telesocial's computer servers through the use of hacking tools; attempting to disrupt or disable the computer servers by intentionally causing errors and failures; and failing to "respect the Intellectual Property contained within [Telesocial's] site and Service."

93.     As a result of Defendants' breach of the Terms of Use, Telesocial has suffered damages in an amount not yet ascertained. Telesocial is entitled to recover damages adequate to compensate it for Defendants' breach in an amount to be determined at trial.

94.     The Terms of Use further provide:

> You agree to … indemnify, defend and hold us … harmless from and
> against any and all … losses, damages, liabilities, …  costs and
> expenses (including reasonable attorneys' fees), arising out of or in

connection with any claim arising out of (i) Your use of the Services, Telesocial API and related material in a manner not authorized by this Agreement, and/or in violation of the applicable restrictions, any other active policies, and/or applicable law, … (iii) Your violation of any term or condition or any applicable additional policies, including without limitation, Your representations and warranties, or (iv) You or Your employees' or personnel's negligence or willful misconduct.

95.     Because Telesocial's claims set forth in this Amended Complaint arise out of (i) Defendants' unauthorized and illicit use of the Services, Telesocial API, and related material; (ii) Defendants' violation of their own representations and warranties regarding their intended use of the Telesocial application; and (iii) Defendants' negligence and/or willful misconduct (including the negligence and/or willful misconduct of Orange's employees and/or personnel), Telesocial is entitled to recover—and does seek to recover—its losses, damages, liabilities, costs and expenses, and reasonable attorneys' fees in pursuing this action.

## COUNT FOUR: BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

(Against All Defendants)

96.     Telesocial realleges and incorporates by reference the above paragraphs of this Amended Complaint as though fully set forth herein.

97.     Telesocial and Defendants were parties to the Terms of Use, and Defendants owed a duty of good faith and fair dealing to Telesocial arising therefrom.

98.     Telesocial abided by the Terms of Use.

99.     Defendants breached their duty of good faith and fair dealing by unfairly interfering with Telesocial's right to receive the benefits of the Terms of Use. In particular, Defendants unfairly interfered with Telesocial's right to restrict access to legitimate users and/or limit use of the Telesocial Application only for lawful and noncompetitive purposes, and in such a manner that the Telesocial API or service would not be distributed or any other way published to any third parties that may develop derivative works without Telesocial's approval.

100.    Telesocial's expectation that Defendants would abide by the Terms of Use and not assent to the terms and conditions set forth therein with a specific intent to disobey them was reasonable and justified.

101.    As a result of Defendants' conduct, Telesocial has suffered damages in an amount not yet ascertained. Telesocial is entitled to recover damages adequate to compensate it in an amount to be determined at trial.

**COUNT FIVE: VIOLATION OF THE CALIFORNIA UNIFORM TRADE SECRETS ACT**

Cal. Civ. Code § 3426, et seq.

(Against All Defendants)

102.    Telesocial realleges and incorporates by reference the above paragraphs of this Amended Complaint as though fully set forth herein.

103.    Telesocial maintained key aspects of its proprietary Call Friends application, API, softswitch, and associated billing solutions as proprietary trade secrets that were not generally known.  Specifically, Telesocial's trade secrets relevant to this dispute include:

      i.    the software code for the Call Friends application;

      ii.    the software code for the Telesocial API;

      iii.    call routing methods and technology, including the software code for the softswitch;

      iv.    the coding techniques, logic flow, modules, and routines designed by Telesocial;

      v.    the routines and calls executed by the Call Friends application, API interface, and/or the softswitch including, specifically, the routines and calls that allowed Telesocial's application to integrate with Facebook and route calls; and

      vi.    designs for the routing and grouping of calls to allow for scalability and flexible billing paradigms.

104.    Telesocial's trade secrets are not generally known to or readily ascertainable by the public.  Telesocial's trade secrets derived independent economic value from the fact that they were confidential including by, among other things, protecting the integrity of Telesocial's innovations, providing Telesocial with a competitive advantage over other social calling competitors, preserving

Telesocial's ability to offer valuable exclusivity to a business partner and/or providing Telesocial with the competitive first-mover advantage in launching its technology in the marketplace.

105. In conducting its business, and at all relevant times, Telesocial took steps reasonable under the circumstances to protect and maintain the confidentiality of all such information.

