QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kevin P.B. Johnson (Bar No. 177129)
  kevinjohnson@quinnemanuel.com
  Todd M. Briggs (Bar No. 209282)
  toddbriggs@quinnemanuel.com
  David E. Myre (Bar No. 304600)
  davidmyre@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:    (650) 801-5000
Facsimile:    (650) 801-5100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Edward J. DeFranco (Bar No. 165596)
  eddefranco@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100

SINGER / BEA LLP
  Benjamin L. Singer (Bar No. 264295)
  bsinger@singerbea.com
  Renee Bea (Bar No. 268807)
  rbea@singerbea.com
601 Montgomery Street, Suite 1950
San Francisco, California 94111
Telephone:    (415) 500-6080
Facsimile:    (415) 500-6080

Attorneys for Plaintiff
TELESOCIAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TELESOCIAL, INC.,<br><br>          Plaintiff,<br><br>     vs.<br><br>ORANGE S.A., et al.,<br><br>          Defendants. | CASE NO. 3:14-CV-03985-JD<br><br>**TELESOCIAL, INC.'S OPPOSITION TO ORANGE'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY FROM GEORGE FOSTER**<br><br>Date:   February 16, 2017<br>Time:   10:00 am<br>Ctrm:   11, 19th Floor<br>Judge:  Hon. James Donato<br>Trial:  April 10, 2017 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................................1

II. LEGAL STANDARD .........................................................................................................1

III. FOSTER'S OPINION SHOULD BE ADMITTED BECAUSE IT WILL INFORM THE JURY'S DAMAGES CALCULATION. ....................................................................2

IV. FOSTER'S OPINIONS SHOULD BE ADMITTED BECAUSE HIS VALUATION OF TELESOCIAL IN THE ABSENCE OF ORANGE'S MISCONDUCT IS BASED ON VALID AND RELIABLE METHODS. .........................6

    A. Foster's Comparable Company Analysis is Appropriate for Valuing an Early Stage Company Like Telesocial And Should Be Admitted. ...........................7

    B. Foster's Method Is Valid Because It Is Replicable and Testable. ..............................9

    C. Foster's Comparable Company Analysis Is Reliable And Should Be Admitted. ....................................................................................................................10

    D. Foster's Opinions Are Admissible Because PitchBook Is an Industry Approved, Reliable Analytical Tool. ........................................................................12

V. FOSTER'S OPINIONS SHOULD BE ADMITTED BECAUSE HIS "BUT-FOR" ASSUMPTIONS ARE REASONABLE AND SUPPORTED BY THE RECORD............14

VI. CONCLUSION ..................................................................................................................15

# TABLE OF AUTHORITIES

**Page**

### Cases

*Abarca v. Franklin County Water Dist.*,
    761 F. Supp. 2d 1007 (E.D. Cal. 2011) ................................................................................2

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*,
    738 F.3d 960 (9th Cir. 2013) ............................................................................................1, 12

*Brown v. Brewer, No. CV 06-3731-GHK (SHx)*,
    2010 U.S. Dist. LEXIS 60863 (C.D. Cal. June 17, 2010) ......................................................4

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) .............................................................................................6, 7

*Daubert v. Merrell Dow Pharm.*,
    43 F.3d 1311 (9th Cir. 1995) ......................................................................................... *passim*

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) .....................................................................................................1, 10, 12

*California v. Kinder Morgan Energy Partners, L.P.*,
    159 F. Supp. 3d 1182 (S.D. Cal. 2016) ..................................................................................2

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*,
    No. C-03-02013 RMW, 2005 U.S. Dist. LEXIS 34285 (N.D. Cal. Sep. 12, 2005) ..............4

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*,
    No. C 03-1431 SBA, 2006 U.S. Dist. LEXIS 101952 (N.D. Cal. May 18, 2006) ................3

*Gray v. Cytokine Pharmasciences, Inc.*,
    2002 Del. Ch. LEXIS 48 (Del. Ch. April 25, 2002) ..............................................................8

*Hyatt v. Sierra Boat Co.*,
    79 Cal. App. 3d 325 (1978) ...................................................................................................4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .....................................................................................................1, 3, 12

*Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*,
    34 Cal. 4th 960 (Cal. 2004) .............................................................................................13, 14

*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*,
    191 Cal. App. 4th 435 (2010) ...............................................................................................14

*Metabyte, Inc. v. Canal + Techs, S.A.*,
    2005 U.S. Dist. LEXIS 46163 (N.D. Cal., June 17, 2005) .................................................5, 8

*In re Nellson Nutraceuticals, Inc.*,
    356 B.R. 364 (Bankr. D. Del. 2006) ..................................................................................2, 5

