# EXHIBIT B

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 2 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

2005 WL 1460296
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.
Court of Appeal, Second
District, Division 5, California.

VEHICULAR TECHNOLOGIES
CORPORATION, Plaintiff and Respondent,
v.
TITAN WHEEL INTERNATIONAL,
INC. et al., Defendants and Appellants.

No. B169590.
|
(Los Angeles County Super. Ct. No. BC263739).
|
June 22, 2005.
|
As Modified on Denial of Rehearing July 22, 2005.

APPEAL from a judgment of the Superior Court of Los Angeles County. James R. Dunn, Judge. Affirmed.

**Attorneys and Law Firms**

Morris Polich & Purdy, Richard H. Nakamura, Jr., Mark E. Hellenkamp, and Dean A. Olson for Defendants and Appellants.

Kaye Scholer, Larry R. Feldman, Robert M. Turner, Julian Brew, and Paul Gelb for Plaintiff and Respondent.

**Opinion**

ARMSTRONG, J.

*1 Respondent Vehicular Technologies ("Vehicular") sued appellant Titan Wheel International, Inc. and Dyneer Corporation dba Tractech ("Tractech") for breach of contract and other causes of action. A jury found in Vehicular's favor and awarded $16.3 million. We affirm.

Facts

This litigation arose from a dispute between two manufacturers of after-market automotive lockers, devices which can be put on car or truck axles to add traction for difficult driving conditions such as off-road driving. When the story began, Tractech dominated the locker market with a device called the Detroit Locker. In the early 1980s, John Zentmyer, an off-road enthusiast, invented a different kind of locker, ultimately called the Lock–Right. Zentmyer's business was ultimately called Vehicular Technologies.[1]

At trial, Vehicular presented evidence that the Lock–Right was a superior product in every way. It was just as durable as the Detroit Locker, but much cheaper. It also worked better and was much easier to install—"just about anyone with a few tools" could install the Lock–Right, but the Detroit Locker required a shop with specialized tools.

Vehicular's case was that Tractech sought to "bury" the Lock–Right because it threatened Detroit Locker sales. To this end, Tractech engineers copied the Lock–Right. While they were doing so, Tractech CEO Ralph McGee contacted Vehicular, ostensibly to discuss a licensing or other business arrangement between the two companies. During the negotiations, McGee requested confidential manufacturing and business information, promising not to use it except for purposes of the negotiation. McGee also promised not to copy the Lock–Right (and concealed the fact that Tractech was already doing just that) or to sell a Lock–Right copy.

Vehicular raised the question of a written confidentiality agreement, but McGee said that there had to be a degree of trust if the companies were to work together and that if his word was not enough, there was no reason to proceed. Vehicular agreed, and in reliance on McGee's promise divulged confidential information on all aspects of its business, including materials, manufacturing techniques, production costs, sales, and profits. McGee's promise not to copy and his promise not to use confidential information were knowingly false.

McGee's proposal would have required that Zentmyer sell his rights to the Lock–Right in return for a royalty and a small salary, but did not obligate Tractech to manufacture the Lock–Right. Zentmyer turned it down. Tractech then prepared to market an exact copy of the Lock–Right, called the EZ Locker. However, in June of 1993, after the negotiations with Tractech were over, Zentmyer had

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 3 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...

2005 WL 1460296, 75 U.S.P.Q.2d 1661

applied for a patent on two aspects of the Lock–Right. The patent was granted in May of 1995.

Tractech learned about the patent when it exhibited the EZ Locker at a 1995 trade show.[2] Tractech then designed around the patent by eliminating an inspection window (which had no operational function) and changing a double spring mechanism to a spring and plug mechanism. The revised EZ Locker was in all other respects a copy of the Lock–Right. The spacers, couplers, driver, saddle, and other components were identical. Tractech even copied the Lock–Right installation instructions and packaging.

**\*2** Vehicular presented evidence that the parts of the Lock–Right and the revised EZ Locker were interchangeable. If you opened a Lock–Right box and an EZ Locker box and mixed up the parts, you could put a locker together.

Tractech began to sell the EZ Locker in the second half of 1995, as "a vehicle to bury the Lock–Right." Even before it introduced the EZ Locker, Tractech contacted Vehicular customers to say that it would be introducing a much better product. Vehicular felt that impact. When it introduced the EZ Locker, Tractech addressed Vehicular's most profitable models and under-priced Vehicular by 13 to 25 percent, creating enormous problems for Vehicular. Tractech's pricing meant that (as a contemporary Vehicular memo put it) Vehicular had "a serious problem in the marketplace with the copy of our locker by Tractech and at the pricing strategy they have elected to use ... We are seeing a softness in our orders since the introduction of the EZ Locker ... We are behind our most pessimistic forecasts and as it now stands January will be our lowest month in years. Distributors are afraid of being caught with a lot of high-priced Lock–Right inventory on the shelf that they will have to sell at a significant loss. They are not about to inventory more lockers under that scenario."