106. Telesocial required employees to maintain the confidentiality of Telesocial's trade secrets. Telesocial's employees knew that Telesocial's proprietary code and application were maintained on a secure server, and that only limited information should be shared with prospective business partners.

107. To further protect its trade secrets, Telesocial restricted the information it provided to prospective business and/or development partners and specifically refused to disclose certain critical information regarding the operation of its Call Friends application, API, and softswitch to prospective partners including, how the features of its social calling application are implemented.

108. All such information constitutes a "trade secret" in accordance with Cal. Civ. Code § 3426.1(d). Specifically, Telesocial's proprietary information comprises one or more formulae, patterns, compilations, programs, devices, methods, techniques, and/or processes, each and all of which derive independent economic value from not being generally known to the public or to other persons who could obtain economic value from its disclosure or use.

109. By and through their employees and/or agents, the Defendants misappropriated Telesocial's trade secrets within the meaning of Cal. Civ. Code § 3426.1(b).

110. By and through their employees and/or agents, Defendants acquired Telesocial's trade secrets by means that each knew or had reason to know to be improper, such as by misrepresentation, breach and/or inducement of a breach of restrictions on access, use, or disclosure of Telesocial's trade secrets, and/or espionage through electronic or other means including, but not limited to, the unauthorized access of Telesocial's computer servers, and the initiation of unauthorized telephone calls using Telesocial's application.

111. Each of the Defendants, between and among themselves: (i) conspired and agreed to participate in a scheme to unlawfully, and by improper means, obtain, use, and/or disclose Telesocial's proprietary information and code; (ii) committed acts or engaged in wrongful conduct in

furtherance of that scheme including by accessing and using Telesocial's computer servers to obtain proprietary information and code, initiate phone calls, and employing hacking tools to do the same, and then disclosed and/or used that improperly obtained information and code without Telesocial's permission; and, (iii) Telesocial was harmed and suffered damages as a result of Defendants' conduct.

112. By and through their employees and/or agents, Defendants further misappropriated Telesocial's trade secrets because each such Defendant disclosed and/or used Telesocial's trade secrets without Telesocial's express or implied consent at a time where Defendants knew or had reason to know that:

      i. such Defendant used improper means to acquire such trade secrets; and/or

      ii. such Defendant's knowledge of Telesocial's trade secrets was (A) derived from or through a person who acquired the same through improper means, (B) acquired under circumstances giving rise to a duty to maintain the secrecy or limit the use of Telesocial's trade secrets, and/or (C) derived from or through a person who owed a duty to Telesocial to maintain the secrecy or limit the use of Telesocial's trade secrets.

113. Orange disclosed and/or used Telesocial's trade secrets without Telesocial's permission when Orange filed an international patent application (No. WO/2014/080131) claiming a filing and priority date of November 21, 2012—the same day Party Call was announced on stage by Orange's CEO—titled "Voice Communication Service From A Social Network," falsely identifying Defendants Anne Benrikhi, Olivier Godiniaux, and Benoit Amet, the non-technical business person assigned to Telesocial during negotiations, as the purported inventors, and disclosing Telesocial's method for connecting voice calls through a social network.

114. Orange further disclosed Telesocial's trade secrets to Facebook without Telesocial's consent after having acquired such trade secrets by improper means including, but not limited to, unauthorized access of Telesocial's application and servers, and the initiation of unauthorized telephone calls using Telesocial's application.

115.     By and through their employees and/or agents, Defendants used Telesocial's trade secrets to develop a copy of Telesocial's social calling application and platform, to gain a competitive advantage allowing them to accelerate that development, to develop related business processes such as calling plans and billing processes, and to launch at least one social calling application offered to Orange and Facebook subscribers and users.

116.     By and through their employees and/or agents, Defendants made such use of Telesocial's trade secrets despite knowing or having reason to know that Defendants had obtained such information by improper means including, but not limited to, unauthorized access of Telesocial's computer servers; and the initiation of unauthorized telephone calls using Telesocial's application.  Defendants further made such use of Telesocial's trade secrets despite knowing that each had an obligation to maintain the secrecy or limit the use of Telesocial's trade secrets including, without limitation, obligations arising from the Terms of Use and at common law.

117.     The acts complained of herein occurred, at least in part, within three years preceding the filing of this Amended Complaint and/or relate back to the date of filing of Telesocial's original Complaint.