*Open Text S.A. v. Box, Inc.*,
  No. 13-cv-04910-JD, 2015 U.S. Dist. LEXIS 8783 (N.D. Cal. Jan. 23, 2015) ..........................7

*GE v. Joiner*,
  522 U.S. 136 (1997) ..............................................................................................................7

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ........................................................................................ *passim*

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
  752 F.3d 807 (9th Cir. 2014) ..............................................................................................2, 9

*United States v. Simmons*,
  470 F.3d 1115 (5th Cir. 2006) ...............................................................................................3

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
  395 F.3d 416 (7th Cir. 2005) .................................................................................................6

### **Statutes**

Cal. Civ. Code § 3300 ...............................................................................................................13

Fed. R. Evid. 702 .......................................................................................................... *passim*

### **Other Authorities**

1 Witkin Sum. Cal. Law Contracts § 871 (10th 2010) .................................................................3, 4

## I. INTRODUCTION

Orange improperly invokes *Daubert* to attempt to remove from the jury's consideration expert testimony concerning the potential value of Telesocial in a but-for world where it had not suffered through Orange's numerous transgressions, but instead had continued on its trajectory in 2012. Professor George Foster ("Foster"), a Stanford Business School Professor and expert in valuation of early-stage companies, followed established and accepted economic principles to estimate the value of Telesocial in this but-for world. Each of Orange's challenges to Foster's testimony—its criticisms of Foster's methods, its attack on Foster's assumptions, and its argument that the jury should not credit Foster's valuation of Telesocial in a but-for world in awarding damages—all go to weight, not admissibility, and are more appropriately the subject of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("*Daubert*"). There is nothing so inherently unreliable in Foster's methodology that supports preclusion of his opinion from trial, and his opinion will assist the fact finder in calculating damages. Each of Orange's criticisms can be remedied through cross-examination of Foster at trial, by presenting its own contrary evidence, and by calling its own witnesses at trial, and do not require exclusion of Foster's testimony. *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010); *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969-970 (9th Cir. 2013).

## II. LEGAL STANDARD

Expert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable. *Daubert*, 509 U.S. at 589; Fed. R. Evid. 702 ("Rule 702"). According to the Ninth Circuit, in assessing admissibility, "the district judge is 'a gatekeeper, not a fact finder.'" *Primiano*, 598 F.3d at 565. "The inquiry envisioned by Rule 702 is…a flexible one," *Daubert*, 509 U.S. at 594, and must be "tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). "Under Rule 702 and *Daubert*, the proper analysis is not whether some of the inputs can be questioned, but whether [the expert's] testimony is relevant and reliable, and whether the methods and principles upon which [he] has relied in

forming [his] opinion have a sound basis in science." *California v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1190 (S.D. Cal. 2016); *see also In re Nellson Nutraceuticals, Inc.,* 356 B.R. 364, 367 (Bankr. D. Del. 2006) ("The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research…[it is] whether the particular opinion is based on valid reasoning and reliable methodology.")).

Once an expert "establishes admissibility to the judge's satisfaction, challenges that go to the weight of the evidence are within the province of a fact finder…" *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014); *Primiano*, 598 F.3d at 564. "[A]dmissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

### III.     FOSTER'S OPINION SHOULD BE ADMITTED BECAUSE IT WILL INFORM THE JURY'S DAMAGES CALCULATION.

Orange seeks to exclude Foster's opinions on the basis that they are not a proper "fit" to the claims of this case. (Mot. at 2). As a threshold matter, however, Orange mischaracterizes Foster's opinions. Foster does not offer an opinion regarding losses to Telesocial or its investors. (*See id*. at 2). Rather, Foster opines "that ███████████████████████████████████ ███████████████████████████████████" if, instead of stealing Telesocial's innovation, Orange had acted in good faith and partnered with Telesocial to launch products based its technology, or simply not stolen Telesocial's inventions in the first place. (Foster Decl. Ex. 1 (Expert Report of George Foster, Ph.D. ("Report") ¶¶[13, 19) (emphasis added)).

Foster's opinion regarding the value of Telesocial in the "but-for" world—the world where Orange did not breach the Terms of Use or misappropriate Telesocial's trade secrets—is highly relevant to the jury and should be admitted. An opinion is relevant if the evidence "logically advance[s] a material aspect of the party's case," or will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Kumho Tire*, 526 U.S. at 149; *Daubert,* 509 U.S. at 591; *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*"). Here, Foster's opinion regarding the value of Telesocial in the "but-for" world may assist the jury to