The stress on the company caused by the "carbon copy" product began at the trade show and intensified month after month. It caused friction between the three principals of the company, affected their performance, and ultimately resulted in one of the principals, Mark Tyson, buying out the other two, Zentmyer and Cole, so that their talents and energy had to be replaced.

Tractech also falsely advertised the EZ Locker as fit for only "occasional" off road use, thus discouraging sales of both the EZ Locker and the Lock–Right and protecting the Detroit Locker, which was advertised as being "for serious off road performance." Tractech's disparagement of the Lock–Right technology, embedded in the Lock–Right and the EZ Locker, made it impossible for Vehicular to compete. Distributors no longer wanted to sell the Lock–Right because the industry leader had said that it was not a durable and safe technology. Vehicular was forced to take out a huge product liability policy to protect distributors.

Vehicular attempted to counter with lower prices and better terms, and also accelerated new technologies it had begun working on, including a device called the Performance Locker. The Performance Locker was an award-winning device, but the cost to bring it to market early was crushing.

Competition from the EZ Locker also forced Vehicular to eliminate necessary expenditures, including travel, promotional, and advertising expenses. Vehicular was unable to take advantage of opportunities for television exposure for the Lock–Right, and could not even afford to stock promotional hats and shirts.

Ultimately, in 2002, a company called Regal Beloit acquired all of Vehicular's operations, including its products, patents, inventory, designs, and trademarks.

**\*3** On damages, Vehicular presented evidence about its sales, growth, projected growth and sales, profits, debts, and business and financial plans from 1993 to the buy-out in 2002. Damages expert Marc Margulis testified that (as a minimum, based on modest estimates) Vehicular lost $8.5 million in profits on the Lock–Right and $12.8 million in profits on the Performance Locker, and that the value of the business on sale was diminished by about $17 million, $4 million of which was attributable to the Lock–Right and $13 million of which was attributable to the Performance Locker.

Tractech's case was that it developed the EZ Locker not with confidential information but through reverse engineering (standard practice in the industry) and its own efforts.[3] For instance, Tractech conducted metallurgical tests to determine the kind of steel Vehicular used in the Lock–Right.

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 4 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

McGee agreed that he had met with Vehicular, but testified that there was no discussion of a confidentiality agreement. He neither sought nor received any confidential information and made no promises concerning such information or about copying the Lock–Right. Further, when Tractech redesigned the EZ Locker after learning about the Lock–Right patent, it made significant improvements to the device, so that as sold to the public, the EZ Locker was not a copy of the Lock–Right.

Tractech did advertise the EZ Locker as a device for occasional use, but did so only because the EZ Locker was not as durable as the Detroit Locker.

Tractech's automotive expert Alvin Low testified that the Lock–Right and the EZ Locker were different in color and finish, weight, and in the shape of the saddle, indicating that the EZ Locker was derived through reverse engineering, not through access to plans or drawings. Surface marks indicated that different cutting tools were used to manufacture the devices, and small differences in hardness indicated that they were not heat-treated in the same way. The change in spring design meant a "slight difference" in installation. The parts of the devices were indeed interchangeable, but that was not unusual in the automotive industry.

Tractech also introduced evidence on Vehicular's possible future sales and profits. Among other things, Tractech's evidence was that Vehicular had financial problems not because of the EZ Locker but because it was undercapitalized, poorly structured, poorly managed, had poor marketing, and was a "start up failure."

*The Verdict*
On special verdicts, the jury was asked:

QUESTION No. 1: "Has plaintiff [Vehicular] proved by a preponderance of the evidence its claim for breach of contract against [Tractech]?" The jury answered "Yes."

QUESTION No. 2: "Has plaintiff [Vehicular] suffered damages based on its breach of contract claim?" The jury answered "Yes."

QUESTION No. 3: "Has plaintiff [Vehicular] proved by a preponderance of the evidence its claim for fraud by intentional misrepresentation against [Tractech]?" The jury answered "Yes."

*4 QUESTION No. 4: "Has plaintiff [Vehicular] suffered damages based on its claim for fraud by intentional misrepresentation?" The jury answered "Yes."

QUESTION No. 5 "Has plaintiff [Vehicular] proved by a preponderance of the evidence its claim for fraud by a false promise against [Tractech]?" The jury answered "Yes."

QUESTION No. 6: "Has plaintiff [Vehicular] suffered damages based on its claim for fraud by a false promise?" The jury answered "Yes."

QUESTION No. 7: "Has plaintiff [Vehicular] proved by a preponderance of the evidence its claim for negligent misrepresentation against [Tractech]?" The jury answered "Yes."

QUESTION No. 8: "Has plaintiff [Vehicular] suffered damages based on its claim for negligent misrepresentation?" The jury answered "Yes."