118.     Telesocial was harmed, and Defendants unjustly enriched, as a direct and proximate result of Defendants' misappropriation of Telesocial's trade secrets.

119.     Defendants' misappropriation of Telesocial's trade secrets was a substantial factor in causing Telesocial to be harmed and Defendants to be unjustly enriched.

120.     As a result of Defendants' conduct, Telesocial has suffered damages, and Defendants were unjustly enriched, in an amount not yet ascertained.  Telesocial is entitled to recover damages adequate to compensate it in an amount to be determined at trial.

121.     Because Defendants' misappropriation was willful and malicious, Telesocial is also entitled to recover exemplary damages pursuant to Cal. Civ. Code § 3426.3 and attorney fees pursuant to Section 3426.4.

## COUNT SIX: VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (FOR UNFAIR AND UNLAWFUL TRADE PRACTICES)

Cal Bus. & Prof. Code §17200, et seq.

(Against Orange)

122.     Telesocial realleges and incorporates by reference the above paragraphs of this Complaint as though fully set forth herein.

123.     Within four years preceding the filing of this Amended Complaint, and at all times mentioned herein, Orange has engaged, and continues to engage, in unfair and unlawful trade practices in California by engaging in the unfair and unlawful business practices described in this Amended Complaint, including the following:

   i.   violating and/or causing their agents and employees to violate the Computer Fraud and Abuse Act, as described herein;

   ii.  violating and/or causing their agents and employees to violate the California Comprehensive Computer Data Access and Fraud Act;

   iii. violating and/or causing their agents and employees to violate California Penal Code § 502.7 by obtaining telephone services by fraud; and,

   iv.  using and/or causing their agents and employees to use fictitious names and identities to conceal the aforementioned violations.

124.     In particular, Orange knowingly, willfully, and with intent to defraud a person providing telephone service (i.e., Telesocial), avoided, attempted to avoid, and aided, abetted, and caused others to avoid the lawful charge for telephone service (i) by use of a code, prearranged scheme, and/or other similar stratagem or device whereby the Defendants, in effect, sent and/or received information; (ii) by rearranging, tampering with, or making connection with telephone Telesocial's equipment, and/or by using Telesocial's telephone service with knowledge and/or reason to believe that the rearrangement, tampering, or connection existed at the time of the use; and (iii) by using deception, false pretense, trick, scheme, device, conspiracy, and/or means including using false identification, fictitious Facebook accounts, and aliases to evade detection.

125. Orange engaged in these unfair practices to increase their profits and gain. Accordingly, Orange has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

126. The aforementioned practices, which Orange used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Orange's competitors as well as injury to the general public.

127. The acts complained of herein occurred, at least in part, within four years preceding the filing of this Amended Complaint and/or relate back to the Complaint.

128. As a direct and proximate result of such actions, Telesocial has suffered and continues to suffer injury in fact and has lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

129. As a direct and proximate result of such actions, Orange has enjoyed, and, unless judgment is entered in Telesocial's favor, will continue to enjoy significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

130. Telesocial is entitled to and does seek a declaration that the above-described trade practices are unlawful and/or fraudulent.

131. Telesocial is further entitled to and does seek an injunction to prohibit Orange from continuing to engage in the unfair trade practices complained of herein, including an injunction prohibiting Orange from developing, testing, maintaining, releasing, copying, or distributing any software application containing or derived from Telesocial technology, including without limitation the Party Call software application.

colt/singer/bea LLP

## **PRAYER FOR RELIEF**

Telesocial requests entry of judgment in its favor against each Defendant for the following:

    a)  A Declaration that each Defendant has committed the violations complained of herein;

    b)  An injunction prohibiting each Defendant from developing, testing, maintaining, releasing, copying, or distributing any software application or platform containing or derived from Telesocial technology including, without limitation, the Party Call software application;

    c)  An award of damages adequate to compensate Telesocial for its losses, together with pre- and post-judgment interest and costs, in an amount according to proof;

    d)  An award of punitive and/or exemplary damages; and

    e)  An award of attorneys' fees and costs;

    f)  Such other costs and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Telesocial, Inc. requests a trial by jury.


Date: 12/15/2014

Submitted By,

COLT / SINGER / BEA LLP

By: _____

Benjamin L. Singer
Renee B. Bea
Douglas S. Tilley
*Attorneys for Telesocial Inc.*