*TELESOCIAL'S OPPOSITION TO ORANGE'S MOTION TO EXCLUDE TESTIMONY OF GEORGE FOSTER*

determine the losses sustained by Telesocial as a result of Orange's misconduct.[1] *See Kinder Morgan Energy Partners*, 159 F. Supp. at 1190 (motion to exclude expert denied where valuation opinion would assist jury with its ultimate damages calculation). For example, Foster's estimate of Telesocial's value as a company, in the absence of Orange's misconduct, may be a relevant input that the jury considers to calculate damages proximately caused by Defendants' pervasive breaches of the Terms of Use ("TOU") and theft of Telesocial's trade secrets. *See Lewis Jorge Constr. Mgmt., Inc.,* 34 Cal. 4th at 969 (the scope of damages under Section 3300 includes those damages foreseeable under the circumstances); 1 Witkin Sum. Cal. Law Contracts § 871 (10th 2010) (damages may be awarded for harm reasonably contemplated by the parties, or harm a party knew or should have known might result, at the time of contracting); *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.,* 148 F.3d 649, 658 (7th Cir. 1998) (finding defendant entitled to seek damages for loss of future business because it was "a foreseeable consequence" of the trade secret misappropriation); *see also Litton Sys., Inc. v. Ssangyong Cement Indus. Co.*, No. C-89-3832, 1993 WL 317266, at *2 (N.D. Cal. Aug. 19, 1993) (finding "considerable leeway in calculating a damage award for trade secrets theft," and noting relevance of "such factors as the resulting and foreseeable changes in the parties' competitive posture"); *Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes*, 191 Cal. App. 4th 435, 474 (2010) (upholding an award of lost profits on real estate development deal where benefits would have been achieved but-for anticipatory breach). Thus, the jury can consider Foster's testimony to calculate the damages based on the difference between the value of Telesocial but-for the alleged misconduct and its value as a result of that misconduct. *See id.*[2]

---

[1] Orange's citation to Foster's deposition testimony that he is not offering an opinion with respect to "any losses that were sustained by Telesocial itself as a result of any conduct – conduct by Orange,"(Mot. at 2), simply reflects the fact that Foster is only offering an opinion regarding the valuation of Telesocial in the "but-for" world, not a damages opinion regarding "losses" sustained by Telesocial.

[2] Orange's various criticisms of Foster regarding the probability of various "future expectanc[ies]" fails to understand that Foster is offering a valuation of Telesocial "but-for" Orange's breach of the TOU and misappropriation of Telesocial's trade secrets. (Mot. at 3-4).

Orange argues Foster's opinions should nevertheless be excluded because he makes "forward-looking assumptions," and Telesocial's damages are limited to those incurred at the time of Orange's misconduct.  (Mot. at 2-3).  This is not the law.  "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."  Cal. Civ. Code § 3300.  Such damages are not fixed in time, and include losses that were foreseeable under the circumstances or occurred by reason of injuries flowing from the breach.  *E.g. Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 969 (Cal. 2004); *Micro Data Base*, 148 F.3d at 658 ("Consequential damages, as long as they are reasonably foreseeable, are the norm in tort cases . . . and the misappropriation of a trade secret is a tort.").  The cases cited by Orange are not to the contrary.[3] The discussion in *First Nat'l Mortgage* is specific to option contracts, for which damages are calculated by measuring the difference between the strike price of an option and the fair market value of the stock on a particular date.  *First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, No. C-03-02013 RMW, 2005 U.S. Dist. LEXIS 34285, at *19 (N.D. Cal. Sep. 12, 2005).  But there, the court still confirmed that, typically, "contract damages must restore the non-breaching party to the position he would have occupied without the breach," *id.* at *17, which is not arbitrarily bound by temporal limitations under California law, but by questions of causation and foreseeability based on the circumstances of each case.  *See* 1 Witkin Sum. Cal. Law Contracts § 871 (10th 2010).

Here, the damage to Telesocial was foreseeable.  Among the most important reasons software providers employ terms of service agreements is to prevent abuse and to protect proprietary content.  Telesocial's TOU expressly prohibits enabling the publication of the Call Friends service to others who might "develop derivative works without our permission," "use of the service in any competitive purpose," or "use of the service in any way that is unlawful."  (Bea Decl. ¶3, Ex. 2 at 2).  The agreement also requires that users "[b]e a good partner to Telesocial,"

---

[3] The *Hyatt* decision is inapposite because damages were limited based on the "unique" fact that there was no causative nexus between the trauma caused by the tort and a later, unrelated diagnosis of multiple sclerosis.  *Hyatt v. Sierra Boat Co.*, 79 Cal. App. 3d 325, 341 (1978).

and prohibits, "reverse engineering the system or service or doing malicious things to our features, functionality and service." (*Id.* at 3).  The TOU also explicitly reserves Telesocial's right to its intellectual property and confidential information, and requires users to represent and warrant that any applications they might develop for use on Telesocial's API platform does not "violate[], misappropriate[] or infringe[] any rights of [Telesocial]." (*Id.* at 4).  A user in Orange's position would understand that the protective provisions in a terms of service agreement, like those set forth in the TOU, exist to safeguard the software application against competition, misuse, or theft.  In this case, Orange's employees not only knew at the time they assented to the TOU that breach of the protective provisions would cause competitive harm to Telesocial, but they specifically intended that harm. (*See* D.E. 37 ¶¶21-23; MSJ Oppn.[4] at 3).