QUESTION No. 9: "Has plaintiff [Vehicular] proved by a preponderance of the evidence its claim for misappropriation of trade secrets against [Tractech]?" The jury answered "Yes."

QUESTION No. 10: "Has plaintiff [Vehicular] suffered damages based on its claim for misappropriation of trade secrets?" The jury answered "Yes."[4]

Additional special verdicts asked the jury to determine "the total amount of damages, if any, to which [Vehicular] is entitled to recover ... based on the Lock–Right product," and based on the Performance Locker. The jury awarded $8.9 million based on the Lock–Right and $4 million based on the Performance Locker. The jury also awarded $903,000 in prejudgment interest and $2.5 million in punitive damages.

*Facts relating to patents and patent litigation*
Several of Tractech's arguments on appeal depend on an understanding of the patent litigation between the parties.[5] We begin with the facts.

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 5 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

Vehicular first sued Tractech in Federal Court. The complaint brought causes of action for patent infringement, breach of contract, fraud, unfair competition, and other causes of action. Vehicular lost the patent infringement claim on summary adjudication. As to the other causes of action, the District Court found triable issues on whether there was an agreement that Tractech would not copy the Lock–Right, whether Tractech used confidential information fraudulently obtained, and on other issues.

There are two published Federal Circuit opinions on the patent aspects of the case, one reversing a ruling granting a preliminary injunction to Vehicular (*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.* (Fed.Cir.1998) 141 F.3d 1084), and the next affirming a grant of summary adjudication to Tractech on the patent infringement claim. (*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.* (Fed.Cir.2000) 212 F.3d 1377.) The opinions establish that the sole question in the patent litigation was whether the EZ Locker's spring and plug was sufficiently different from the Lock–Right's double spring, given the limited claims of Vehicular's patent.

For instance, in affirming summary judgment, the Federal Circuit found that the question of equivalents "cannot be divorced from the scope of the claims," that the patent expressly and specifically required two springs, a requirement underscored by the drafter's choice of the term "consisting of," rather than "comprising," and that "No reasonable jury could find infringement by equivalents in these accused devices when the claim requires 'two concentric springs' or a structure insubstantially different from that." (*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., supra,* 212 F.3d at pp. 1382–1383.)

*5 After the cause of action for patent infringement was disposed of, the District Court dismissed the remaining causes of action without prejudice to refiling in state court, finding "no persuasive reason to retain those claims in federal court," and that "Contrary to defendants' argument in the instant motion, the Federal Circuit decisions rendered in this case decided none of the issues involved in the state claims."

That is the patent litigation. We must delve into one more area, the court's ruling on the admission of evidence concerning patents and the patent litigation.

Prior to trial, Vehicular moved in limine to exclude evidence relating to patents. It argued that, as the District Court had found, there were no patent issues in the case, making the evidence irrelevant and more prejudicial than probative. Tractech opposed the motion, but only argued that it should be allowed to present evidence of the EZ Locker patent. During the extensive oral argument on the motion, after it became clear that Vehicular had no objection to the introduction of evidence that Tractech had successfully designed around the Lock–Right patent, so that there was no patent infringement,[6] Tractech argued that the jury should learn that the Federal court had found that the EZ Locker was not the equivalent of the Lock–Right under the doctrine of equivalents, and that Tractech was (in 1998) awarded a patent on the modifications it made to the EZ Locker.[7]

Vehicular argued that while experts could testify about the differences between the Lock–Right and the EZ Locker, evidence about patents would be both prejudicial and confusing. Vehicular pointed out that neither side had designated an expert on patents or patent litigation, so that the jury would have no way to understand the meaning of the EZ Locker patent or the patent litigation, and that if evidence of the patent litigation and EZ Locker patent was admitted, it would be forced to call witnesses to testify concerning the deficiencies of the Lock–Right patent application and Lock–Right patent counsel.[8]

The trial court ruled that with the exception of evidence relating to Tractech's redesign of the EZ Locker to avoid patent infringement, the patents and patent litigation had no probative value, in that the evidence was irrelevant to the question of whether Tractech used confidential information in breach of an agreement not to do so. The court also ruled that the introduction of patent evidence would result in an undue consumption of time, raise irrelevant questions about patents, the patent application process, and how the patent system works, require expert testimony, and create a great potential for confusion on the issues in the minds of the jurors.

Discussion

1. Issues relating to jurisdiction

*a. preemption*

Case 3:14-cv-03985-JD Document 258-4 Filed 03/13/17 Page 6 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

In an argument raised for the first time on appeal, Tractech contends that this entire litigation was preempted because the verdict actually conflicted with federal patent law. Conflict preemption is found where it is impossible for a party to comply with both state and federal requirements or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' [Citation.]" (*Warehouse, Processing Etc. Union v. Hugo Neu Proler Co.* (1998) 65 Cal.App.4th 732, 736, 76 Cal.Rptr.2d 814.)