Orange's mobile executives ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*See* Report ¶¶55-68; D.E. 37 ¶¶21-23; MSJ Oppn. at 1).  Orange's employees in charge of building the competing application knew, when they assented to the TOU by registering as users, that they intended to use the Call Friends application for competitive purposes and that doing so would have a devastating impact on Telesocial's opportunity to commercialize its own core technology. (D.E. ¶¶29-39, 40-53, 60, 64-65, 83; MSJ Oppn. at 4).  In a coordinated campaign, Orange's engineers accessed Call Friends repeatedly, using it for months to reverse engineer the application, and to access and misappropriate Telesocial's trade secrets without authorization—all in violation of the TOU. (D.E. ¶¶40-53, 77, 86-92; MSJ Oppn. at 3).  Orange's violations were continuous throughout the last four months of 2012 (D.E. ¶42), and included using the Call Friends application to compete with Telesocial, republishing Telesocial's service to partners and its own internal development team to develop a competing product, and using the application to commit unlawful acts, including to hack Telesocial's servers and misappropriate Telesocial's trade secrets. (*Id* .at ¶90-92; *see also* MSJ Oppn. at 3).  Therefore, because the damage to Telesocial caused by Orange usurping the

---

[4] Citations to "MSJ Oppn." refer to Telesocial's Memorandum of Points and Authorities in Opposition to Orange's Motion for Summary Judgment, filed concurrently herewith.

opportunity to commercialize its innovation was foreseeable, Telesocial is entitled to be compensated for the resulting harm.  *See* Cal. Civ. Code § 3300.

### IV. FOSTER'S OPINIONS SHOULD BE ADMITTED BECAUSE HIS VALUATION OF TELESOCIAL IN THE ABSENCE OF ORANGE'S MISCONDUCT IS BASED ON VALID AND RELIABLE METHODS.

In its sweeping motion to exclude all of Professor Foster's testimony, Orange advances four bases for its argument—none of which establish that Foster's valuation is invalid and unreliable.  First, Orange takes issue with the valuation method chosen by Foster, arguing that he should have used a different method to value the company. (Mot. at 10).  Second, Orange asserts that Foster's sampling method lacks validity. (*Id.* at 6).  Third, Orange objects that the companies in Foster's sample set are not sufficiently comparable to Telesocial.  (*Id.* at 8).  Fourth, Orange attacks Foster's use of PitchBook.  (*Id.* at 4).  Each argument is more appropriately addressed via cross examination of Professor Foster, not exclusion of his testimony.

The "test of reliability" for a testifying expert "is 'flexible.'"  *Primiano*, 598 F.3d at 564.  In *Daubert*, the Supreme Court set forth a non-exhaustive list of "illustrative" factors to be considered in assessing reliability: "(1) whether the theory or technique employed by the expert is generally accepted in the scientific community; (2) whether it's been subjected to peer review and publication; (3) whether it can be and has been tested; and (4) whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17.  In assessing reliability of testimony offered based on "technical, or other specialized knowledge," such as Foster's opinion of Telesocial's value, "trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case." *United States v. Simmons,* 470 F.3d 1115, 1123 (5th Cir. 2006) (citing *Kumho Tire*, 526 U.S. at 153).  "In such instances, other indicia of reliability are considered under *Daubert,* including professional experience, education, training, and observations." *Simmons*, 470 F.3d at 1123.  "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 U.S. Dist. LEXIS 101952, at *10 (N.D. Cal. May 18, 2006).

**A.     Foster's Comparable Company Analysis is Appropriate for Valuing an Early Stage Company Like Telesocial And Should Be Admitted.**

Orange challenges Foster's opinions by arguing that he should have used a different method to value Telesocial, (Mot. at 10), rigidly insisting that all valuations must be the result of applying a multiple to revenues. (*Id.*). As Foster explained, however, in the context of early-stage companies, applying a multiple to revenues is math without meaning, and can result in highly misleading valuations. (Foster Decl. ¶3, Ex. 2 ("Foster Depo") at 81).