**\*6** Tractech sees two conflicts. It first argues that the Federal Circuit's ruling on infringement meant that the EZ Locker was substantially different than the Lock–Right, so that Vehicular's evidence that the changes were insignificant meant that the jury was invited to improperly second-guess the Federal Circuit. Tractech also argues that the patent on the EZ Locker meant that it was not a copy of the Lock–Right, so that the jury was improperly invited to second guess the patent office.

Each of these arguments depends on Tractech's characterization of Vehicular's case as one solely about copying. Tractech characterizes the promise not to copy as nothing more than a promise not to infringe, or a "common law clone of patent protection," and characterizes the verdict as a finding that it copied patented components. These are characterizations with which Vehicular vehemently disagrees. Vehicular is right. This case was not about lawful copying or unlawful infringement, but about breach of contract, fraud by intentional misrepresentation, fraud by false promise, negligent misrepresentation, and misappropriation of trade secrets. Those were the verdicts.

The Federal Circuit decided that the spring and cap mechanism of the EZ Locker was sufficiently different from the double spring mechanism described in the Lock–Right patent that there was no infringement by equivalents. The Federal Circuit did not decide whether Tractech otherwise copied the Lock–Right, whether it promised not to do so, or whether it obtained confidential information through fraud and used that information to compete, in violation of a promise not to do so.

For instance, Vehicular presented evidence that when Tractech began selling the EZ Locker, it used the confidential business information provided by Vehicular to target Vehicular's most profitable models. That evidence supported Vehicular's claim that Tractech breached its promise not to use Vehicular's confidential information for any purpose other than the business negotiations, and Vehicular's claim that Tractech obtained confidential information through fraud. Those questions were not before the Federal Circuit, and the Federal Circuit had nothing to say about those claims or that evidence.

Vehicular witnesses testified that Tractech promised not to copy the Lock–Right, but did so, that it promised not to compete with the Lock–Right, but did so, and that it used confidential information to drive Vehicular out of the market, in violation of a promise not to do so. The jury was presented with conflicting evidence about the similarities and differences between the Lock–Right and the EZ Locker, but the question for the jury was not just about copying, but whether, as Vehicular witnesses testified, Tractech used confidential information in violation of its promise not to, or whether, as Tractech witnesses testified, there was no transfer of confidential information and no promise. We echo the District Court: "Contrary to defendants' argument ... the Federal Circuit decisions rendered in this case decided none of the issues involved in the state claims."

**\*7** In this category, Tractech also argues that because it used information in the Lock–Right patent to redesign the EZ Locker, it cannot be held liable under state law for "exploit[ing] Vehicular's [patent] disclosures to develop a new invention," something permitted under federal law, and that the state court verdict improperly infringed on Tractech's right under the patent law to develop and sell new products But Vehicular's evidence was that Tractech did not use just the information disclosed in the patent, but used confidential information extracted by fraud. We see no way in which state law protections against fraud conflict with the goals of the patent law.

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.* (1989) 489 U.S. 141, 155, 109 S.Ct. 971, 103 L.Ed.2d 118), cited in Tractech's reply brief, does not hold to the contrary. That case considered a Florida law which prohibited use of direct molding to duplicate boat hulls, for purposes of sale. The Supreme Court found that the statute was preempted: it substantially impeded "the public use of the otherwise unprotected design and utilitarian ideas embodied in unpatented boat hulls," and granted rights

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 7 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

that were similar to patent rights, but were inconsistent with the federal scheme. (*Id*. at p. 157.) The opinion also specifies that the states are *not* prohibited from regulating "the tortious appropriation of private information." (*Id.* at p. 154.)

In its reply brief, Tractech seems to argue that there is federal preemption because the agreement between the parties gave Vehicular greater rights than the patent laws provide, or because the non-patented components of the Lock–Right were so unimportant that the Lock–Right was nothing but its patented parts,[9] or because a promise not to copy includes a promise not to infringe, or because Vehicular's statements in the trial court disparaging its own patent are legally meaningless. These arguments fail for the reasons cited above. They ignore the fact that this case was not simply about copying and the patented components of the Lock–Right.

Nor do we see that the EZ Locker patent means that this lawsuit frustrated the purposes of the patent law. Under Vehicular's theories, Tractech could be liable even if it had marketed an EZ Locker which was entirely different from the Lock–Right, if it used confidential information obtained by fraud to get there. Vehicular noted this in closing argument to the jury, arguing that if Tractech had marketed one of the alternative designs it attempted to develop, it would have been in breach of its contract with Vehicular if it used confidential information to develop the product.