When it comes to corporate valuation, federal courts have recognized: "[F]inancial valuation is not an exact scientific methodology. Estimations, predictions, and inferences based on professional judgment and experience are key ingredients in any valuation. In a variety of contexts, the circuit courts have noted that economic valuation is less than an 'exact science.'" *Brown v. Brewer*, No. CV 06-3731-GHK, 2010 U.S. Dist. LEXIS 60863, at *88-89 (C.D. Cal., June 17, 2010) (citing cases). Therefore, the indicia of reliability considered relevant to the assessment of whether a financial valuation is admissible under Rule 702 include "professional experience, education, training, and observations." *Id.* at *88 (citing *Simmons,* 470 F.3d at 1123).

As explained in his report, independent of the litigation, Foster has extensive experience and expertise with valuing and analyzing early-stage companies. Foster has held positions in venture capital firms which regularly engage in the exercise of valuing early-stage companies, such as Telesocial. (Report ¶11). In addition, Foster's experience includes conducting empirical and field-based research on, and publishing in peer-reviewed journals that focus on, early-stage companies (*id.* ¶¶4-5); conducting research and publishing in peer-reviewed journals regarding financial analysis, cost analysis and corporate valuation (*id.* ¶3); authoring textbooks on financial analysis and valuation (*id.* ¶8); participating in respected organizations and associations that deal with entrepreneurship (*id.* ¶7); and teaching in these relevant fields, including financial analysis, valuation, and management programs that train early-stage company management (*Id.* ¶¶6, 9).

Foster also explained the basis for the methodology he selected, and specifically addressed, both in his report and during his deposition, and why the alternative methodologies Orange advocates are not appropriate or useful in valuing early-stage companies. (Report ¶¶69-71, Exs.

13, 14, 15; Foster Depo. 46-47, 72-74, 80-82).  As Foster explained, the methodologies Orange insists upon do not make sense as applied to early-stage companies that often have no revenues or, at best, have limited operational history of revenues and cash outlays that often exceed any revenues.  (Report ¶¶69-70, n.152).[5]  Foster has interacted with hundreds of entrepreneurs who deal with the valuation of their companies when financial metrics based on revenue multiples are not available.  (*Id.* ¶¶5-7, 10).  Based on his experience, Foster applied a valuation methodology employing a comparison of implied valuations using comparable company analysis for companies in a shared industry vertical (in this case mobile), which is an approach widely accepted in the venture capital community.  (*Id*. ¶70, n.154).  The reasoning behind Foster's choice to calculate value based on the median implied value is also explained in his report (*id.* ¶84), and not "arbitrary" as Orange suggests.  (Mot. at 11).

Orange's reliance on soundbites from cases concerning wholly different valuation contexts is unavailing.  In *In re Nellson,* there was no actual dispute regarding the valuation method; rather, the challenge was to the multiple metric that one of four valuation experts used to perform what would otherwise be a textbook discounted cash flow analysis.  356 B.R. at 367.  The court excluded the opinion only because the metric in question had never been used by any other expert, and there was no evidence it was accepted to any degree in the relevant field.  *Id.* at 374-76.  However, the court's statement describing "standard valuation practice" cannot be extrapolated to stand for the proposition that there is only one acceptable method of valuing a company; rather, it described what all four experts in that case had agreed was the appropriate methodology for that particular case.  *Id.* at 370, n.6.

Likewise, in *Metabyte,* the court took issue with an expert because the expert's stated "market approach" method to calculate fair market value departed drastically from the multi-step

---

[5] Indeed, even Orange's own source cited for the definition of a "valuation multiple" recognizes that, while "popular," there are disadvantages to using multiples, including that it "encourages simplistic—and possibly erroneous—interpretation" of value, "fails to capture the dynamic and ever-evolving nature of business and competition," and that "there are so many reasons that multiples can differ, not all of which relate to true differences in value." (Mot. at 12, n.8 (citing November 2001, UBS Warburg Research Paper)).

analysis typically employed in a market-based approach. *Metabyte, Inc. v. Canal + Techs, S.A.*, 2005 U.S. Dist. LEXIS 46163, at *9 (N.D. Cal., June 17, 2005). Unlike the truncated version of an otherwise acceptable methodology proposed by that expert, for which that expert provided "no support," *id.*, Professor Foster has provided ample support showing that his methodology of determining an implied valuation of an early-stage company is accepted in his field. (Report ¶¶69, 70.) Indeed, even the *Metabyte* court noted that "experts enjoy leeway to adjust recognized methods to account for the particularities of unique situations." 2005 U.S. Dist. LEXIS 46163, at *10-11. In sum, the issues with expert testimony tackled by the *In re Nellson* and *Metabyte* courts are not present in this case, and Orange's objections to Foster's methodology should be addressed on cross-examination before the jury at trial. *Primiano*, 598 F.3d at 564.