The argument about the EZ Locker patent suffers from an additional disability. Tractech refers to the patent as a patent "on the EZ Locker." Vehicular characterizes it as a patent on one small aspect of the EZ Locker. Tractech's preemption argument impliedly asks us to examine the patent, determine its scope, compare it to the claims Vehicular made at trial, and decide whether Vehicular misled the jury or asked it to decide issues already decided through the issuance of the patent. The preemption argument was not waived when Tractech failed to raise it at trial, but it is nonetheless too late to build that factual record.[10]

 *8  Tractech makes an additional argument based on the fact that when the question of the admissibility of the EZ Locker patent was raised, one of Vehicular's arguments was that the patent had never been challenged, calling its validity into question. Tractech now attempts to build an argument around the fact that Vehicular did not prove, pretrial, that the patent was *in*valid.

If the validity of Tractech's patent was crucial to the defense of preemption, Tractech should have raised the issue so that the factual issues could have been determined. Vehicular had no reason to ask for a pretrial hearing on the question, and cannot now be faulted for failing to do so.

*b. exclusive jurisdiction*

Tractech also argues that the state court had no jurisdiction because patent questions predominated in the litigation, even though the District Court concluded to the contrary. Tractech cites in support statements Vehicular made in the federal litigation, in response to the District Court's order to show cause why three causes of action in the original federal court complaint[11] should not be dismissed in the exercise of that Court's discretion regarding supplemental jurisdiction. In the cited pleading, Vehicular argued that the Court should retain jurisdiction under 28 U.S.C. 1338, subdivision (b), which provides that "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trademark laws."

Tractech argues judicial admission. We are unpersuaded. Vehicular made that argument, which was in any event only about factual overlap, early in the federal court litigation, before the second amended complaint was filed, before the case ever went to the Federal Circuit, and, as far as we can tell, before either of Tractech's summary judgment motions was ruled on. It is not the position which ultimately prevailed, and there was no estoppel. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183, 70 Cal.Rptr.2d 96.)

Nor do we see that federal questions predominated. Tractech cites Vehicular's allegation, in the complaint, that Tractech copied the Lock Right "in knowing violation of Vehicular's rights," then declares that Vehicular's rights were defined by its patent. Tractech may wish to so limit Vehicular's claim, but Vehicular did not. "[F]ederal question jurisdiction 'extend[s] only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 8 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.' (*Christianson v. Colt Industries Operating Corp.* (1988) 486 U.S. 800, 808–809, 108 S.Ct. 2166, 100 L.Ed.2d 811 (*Christianson*); see also *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.* (2002) 535 U.S. 826, 122 S.Ct. 1889, 153 L.Ed.2d 13.)" (*Holiday Matinee, Inc. v. Rambus, Inc.* (2004) 118 Cal.App.4th 1413, 1422, 13 Cal.Rptr.3d 766.) Patent law is not a necessary element of the claims here.

**\*9** Tractech's reliance on *Kabehie v. Zoland* (2002) 102 Cal.App.4th 513, 125 Cal.Rptr.2d 721 is misplaced. That case arose out of contracts for the purchase of exclusive rights to music compositions. The complaint brought causes of action for breach of contract, fraud, and interference with economic relations. We employed the "extra element" test for federal copyright preemption, and concluded that the causes of action were preempted to the extent that they asserted rights equivalent to the exclusive rights protected by federal law, but that the causes of action were not preempted if they required elements which were qualitatively different from the elements of a federal copyright infringement action. (*Id.* at p. 517, 125 Cal.Rptr.2d 721.)

Tractech cites the case, then argues that there was no extra element here because this case is only about a promise not to copy protected material. As we have seen, that is a serious mischaracterization of the case.

2. Collateral Estoppel

Tractech's theory here is that the Federal Circuit's ruling that the spring configuration of the EZ Locker was not the substantial equivalent of the spring configuration of the Lock–Right collaterally estopped Vehicular from claiming that Tractech copied the Lock–Right. In Tractech's view, when the Federal Circuit decided that the spring and cap did not infringe on the double spring under the doctrine of infringement by equivalents, it decided that the EZ–Locker was not in any respect a copy of the Lock–Right. Of course, that is not what the Federal Circuit decided. Collateral estoppel precludes a party from relitigating issues actually litigated and decided in a prior proceeding. *(Branson v. Sun–Diamond Growers* (1994) 24 Cal.App.4th 327, 346, 29 Cal.Rptr.2d 314.) The contract and fraud issues here were not decided in the patent litigation. We see no collateral estoppel.

3. Evidentiary Issues

Tractech contends that a new trial is required because the court erred in excluding relevant patent evidence, specifying three categories of evidence. Two, the EZ Locker patent and the Federal Circuit's non-infringement ruling, are familiar, and we address them first.

Even if Tractech is right that the EZ Locker patent and the non-infringement ruling would have been relevant an issue in the case, whether the product Tractech sold was (but for the changes made to avoid patent infringement) a copy of the Lock–Right, relevance is not enough. A trial court has broad discretion under Evidence Code section 352 to exclude evidence which will "necessitate undue consumption of time" or "create substantial danger ... of misleading the jury." (*People v. Chapman* (1975) 50 Cal.App.3d 872, 881, 123 Cal.Rptr. 862.)