### B. Foster's Method Is Valid Because It Is Replicable and Testable.

Orange wrongly claim that Foster's sampling method cannot be replicated and therefore lacks validity. (Mot. at 6). In fact, Foster's methodology, including the sample selection process, is replicable and therefore testable. "Under *Daubert*'s testability factor, the primary requirement is that '[s]omeone else using the same data and methods…be able to replicate the result[s].'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) (quoting *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005)). Here, Orange chose not to even attempt to replicate Foster's methodology, but it certainly could have if it wanted to. Indeed, despite claiming that Foster's methodology is "totally opaque, impervious to review, [and] non-replicable, " Orange is able to recount the steps of Foster's process is great detail. (Mot. at 6).

Foster's report too sets forth, in painstaking detail, the steps and criteria he employed. (Report ¶¶72-75). Foster's sample is comprised of companies that were identified using industry categorization criteria selected by Foster **and** companies that were identified as similar to Telesocial based on PitchBook's similarity score. (*Id.* ¶¶72-75, n.158-163; Foster Depo. at 100:8-16; 101:1-102:1). The fact that PitchBook's similarity scoring algorithm is proprietary does not make it a "black box," as Orange contends. Prior to using PitchBook's similarity scoring process, Foster did extensive due diligence into the inputs that the PitchBook algorithm uses and concluded,

based on his experience, those inputs (company strategy, customers, partnerships, products, etc.) are appropriate variables to identify comparable companies. (Foster Depo. at 97:18-99:10; 99:17-21). Foster then whittles the initial sample of 200 companies[6] to eleven comparable companies based on criteria relating to when those companies raised funding and the rounds of funding they obtained; all of these criteria are, again, in his report. (Foster Report ¶¶72-75.) Ten of the eleven companies in the final sample were returned using *either* the similarity score or Foster's industry criteria, providing further validation for the sample set. (Foster Report ¶73, n.159.) From there, as is explained above, one can calculate, using basic math, the median values. (Report ¶78.)

The cases cited by Orange do not support its characterization of Foster's step-by-step, fully disclosed, replicable process as a "black box." In both *Open Text S.A. v. Box, Inc.,* No. 13-cv-04910-JD, 2015 U.S. Dist. LEXIS 8783 (N.D. Cal. Jan. 23, 2015), and in *GE v. Joiner,* 522 U.S. 136, 146 (1997), testimony was excluded because the expert's ultimate calculation was not based on any disclosed method, but rather solely on that expert's "experience" or "say-so." In contrast, Professor Foster lays out in detail the steps one would need to replicate the two methods he used to select a sample (industry categories and PitchBook similarity score), the criteria he used to narrow the sample, the resulting sample (the PitchBook data for each company was produced to Orange), and the math used to arrive at the value range he concludes is an appropriate estimate of Telesocial's value in a but-for scenario. (*See* Foster Report ¶¶ 71-75, 82-94 and Appendix D.) Testability supports reliability and Professor Foster's method is testable because, had Orange chosen to apply these same methods in PitchBook, it would have been able to replicate Foster's results. *City of Pomona,* 750 F.3d at 1047.

**C.    Foster's Comparable Company Analysis Is Reliable And Should Be Admitted.**

Orange also objects that the eleven companies in Foster's sample are not, by its own assessment, comparable to Telesocial. (Mot. at 8-10). Orange does not dispute the companies in

---

[6] Orange complains that Foster did not provide a list of the 200 companies that were returned through this process. (Mot. at 6). Orange can replicate the selection process disclosed in Foster's report, and through that exercise investigate whatever additional questions it might have about the unfiltered sample set.

Foster's sample all operate in the mobile industry, nor that the products or services those companies offer are based on voice technologies. (*Id.*). Instead, Orange's criticism glosses over these core similarities, and instead picks at granular aspects of the comparable companies—namely, how similar were the specific voice products they offer, whether they had revenue, and their respective user bases. (*Id.*). Orange's criticisms based on such differences all go to the weight, and not admissibility, of Foster's testimony. *Primiano*, 598 F.3d at 564. Such "[c]hallenges that go to the weight of the evidence are within the province of a fact finder" and do not serve as a basis to exclude Foster's testimony. *City of Pomona*, 750 F.3d at 1044.