As the trial court found, the patent evidence Tractech sought to introduce was such evidence. The jury could not have understood the meaning of the Federal Circuit's non-infringement ruling or the meaning and import of the EZ Locker patent without hearing evidence on patent drafting, patent litigation, and the technicalities of patent infringement. The evidence would have been very time consuming and would have had presented an obvious potential for juror confusion. It is not even clear that such evidence could have been presented without delaying the trial, since no expert on the issues was on either side's witness list.

**\*10** Further, although Tractech argues in several places that the jury did not know of the non-infringement, the evidence is to the contrary. In opening statement, Tractech said that the spring cap was a substantial improvement, "and that these improvements eliminated any potential patent offense and there was no patent offense...." Both Vehicular and Tractech elicited testimony from Tractech chief engineer Walter Dissett that the EZ Locker was redesigned to avoid patent infringement. When Dissett testified that "We never had any desire to infringe on any patent," counsel for Vehicular commented "We agree. So stipulated. We're not suggesting you did." In closing argument, Tractech argued that "there was a mistake made," when the EZ Locker was introduced with a copy of the spring assembly, but that "it was taken off the market before it was sent to distributors, before a single unit was sold. But when they did introduce the product, it did not

Case 3:14-cv-03985-JD Document 258-4 Filed 03/13/17 Page 9 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

include any protected aspect whatsoever." If that was not enough for Tractech, it should have introduced additional evidence or accepted Vehicular's offer to stipulate to non-infringement.

Tractech's third contention of error requires a few words of factual background: During the 1993–1995 time period, while Tractech was copying the Lock–Right, it also attempted to develop a similar product on its own. Jim Bawks was a Tractech engineer who worked on that project. Tractech did not ultimately use his design, but did pursue it for a period of time. During examination of McGee, Tractech sought to introduce evidence that it prepared (or had begun to prepare, the record is unclear) a patent application for the Bawks device. The evidence was offered to show that Tractech was serious about pursuing the Bawks design and was not engaged in a deceitful plan to copy. On Vehicular's objection, the court excluded the evidence.

We cannot see that evidence of a patent application on the Bawks design would have made any difference to this trial. McGee testified that beginning in February 1993, Tractech spent a year on the Bawks design, and took the jury through the technical details of that design. Another of Tractech's engineers testified about the process. Tractech was, of course, free to introduce other, similar, evidence from other witnesses. Evidence that Tractech had prepared a patent application would have been cumulative.

4. Issues relating to damages

*a. Lock–Right damages*

On the Lock–Right, Vehicular damages expert Marc Margulis calculated the number of sales Vehicular could have expected between 1996 (when the EZ Locker was introduced) through 2002 (when Vehicular was sold), capping those sales at what he deemed a conservative number of 30,000 a year. He then determined Vehicular's costs per unit and its actual sales, and concluded that Vehicular had lost profits of $8.5 million.

Margulis testified that the profits were lower than would have been expected because competition from the EZ Locker caused confusion in the marketplace and forced Vehicular to lower its prices, so that Vehicular had less money "to be out there with advertising, with promotion" or for research and development, and was left "undercapitalized to achieve its goals."

*11 Margulis also computed the worth the business would have had at the time it was sold, without Tractech's fraud, breach of contract, and misappropriation of trade secrets, and compared it to the actual sum realized on the sale, an additional loss of about $4 million. That is a total of $12.5 million, compared to the $8.9 actually awarded. [12]

Tractech's contention that the Lock–Right damages are insupportably high is based primarily on the fact that Vehicular abandoned its common law unfair competition cause of action at the close of evidence, so that there was no jury instruction or special verdict on the cause of action. Tractech contends that there was thus no legal theory on which the jury could have based an award for disparaging advertising. It further argues that the jury award on the Lock–Right did include such amounts. Tractech's theory of Vehicular's damages is that loss of sales due to disparaging advertising must be ignored, so that the only sales Vehicular lost were the sales Tractech made. Citing evidence that it sold at most 5,000 EZ Lockers a year, it contends that Vehicular lost at most $2.89 million in sales to the EZ Locker.

Tractech's argument here, like all its damages arguments, depends on a vast oversimplification of the evidence and of Vehicular's case. Vehicular presented evidence that Tractech set out to bury the Lock–Right, and did so by taking advantage of its position as an industry leader and of Vehicular's confidential business information. Vehicular's evidence was that Tractech did not want to sell EZ Lockers, and that its actions, including breach of contract, fraud, disparaging advertising, price cutting, and targeting the most profitable models, put Vehicular into a corporate tailspin, causing it to incur the expense of rushing a new product to market, making distributors reluctant to sell the Lock–Right, and hurting profits, growth, Vehicular's management structure, its ability to plan, and every other aspect of its corporate life. Dismissal of the cause of action for unfair competition had no effect on the jury's ability to award damages according to this proof.