Moreover, even were such criticisms relevant to assess admissibility, Foster's methodology and analysis account for differences among comparable companies. It is hardly surprising that these other start-ups apply voice technology to different end uses because product differentiation among any cross-section of early-stage, venture-backed companies is to be expected. Venture capital investors seek out companies with product differentiation, which is regarded as a source of value. (Foster Depo. 112:4-113:13; Foster Decl. ¶4). Professor Foster's opinion accounts for potential differentiation among comparable companies by selecting a cross-section of companies that share industry vertical characteristics, then using available information to understand the milestones achieved by these comparables. (Report ¶73; Foster Decl. ¶¶4-5). As to the variation among revenues between these early-stage companies, such variation is common, is a primary driver of Foster's selection of valuation methodology, and is therefore taken into account in his selection of valuation methodology, as explained *supra* at 8-9. Orange also attempts to distinguish Telesocial as having a smaller user base relative to four user-based companies—GroupMe, Tango, Snapguide and Voxer. (Mot. at 9). Professor Foster explained, however, that user base is not relevant as a measure vis-à-vis Telesocial because its business model was a partnership model, not a user acquisition model. (Foster Depo. 78:9-79:3).

Moreover, the cases cited by Orange do not provide a basis to exclude Foster's testimony based on Orange's objection to individual comparables as purportedly not sufficiently comparable. In *Metabyte,* the court criticized a valuation that relied on **only one** comparable company because

the differences between the comparable and the subject were "so significant" that the use of a ratio based on respective market capitalization rendered the analysis unreliable. 2005 U.S. Dist. LEXIS 46163, *8.  In contrast, here, Professor Foster's analysis is based on eleven comparable companies, which he methodically selected based on industry and keyword filters as well as PitchBook's similarity scoring algorithm. (Report ¶¶73-75). The Delaware Chancery Court's opinion in *Gray* is even less informative, as that case does not even concern the admissibility of expert testimony under Rule 702 (or any other evidentiary rule, for that matter). *See Gray v. Cytokine Pharmasciences, Inc.,* 2002 Del. Ch. LEXIS 48 (Del. Ch. April 25, 2002). Rather, in *Gray* the Vice Chancellor acted as the ultimate fact finder charged with "determin[ing] the fair value of the shares" in dispute. *Id.* at *1. Therefore, to the extent *Gray* is informative, it only further supports the conclusion that matters of weight and credibility are properly the province of the fact finder. *Pyramid Techs., Inc.,* 752 F.3d at 814; *Primiano*, 598 F.3d at 564.

### D. Foster's Opinions Are Admissible Because PitchBook Is an Industry Approved, Reliable Analytical Tool.

Orange also attacks Foster's use of PitchBook. (Mot. at 4). PitchBook is a comprehensive research and analysis tool providing data on over 740,000 private companies globally, and is widely used in the venture capital and private equity community to value companies. (Foster Report ¶73, n156, n.160). PitchBook is widely recognized as a reliable source by the field with the greatest expertise in the valuation of privately-held companies—venture capital funds. In fact, while there are other databases available to the industry, the National Venture Capital Association ("NVCA") has endorsed PitchBook as the bellwether tool for obtaining data for, and analyzing, early-stage and private companies. (Foster Decl. ¶6). The NVCA is the flagship trade association for venture capital firms representing the interests of its 303 members. (*Id.* at ¶7). Therefore, even if Professor Foster's own assessment of PitchBook as a reliable data source were insufficient, the "policy statement of [the NVCA] professional association," provides an "objective source" demonstrating that Foster has followed the accepted "scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." *Daubert II*, 43 F.3d at *1318-19.

1    Moreover, Professor Foster explained why, based on his own extensive research and
2 expertise in valuation, and in particular valuation of and early-stage companies, he selected
3 PitchBook as the appropriate source of data to support his analysis. (Foster Depo. 83-86).
4 Professor Foster's prior experience with PitchBook includes using the database to prepare case
5 teaching materials for his students, and to conduct independent due diligence to confirm the
6 reliability of the data on the ultimate sample set. (Foster Depo. at 84-85, 94-95; Report
7 ¶84). Foster also explained that he has experience with other similar databases, and that he relied
8 on that experience in selecting PitchBook over other available options as the best analytical tool
9 and source of early-stage company data. (Foster Depo. at 83-86).
10    Offering no alternative source of early-stage company data, Orange's attack on PitchBook
11 hinges on a single purported "inaccuracy" relating to Telesocial's early investment rounds. (Mot.
12 at 5-6). The "inaccuracy" Orange points to—that PitchBook incorrectly categorized Telesocial's
13 early investment round as an "angel" round instead of a "Series A" round—does not alter the
14 conclusion that PitchBook is nonetheless sufficiently reliable for purposes of Rule 702. Most
15 importantly, reasonable minds can differ regarding the designation of a funding round as "angel"
16 versus "Series A" versus "Series B." (Foster Depo. 141:4-14, 143:6-21, 169:10-170:1).
17 Moreover, Professor Foster not only considered PitchBook's funding round designation, but
18 independently assessed and took into account the qualitative level of business development of the
19 comparable companies in comparison with Telesocial based on his expertise in venture capital and
20 early stage companies. (*See* Report ¶89, Appendix D). For example, Foster provided an
21 alternative range of valuations that excluded WhatsApp based on his determination that WhatsApp
22 had "demonstrated explosive growth" by the time of its "Series B" funding round. (Report ¶89).
23 Even Orange's expert Puntillo ███████████████████████████
24 ███████████████████████████████████████████████"). (*See* Bea
25 Decl. ¶2, Ex. 1 (Depo. Tr. Puntillo at 32:7-33:7, 141:12-21)).
26    Professor Foster clearly explained his assessment of Telesocial's prior funding rounds, and
27 their impact, if any, on his analysis. (Foster Depo. 141, 146-147, 169-170). To the extent Orange
28