Finally, Tractech argues that, even if Vehicular was entitled to recover for disparaging advertising, there was no substantial evidence that the advertising was

Case 3:14-cv-03985-JD Document 258-4 Filed 03/13/17 Page 10 of 12

**Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...**
2005 WL 1460296, 75 U.S.P.Q.2d 1661

false, and no evidence that disparaging advertising caused a loss in profits. We see substantial evidence in testimony from Zentmyer, Vehicular principal Mark Tyson, automotive expert Jerry King, who specialized in repairing differentials, and automotive engineer Wesley Schultz that testing and experience revealed that the Lock–Right was as durable as the Detroit Locker, and testimony from Tyson that Tractech's disparagement of the technology hurt the product line. Further, Dissett testified that "occasional" meant that the device would "break if you use it all the time," and counsel for Vehicular quite properly appealed to the jury's common sense, asking jurors to consider the effect of characterizing a mechanical device as fit for only occasional use.

**\*12** In its reply brief, Vehicular argues that the jury could have awarded damages over and above EZ Locker sales based on the evidence that due to Tractech's actions it had cut prices and that it lacked funds for marketing. In response, Tractech argues that there was no substantial evidence for an award of damages based on those factors, citing the lack of specific data on various points. These arguments—indeed, Tractech's entire argument in this regard—misses the mark. The question on appeal is whether there is substantial evidence for the award of damages, not whether all possible evidence has been presented on each possible component of the award.

"Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty. [Citations.] The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." (*GHK Associates v. Mayer Group, Inc. . (1990) 224 Cal.App.3d 856, 873–874, 274 Cal.Rptr. 168.*) The damages award on the Lock–Right passes muster under that rule.

### b. *Performance Locker damages*

Margulis's analysis on these damages was similar to his analysis on the Lock–Right: he calculated the sales Vehicular could have expected, considered the actual sales, and determined that Vehicular lost profits of $12.8 million. He also testified that he did not have the same degree of comfort with the numbers on predicted sales as he did with the EZ Locker, because unlike the EZ Locker, the Performance Locker had no track record. (In closing argument, counsel for Vehicular asked the jury to award fifty percent of the $12.8 million.)

Tractech challenges this damage award in several ways, contending that no damages could logically be awarded for lost profits on the Performance Locker prior to the date of its planned introduction, that the damages were too speculative, that the damages are duplicative of the prejudgment interest award, and that there is no substantial evidence for the award.

We find substantial evidence for the award in Margulis's testimony concerning the amount of the lost profits and the lost business value. The evidence was not speculative, but was based on Vehicular's financial records and Tyson's calculations of the potential market for the Performance Locker. "[I]t is within the province of the trier of fact to reconcile conflicting testimony when presented with wide discrepancies in the estimates of value and damage by witnesses for each side." (*Contra Costa Water Dist. v. Vaquero Farms, Inc. (1997) 58 Cal.App.4th 883, 905, 68 Cal.Rptr.2d 272.*)

Tractech's argument about lost profits prior to the date of the planned introduction of the Performance Locker fails because (among other reasons) it cannot be said that the jury did award such damages. Margulies testified to $12.8 million in lost profits and $13 million in lost value on sale. The jury awarded only $4 million. Tractech did not ask for a special verdict segregating the damage award, and thus waived any claim of error. (*Heiner v. Kmart Corp. (2000) 84 Cal.App.4th 335, 346–347, 100 Cal.Rptr.2d 854.*)

**\*13** Similarly, the claim that prejudgment interest was improper was waived, in that it was not raised in the trial court. (*Jones v. Wagner (2001) 90 Cal.App.4th 466, 481–482, 108 Cal.Rptr.2d 669.*)

### c. *Lost business value*

As we noted earlier, Vehicular presented evidence that it suffered not only lost profits, but that it was forced to accept a lower value at sale, due to Tractech's conduct. Tractech argues that to the extent that the jury awarded damages for lost business value, those damages are duplicative of the lost profits damages, and also argues that because the damages represent lost future profits, they belong to Vehicular's successor, not to Vehicular.

Nor do we agree that the damages are duplicative. Vehicular presented evidence that without Tractech's tortious conduct, it would have had a prosperous business

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 11 of 12

Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...
2005 WL 1460296, 75 U.S.P.Q.2d 1661

in 2002, which could have been sold for a high price, but that due to Tractech's conduct, it was a business with low sales, poor marketing, and management disarray, and could only command a low price. Margulies testified that "a valuation of a business is by definition all about the future," that Vehicular would have earned substantial additional sums (the lost profit damages) from 1996 to 2002, and then, in addition, would have garnered an additional $17 million on the sale of the business in 2002. His opinion, based on his review of the facts, was that Vehicular would have had over $20 million in lost profits *and* $17 million at the time of the sale. That is substantial evidence that the damages were not duplicative, but would actually compensate Vehicular for the harm caused by Tractech's torts.