wishes to challenge that assessment, for example by presenting alternative scenarios or disputing the funding designations, that is not a basis for exclusion of Foster's opinions. Instead, Orange should do so through the presentation of contrary evidence and cross examination of Foster at trial. *Daubert,* 509 U.S. at 596.

## V.     FOSTER'S OPINIONS SHOULD BE ADMITTED BECAUSE HIS "BUT-FOR" ASSUMPTIONS ARE REASONABLE AND SUPPORTED BY THE RECORD.

Orange's criticism that Foster blindly accepted assumptions regarding the "but-for" world are directly contradicted by his report. (Mot. at 11-12). Professor Foster explains that his estimate of Telesocial's value as a company assumes a "but-for" world wherein: (i) Telesocial entered into a contract with Orange or another telecommunications company to commercialize its technology, and (ii) Telesocial completed a Series B round of financing. (Report ¶13). Foster's extensive experience and expertise studying early-stage companies, detailed *supra* at 8, makes him qualified to draw conclusions from the factual record regarding Telesocial's trajectory as a start-up and the reasonableness of the assumptions upon which his valuation relies.

Although this is a question of the weight, not the admissibility, of the evidence, *Primiano,* 598 F.3d at 564-65, the evidence does support these assumptions. Telesocial will introduce evidence supporting these assumptions and Professor Foster has assessed the reasonableness of these assumptions and found support for them. Professor Foster observed that Telesocial had important indicators of success for an early-stage company. (Report ¶16). He also concluded that, prior to Orange's intervening misconduct, Telesocial had made significant progress towards commercializing its technology. (*Id.* ¶17). Foster observed that Telesocial had a unique technology, that there were significant MNOs keenly interested in that technology (████████████ ████████████████████), and that Telesocial was well positioned to engage with a strategic partner that would have spurred significant interest from the venture capital community. (*Id.* ¶¶46, 79-81). Foster's report also explains the significant prospective market that Telesocial's technology would have addressed—680 million active Facebook users on mobile devices, and an opportunity to recapture some of the $13.9 billion in annual mobile revenues MNOs were losing to internet protocol based voice and text options—which also informs the investment community's demand.

1  (*Id.* ¶¶31-36).  Foster regards as significant the fact that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
2  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
3  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  (Report ¶87, n.181;
4  Foster Depo. 23, 54-55).   The Hello! presentation confirmed the value and significance of
5  Telesocial's technology in the mobile and social network marketplace as of November 2012,
6  (Report ¶¶18, 65-67), and Foster is qualified to make an independent assessment regarding the
7  implications of that market validation of Telesocial's social voice technology.  Moreover, the
8  extensive interest in Party Call following Orange's announcement further validates the technology
9  and the likelihood that, absent Orange's misconduct, Telesocial probably could have partnered with
10 another MNO on the project as well.  (*Id.* ¶68).

11 Of course, nobody will ever know with certainty what might have otherwise transpired had
12 Orange not misappropriated Telesocial's innovation.  "As in any damages case, [Foster's]
13 calculation had to address a hypothetical world that never existed, one in which other things
14 remained the same but the breach had not occurred." *Alaska Rent-A-Car,* 738 F.3d at 968.  To the
15 extent Orange seeks to counter the assumptions that, but-for Orange's misconduct, Telesocial
16 would have been able to commercialize and capitalize on its invention, the proper mechanism for
17 Orange to attempt to counter Telesocial's evidence is through the introduction of evidence and
18 cross-examination of witnesses at trial.  *Id.* at 970; *Daubert,* 509 U.S. 596.  Orange's challenges to
19 Foster's assumptions are for the jury to weigh the evidence, assess the reasonable and foreseeable
20 consequences to Telesocial from Orange's conduct, and then calculate any amount of
21 compensation based upon the evidence it finds credible. *See Alaska Rent-A-Car,* 738 F.3d at 970.

22 **VI.   CONCLUSION**

23 For the foregoing reasons, Orange's motion to exclude the opinions and testimony of
24 Professor Foster should be denied.

DATED: February 15, 2017

By: */s/ Todd M. Briggs*
Todd M. Briggs