The jury was not asked to specify an amount of damages for each cause of action, but to determine the amount of damages attributable to all causes of action. Thus, these damages represent not just contract damages, for which a plaintiff is entitled only to "damages that are equivalent to the benefit of the plaintiff's contractual bargain" (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968, 22 Cal.Rptr.3d 340, 102 P.3d 257) but tort damages, "so that the measure of damages ... is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ.Code, § 3333; *Engle v. City of Oroville* (1965) 238 Cal.App.2d 266, 272–273, 47 Cal.Rptr. 630.)

Finally, we cannot agree with Tractech that the lost business value damages belong to Vehicular's successor. To the contrary, Vehicular's successor paid a low price which reflected the damage caused by Tractech's torts.

Disposition

The judgment is affirmed. Respondent to recover costs on appeal.

We concur: TURNER, P.J., and MOSK, J.

**All Citations**

Not Reported in Cal.Rptr.3d, 2005 WL 1460296, 75 U.S.P.Q.2d 1661

Footnotes

1   This is what may be called a Russian novel case, where the parties and products have several different names. For instance, Vehicular was once called Industrial Technologies, and the Lock–Right was once the L.A. Locker. For purposes of sanity, we use one name per party and one per product.
2   The jury heard evidence that when Vehicular representatives told Tractech representatives about the patent, the Tractech representatives said that they "intended to copy everything that [Vehicular] did in order to drive [Vehicular] out of business."
3   The jury was instructed, as part of the instructions on the trade secrets cause of action, that "[r]everse engineering or independent derivation alone shall not be considered improper means, absent a valid promise or agreement not to copy."
4   The "yes" answers to questions 2, 4, 6, 8, and 10 meant that the jury was instructed not to answer the question "did plaintiff prove by a preponderance of the evidence that defendants made a clear and unambiguous promise not to copy the Lock–Right product?" and additional questions concerning reliance on that promise and damages suffered due to the reliance.
5   One of those claims, preemption, was not raised in the trial court, but is nonetheless cognizable on appeal. (*Balboa Ins. Co. v. Trans Global Equities* (1990) 218 Cal.App.3d 1327, 1338–1339, 267 Cal.Rptr. 787.) Another, collateral estoppel, was raised only in Tractech's motion in limine to exclude evidence that the EZ Locker was a copy of the Lock–Right. This means that many of the relevant documents were not before the trial court. Tractech has asked us to take judicial notice of various pleadings and orders in the District Court case. We grant the motion, and also grant Vehicular's request that we notice additional documents, necessary to our understanding of the case. (Evid.Code § 452.)
6   Indeed, Vehicular offered to so stipulate.
7   We grant Tractech's request that we take judicial notice of that document.
8   In the opinion on the preliminary injunction, that Court wrote "As for the purported ease with which Tractech may have designed around this patent, that result was invited by the language used by the patentee to define his claim." (*Vehicular Technologies Corp. v. Titan Wheel Intern., Inc.* (Fed.Cir.1998) 141 F.3d 1084, 1091–1092.) The concurring justice in the summary adjudication case noted that "a skilled patent drafter" would have readily foreseen the limiting potential of the

**Vehicular Technologies Corp. v. Titan Wheel Intern., Inc., Not Reported in Cal.Rptr.3d...**
2005 WL 1460296, 75 U.S.P.Q.2d 1661

Case 3:14-cv-03985-JD   Document 258-4   Filed 03/13/17   Page 12 of 12

|     | |
| --- | --- |
|     | "consisting of two concentric springs limitation." (*Vehicular Technologies Corp. v. Titan Wheel Intern. ., Inc., supra,* 212 F.3d at pp. 1383–1384.) |
| 9   | Tractech cites in support Vehicular's position in the patent litigation about the importance of the patented spring design, and argues that Vehicular thus admitted that the non-patented parts of the Lock–Right were unimportant. If Tractech suggests a judicial admission, we see none. The federal patent litigation gave Vehicular no forum for complaining about anything but infringement on patented components of the Lock–Right. |
| 10  | It is true that Tractech sought to introduce the fact of the patent into evidence at trial, and now claims the exclusion of the evidence as error. However, there is no reason to believe that introduction of the patent at trial would have developed the evidentiary record required to evaluate the preemption claim, at least without the introduction of extensive additional evidence—precisely the additional evidence which led the court to exercise its discretion under Evidence Code section 352. |
| 11  | That complaint is not in our record. |
| 12  | Tractech argues that the lost business value damages were improper, but, as we explain below, we disagree. |

**End of Document**                                            © 2017 Thomson Reuters. No claim to original U.S. Government Works.