**Pages 1 - 71**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| TELESOCIAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. C 14-03985 JD** |
| | ) | |
| ORANGE, S.A., et al., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

San Francisco, California
Friday, March 24, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Telesocial, Inc.:

                        Quinn, Emanuel, Urquhart & Sullivan LLP
                        555 Twin Dolphin Drive, 5th Floor
                        Redwood Shores, CA  94065-2193
                        (650) 801-5000
                        (650) 801-5100 (fax)
            BY:  **TODD MICHAEL BRIGGS**
                **MAISSA CHOURAKI**
                **DAVID EDWARD MYRE, III**

                        Quinn, Emanuel, Urquhart & Sullivan LLP
                        50 California Street, 22nd Floor
                        San Francisco, CA  94111-4624
                        (415) 875-6600
            BY:  **AMY H. CANDIDO**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

1  **APPEARANCES**:

2  For Plaintiff Telesocial, Inc.:
                         Singer / Bea LLP
3                        601 Montgomery Street, Suite 1950
                         San Francisco, CA  94111
4                        (415) 500-6080
                    BY:  **RENEE BELTRANENA BEA**
5                        **BENJAMIN LABAN SINGER**

6  For Defendant Orange S.A.:
                         Durie Tangri LLP
7                        217 Leidesdorff Street
                         San Francisco, CA  94111
8                        (415) 362-6666
                         (415)  236-6300 (fax)
9                   BY:  **DARALYN J. DURIE**
                         **EUGENE NOVIKOV**
10
   For Defendant Orange S.A.:
11                       Foley Hoag LLP
                         Seaport World Trade Center West
12                       155 Seaport Boulevard
                         Boston, MA  02210-2600
13                       (617) 832-1000
                    BY:  **ANTHONY MIRENDA**
14
   For Defendant Orange S.A.:
15                       Foley Hoag LLP
                         1540 Broadway, 23rd Floor
16                       New York, NY 10036
                         (646) 927-5500
17                  BY:  **DANIEL SCHIMMEL**

18

19

20

21

22

23

24

25

```
1  Friday - March 24, 2017                              10:25 a.m.

2                    P R O C E E D I N G S

3                         ---oOo---

4           THE CLERK:  Please be seated.  Calling Civil 14-3985,

5  Telesocial, Inc., versus Orange S.A.  Will the parties please

6  state their appearances for the court?

7           MR. BRIGGS:  Good morning, Your Honor, Todd Briggs

8  from Quinn Emanuel for the plaintiff, Telesocial.  Also with me

9  is Amy Candido.

10          MS. CANDIDO:  Good morning, Your Honor.

11          MR. BRIGGS:  David Myre?

12          THE COURT:  Who was that?  Amy Candido?  Okay.

13          MR. BRIGGS:  And Maissa Chouraki.  And Ms. Chouraki

14  is a second-year lawyer who you may hear from today if we --

15          THE COURT:  Okay.

16          MR. BRIGGS:  -- argue jury instructions.

17          THE COURT:  All right.

18          MR. BRIGGS:  And also with me is our co-counsel from

19  the firm of Singer Bea, Ben Singer.

20          MR. SINGER:  Good morning, Your Honor.

21          MR. BRIGGS:  And Renee Bea.

22          THE COURT:  All right.

23          MS. DURIE:  Good morning, Your Honor.  Daralyn Durie,

24  from Durie Tangri, representing Orange.  With me is my

25  colleague, Eugene Novikov, also from Durie Tangri; and
```

**PROCEEDINGS**

1  Mr. Schimmel and Anthony Mirenda from Foley Hoag.

2          **THE COURT:**  I didn't catch that last part.

3          **MS. DURIE:**  Daniel Schimmel and Anthony Mirenda.

4          **THE COURT:**  Yes.  Great.  All right.  Okay.  Well,

5  let's see.  So you've all been with Judge Tigar.  Is that

6  right?  Why don't you come on up?

7          **MR. BRIGGS:**  Yes, Your Honor.  We met with

8  Judge Tigar on Monday.  We made some progress, and we're

9  continuing to talk and continuing to work with Judge Tigar.  I

10  think he was going to be out of town next week, but he planned

11  to communicate with us when he was on his trip.

12          **THE COURT:**  Okay.  Do you have anything set up to see

13  him again, or is it more open?

14          **MR. BRIGGS:**  It's more open-ended than that.  We

15  don't have another meeting scheduled.  The only date he had

16  available on his calendar was March 20th, before trial.

17          **MR. MIRENDA:**  He did ask the parties to get in touch

18  with him after today's proceedings, this afternoon, or Monday,

19  to let him know the progress.

20          **THE COURT:**  Okay.

21          **MR. MIRENDA:**  And perhaps have further discussions.

22          **THE COURT:**  All right.  Good.  Well, I'm glad that

23  worked out.

24      Sorry.  Just turning my calendar on.  Just one second.

25      Okay.  All right.  So here are --

**PROCEEDINGS**

1     This part, you can sit down.  Here are the general

2  dynamics.  So we're going to have you in on April 3rd at

3  9:00 a.m.  And I do four days a week:  Monday, Tuesday,

4  Wednesday, Thursday.  Fridays are dark.  Okay?

5     And the trial day is 9:00 a.m. to 2:30 p.m.  There will be

6  two -- there's no lunch.  There are two 15- to 20-minute

7  breaks; one in the morning, and one in the early afternoon.  So

8  that lets -- I do that because, you know, this is a big

9  commitment by the jurors as well as by the litigants; by the

10  jurors particularly.  It's important that they get out early

11  enough not to get hung up in traffic; come in late enough to

12  get kids off to school and do other thing before we start.

13     So you've all asked for --

14     By the way, the pretrial filings were, for the most part,

15  in very good shape.  So thank you for that.  You have the

16  distinction of being the first sides who both actually followed

17  my order on motions *in limine*, and did only evidentiary issues.

18  And I'm grateful for that.  No covert summary judgment.

19     So in addition to that, I've decided to give you 16 hours

20  of trial time each.  All right?  So that's your examination

21  time:  All objections, everything else, other than opening and

22  closing.  You'll have up to 45 minutes for opening each, and up

23  to an hour for closing each.

24     Now, with my schedule of Monday through Thursday, that

25  should be about seven and a half, maybe eight -- or probably

PROCEEDINGS

1    seven and a half trial days.  Okay?  So that will be two weeks

2    of actual calendar time before it goes to the jury.  So you

3    should plan on that.  And I will tell the jury that when they

4    arrive.

5         I do need, before I forget, a very short two- or

6    three-sentence joint description of the case.  I share that

7    with the venire panel when they come in, so they know what's

8    happening.  So make sure you get that to me -- unless I say

9    otherwise, just assume everything that we talk about today

10   should be due by 5:00 p.m. on Tuesday of next week.  Okay?

11   Now, if that's a problem, you can discuss it with me, but it

12   will help me keep things in order just to set that as a

13   deadline.  So get that to me by 5:00 p.m. -- just a very short

14   statement which I can read to the venire panel.

15        I'm going to seat nine jurors.  And what I do is a strike

16   and replace method.  So we'll call in, you know, somewhere

17   between 40 and 50 people; probably more towards 40.  This is

18   not the kind of case where people are going to have a lot of

19   conflicts with, unlike other cases we do.  I will seat nine in

20   the box.  They're all randomly called.  All right?

21        Now, I do the *voir dire*.  It's going to be based on my

22   standard demographic questions and the questions that you all

23   have submitted that I need to give.  And I'll have that out

24   Monday or Tuesday of next week.  And, you know, if you want to

25   object to anything or supplement, you'll have a chance to do

**PROCEEDINGS**

1  that, but that will be the *voir dire*.

2       Now, I will have each person in the box -- all nine

3  jurors -- speak out loud, so you will hear them and you will

4  see them.  They will have a hand mic, and they will answer the

5  eight -- we have about eight basic demographic questions.

6  Where do you live?  Relationship status.  Employment history.

7  Education background.  Military service.  Prior jury service.

8  The usual eight questions that are asked of everybody.  They'll

9  pass the mic around.  You can see them and hear them, as I

10 mentioned.  Then I will ask the *voir dire* that we especially

11 agree to.

12      Now, when I ask the nine in the box, I am also going to

13 ask the same questions of all the people in the venire panel --

14 Okay? -- because I don't want to have to repeat it.  It's too

15 time-consuming to do it.  Now, the people in the audience are

16 going to have a notepad and a pen.  And I'm going to give them

17 the question number -- you know Question Number 4, for example.

18 Have you ever been involved in a trade-secret litigation?  I'm

19 just making that up.  Okay?

20      Everyone here will respond by raising his or her hand.

21 And if there's follow-up, we'll handle it; but everyone in the

22 audience is going to make a note, saying, *When I get called up,*

23 *if that happens, I will tell the Judge I haven't answered*

24 *Number 4.*  It makes things go much more quickly.  All right.

25 So we'll go through all of that.

**PROCEEDINGS**

1        And you'll have your peremptories, as accorded by statute.

2    I think the statutory number will be fine.  And you can --

3    we'll have a sidebar at that point.  And you can dismiss anyone

4    that you want, under your peremptories, or raise a cause

5    challenge, if you need to do that.

6        Now, when I excuse someone who is in the box, that seat

7    will be filled in the same order as that person was excused.

8    So, for example, if it's Juror Number 7 who was excused, one

9    person will come up and fill Juror Number 7's seat.  All right?

10        Now, there are two thing you need to keep in mind.  If we

11    do a round of challenge and you do not challenge someone

12    sitting in the box, that person is a juror.  You cannot go back

13    later and say, *We want to actually raise a challenge to*

14    *Number 1*.  If you pass on someone, that person is seated.

15    There's no backhoe-ing.  Okay?  So that's the first point.

16        Second point is, as I said, you can -- I'm going to fill

17    each seat.  So once people are seated, and pass, that seat is

18    taken.  You're not shuffling people around.  All right?

19        So any questions so far on that?

20            **MR. BRIGGS:**  No.

21            **MR. MIRENDA:**  Your Honor.

22            **THE COURT:**  Jury selection typically take about 90

23    minutes.

24        Sorry.  Go ahead.

25            **MR. MIRENDA:**  Just the one question.  I thought

**PROCEEDINGS**

1   Your Honor -- maybe I misheard.  Your Honor said April 3rd.  I

2   thought it was -- April 10th was the opening first day of

3   trial.

4            **MR. BRIGGS:**  That's correct.  I heard the same thing.

5            **THE COURT:**  It's when?

6            **MR. BRIGGS:**  I said I heard the same thing.  I heard

7   "April 3rd," too.

8            **THE COURT:**  Oh, it's April 10th.  Who set for

9   April 3rd?

10           **THE CLERK:**  Nobody, but you have something on the

11  4th.

12           **THE COURT:**  Oh, okay.  All right.  That's someone

13  else's trial.  Okay.  So all of that still applies, but I will

14  see you on April 10th.  Is that right?  Okay.

15           **MR. BRIGGS:**  Can I ask for one clarification,

16  Your Honor?  Did you say 15 hours or 16 hours?

17           **THE COURT:**  Sixteen.

18  (Discussion off the record.)

19           **THE COURT:**  That was user error.  I was looking at

20  another Judge's calendar.  So we are all set.  And I was

21  concerned, because it said, "Judge out the week of April 10th,"

22  and I don't remember going anywhere.  Okay.  All right.

23       Any other questions on jury selection?  No?

24       All right.  So be prepared to open on that Monday.  And

25  you always -- whoever -- plaintiffs, starting with you, you

**PROCEEDINGS**

1   need to have your witnesses next in order ready to go.  Okay?

2   If anyone does not have -- I don't want to burn jury time.

3   We're not going to end a half hour early or 45 minutes early or

4   even 15 minutes if someone's not available.  This is a precious

5   time, a precious resource; and we're going to make every effort

6   to be efficient and optimal in its use.  So you must have your

7   next-in-order witness on deck and ready to go.  If you don't,

8   you're going to be deemed to have rested.  Your case-in-chief

9   will be over.  Okay?  So between letting witnesses burn time in

10  the hallway and wasting jury time, it's going to be on the

11  witnesses.  All right?  Be aware of that, and make sure you

12  have your folks ready to go.

13         Now, I do let jurors ask questions.  We'll have a written

14  form.  Before I dismiss each witness, I will ask the jury if

15  they have any questions.  I've had about 15 trials to date, and

16  in almost all of those, questions have been asked -- not in

17  criminal cases, but in civil cases -- and they have uniformly

18  been outstanding questions.  So I encourage that, and I'm

19  looking forward to doing that.  We will have a brief discussion

20  before I decide whether to ask a question or not.  I think on

21  only one occasion or two occasions have I declined a question,

22  but I will talk about it first, and then I will pose the

23  question to the witness before the witness is discharged.

24         The jurors are also going to be allowed to take notes.

25  And one of the things you two are going to do is prepare a jury

1    notebook this size.  One-inch binder.  Okay?  And you're going

2    to put on a caption sheet that's very plain.  It just says the

3    name of the case, and then "Juror Notebook," in about this

4    size; you know, about 15-, 16-point font at the bottom.  Bring

5    in 12 of those, just so we have a few extras.  This will be on

6    the first day of trial.  It should have three tabs in it.

7         Behind the first tab, put in 50 -- five zero -- pages of

8    lined, ruled paper; kind of thing you may have used at some

9    point in your school life, but make sure it's three-hole

10    punched, and it's in the binder, and it's lined.  That's going

11    to be their notepaper.

12         Behind the second tab we're going to put in headshots;

13    eight-and-a-half-by-eleven headshots of each witness before

14    they testify.  So you may -- you need to set this up.  It's

15    very easy to do.  When you call a witness, as that witness is

16    being seated, you're going to give Ms. Clark the photograph, in

17    color.  It must depict the witness in exactly the same

18    appearance and clothes as of the day of testimony, with the

19    witness' name at the bottom.  All right?  That's to help the

20    jury keep track of who said what when.  It's a very effective

21    tool for the jury to remember testimony.  As they're being

22    seated, Ms. Clark will hand out the color headshot of the

23    witness, and they'll put that behind Tab 2.  Okay?

24         Behind Tab 3, each juror at the end of the case is going

25    to get a copy of the Final Instructions, to read along with me.

1   It's too hard to listen to these things.  They need to have

2   that.  And one copy in the jury room is not enough.  So each

3   juror is will have a full set of your Final Instructions, to

4   follow along as I read them out.

5        Now, if is there any need -- I don't think there is, but

6   do you all want to have any kind of glossary or anything to

7   hand out?

8             **MR. BRIGGS:**  No.

9             **THE COURT:**  If you want to, you can change your mind.

10  I mean, I'll do it only if it's a joint, agreed definition.

11  I'm not going to resolve any disputes, but if both sides want

12  to put in a couple of acronyms, that's fine.

13       Oh, also by Tuesday I need a list of all of the witnesses

14  or potential witnesses, so I can read their names during *voir*

15  *dire* to the jury.

16       Okay.  Any questions on that?

17            **MR. MIRENDA:**  Your Honor, again, that Tuesday -- is

18  that next Tuesday, or is it the Tuesday --

19            **THE COURT:**  Next Tuesday.  I want to get it.  I'd

20  like to get all of these things done.  Is that too soon?  You

21  want it to be next Thursday?  How about next Thursday?

22            **MR. MIRENDA:**  It's fine.  Whatever.

23            **THE COURT:**  Everything for Thursday at 5:00 p.m.

24            **MR. MIRENDA:**  All right.  Thank you.

25            **THE COURT:**  Much more time.  As you know, this is a

1    fully electronic courtroom.  All of the evidence will be

2    displayed on screens.  You don't have to pass anything out.

3    And you, in fact, shouldn't pass anything out, unless there's

4    some special reason for it.  Okay?  So the jurors all have

5    monitors.  I have monitors.  The public's going to have

6    monitors.  So make sure you're all fired up for that.  You can

7    make an appointment with Ms. Clark a couple days before trial.

8    Have your tech teams come in.  It's very easy.  Microsoft

9    plug-and-play display.  Have your teams come in; get it wired;

10   make sure you're ready to go, so that nobody's fumbling around

11   during trial time.

12       Now, the only hard copies you should give are to me and to

13   the witness.  All right?  So have a witness binder, just in

14   case the monitors aren't working very well; sometimes that

15   happens on the witness stand.  So you can examine a witness,

16   get your exhibits.  Make sure there's a hard copy on that desk,

17   and one for me.  It's much easier for me to look at documents

18   in print for objections than it is on screen.  So each day --

19       What I don't want is I don't want 30 binders of all of the

20   potential evidence.  I just want each day -- you come in.  You

21   have four witnesses.  At the start of each witness, you hand

22   Ms. Clark that binder with docs that you may or may not use;

23   but whatever the potential universe of exhibits is, so I will

24   have it here.  Okay?  I will probably return those to you at

25   the end of each day; maybe not.  But just do it witness by

**PROCEEDINGS**

1  witness; and not a giant, you know,

2  Encyclopaedia Britannica-size kind of thing, a reference that

3  makes sense only to the people over age 50.  Don't give me a

4  huge compendium.  All right?  Any questions on that?

5       No sidebars during trial.  Don't ask.  There will be no

6  sidebars.  If we have an issue, we can raise it before the

7  day's testimony or at the end of the day.

8       If you have an objection, stand up, so I can see it.  I

9  can't hear it, because I'm often looking at the witness or

10  looking at the screen or something.  Stand up and just say,

11  "Objection.  Hearsay."  Just one word.  Okay?  Or three words,

12  if you need to.  "Facts not in evidence."  Whatever you want to

13  say -- but that's it.  Okay?

14       All right.  I think that's all of the preliminaries.

15       Oh.  Also, for evidence that goes to the jury room, once

16  things are admitted, what I like to do is we have a dedicated

17  laptop that we put in the jury room.  So all of the evidence at

18  the end of the case, you're going to put on a USB stick.  Okay?

19  And that's going to be given to the jury, so they don't have to

20  shuffle through documents.  It's fully searchable.  It's

21  actually very handy for the jury to have.  There's a laptop in

22  the jury room.  It is completely severed from any external

23  access.  It has no internet or anything else.  It can be used

24  only to display the documents that are on the memory stick.  So

25  at the end of the trial, make sure your team gets together with

**PROCEEDINGS**

 1   Ms. Clark, and you all can get that put together.

 2         All right.  That's the basics.  Anything else?  Any

 3   questions?  No?  None?

 4         Okay.  Oh, and then the final thing is -- and Mr. Briggs?

 5               **MR. BRIGGS:**  Yes.

 6               **THE COURT:**  Mr. Briggs alluded to this.  Look.  We

 7   have a very urgent need for younger lawyers to have court time.

 8   So I want both sides to do everything you can do to get your

 9   younger attorneys up and examining a witness or, you know,

10   handling the defense of a witness, or doing something.  Okay?

11   This is the time to do it.  These types of trials don't happen

12   very often, so I would be grateful -- and I know your younger

13   colleagues would be grateful -- if you'd make a real effort to

14   get some of your less-experienced people some courtroom time.

15   Okay?  Can you do that, Mr. Briggs?

16               **MR. BRIGGS:**  Absolutely.

17               **THE COURT:**  Ms. Durie.

18               **MS. DURIE:**  Yes, sir.

19               **THE COURT:**  All right.  Good.  Okay.  Now let's do

20   the motions *in limine*.  All right.  Here are your motions *in*

21   *limine* rulings.

22         Orange's Motion Number 1 -- let me just get that.  All

23   right.  That motion is denied.  Trade secrets is an intentional

24   tort.  And the Business Plan -- I mean, the Facebook

25   Demonstration is relevant to issues of intent and motive.

**PROCEEDINGS**

 1  However, there will be no reference to the Nondisclosure

 2  Agreement or the breach of the Nondisclosure Agreement.  So,

 3  Telesocial, you can show that document from Facebook with

 4  respect to whether that is something the jury might want to

 5  consider for motive and intent, but no discussion of the NDA or

 6  the breach of the NDA.  All right?

 7       There's no Orange Number 2.  Right?

 8            **MR. MIRENDA:**  That's correct, Your Honor.

 9            **THE COURT:**  So Orange Number 3.  That's denied,

10  without prejudice, pending proof at trial.  I need to see some

11  thing before I can fully resolve this.  I do want to see

12  evidence that links the --

13       Is it LeDrogo?  Is that how you say it?

14            **MR. MIRENDA:**  LeDrogo.  Yes, Your Honor.

15            **THE COURT:**  All right.  I want to see evidence at

16  Telesocial that the LeDrogo Business Plan came out in some

17  close proximity in time to the misappropriation of the trade

18  secrets.  If that -- and you all have a little bit of dispute

19  about that timing.  If that timing is close enough, I will let

20  it in.

21       My other concern is I do not want the jury to be confused

22  or misled about that Business Plan with respect to potential

23  damages.

24       Now, the plan and the projections in it, you know, might

25  be relevant to a royalty theory; but it is not going to be

**PROCEEDINGS**

1  argued -- and we'll get to more about this when we get to

2  Mr. Foster -- Dr. Foster.  It is not going to be allowed to be

3  evidence of the valuation of plaintiff's trade secrets or

4  technology, or the valuation of any benefits to Orange.

5      And the reason for that is those projections are

6  completely speculative.  They were never realized in fact.  And

7  they're not a reasonable basis for a jury to decide actual

8  losses for plaintiff, or actual profits or gains for

9  defendants.

10      So if you all cross the threshold of showing on a

11  reasonable basis that the LeDrogo plan came out in close

12  proximity to the misappropriation, I will let it in.

13      I will also be open, if someone wants to request it, to a

14  limitings instruction, to make sure that the jury gets why it's

15  coming in, and we can help preëmpt any confusion about damages.

16      All right.  So I think that's the only two from Orange.

17  Is that right?

18          **MR. MIRENDA:**  That's correct, Your Honor.

19          **THE COURT:**  Okay.  Now, Telesocial.  The Telesocial

20  Number 1 -- that is granted in part.  Stillerman can testify.

21  However, he cannot, as I've said before, express any legal

22  opinions or conclusions that is not an appropriate role for a

23  testifying witness.

24      Telesocial Number 2 is granted on 402/403 grounds.

25  There's significant risk that jury would just kind of be

18

1  mystified by what's going on.  And it would be a significant

2  diversion of time to get through the truth of those issues.

3  And I think that's of doubtful relevance.  So it's excluded on

4  402/403 grounds.

5       Telesocial Number 4 is granted in part.  Any reference to

6  the lawsuit or litigation is excluded on 403/403 grounds.

7  However, if Mr. Tucker wants to come in and testify about why

8  he invested, and how much he paid, and what he got in terms of

9  ownership stake, that's perfectly fine.  So he can do that in

10 person, but there will be no discussion of any subsequent

11 litigation, breach of duties, or anything else that Mr. Tucker

12 alleged.

13      There was no opposition to the exclusion of the

14 $11 million to $13 million purchase price figure, and so that

15 number is excluded on that ground.

16      Telesocial Number 5 is granted.  Patents -- I'm going to

17 set the rule, because I can't figure out evidentiarily where

18 you are, but the rule is going to be:  If you did not disclose

19 the patents in discovery, they're not coming in now.  You can't

20 do that.  You can only -- Telesocial's request was broad and

21 perfectly reasonable.  So if the patent was not disclosed in

22 the course of discovery, it cannot be raised at this point.

23           **MR. MIRENDA:**  Your Honor, the patent was disclosed.

24 I think that was the point of our opposition, was that that

25 patent was disclosed and discussed extensively.  It was, in

**PROCEEDINGS**

1  fact, produced 14 times -- the patent, itself.  And it was

2  discussed during the expert depositions.  So --

3       **THE COURT:**  Well, I thought it wasn't disclosed in

4  response to the interrogatory.  Is that right?

5       **MR. MIRENDA:**  It was outside the scope -- this

6  particular patent was outside of the scope of the

7  interrogatory.

8       The interrogatory was asking for social calling patents,

9  which, of course, related to Facebook; patents related to

10  technology used involving social networks.

11       The social networks didn't exist back in 2001 when this

12  patent issue.

13       **THE COURT:**  Let me ask you this.  What are you

14  planning to do with these patents?

15       **MR. MIRENDA:**  The only reason this patent is

16  relevant, Your Honor, is because there is a particular feature

17  disclosed in the patent is the click-to-call technology.

18       **THE COURT:**  Okay.

19       **MR. MIRENDA:**  One aspect of what the plaintiff claims

20  as a trade secret is click-to-call.  And so we want to be able

21  to demonstrate that click-to-call was a publicly known feature;

22  that that's --

23       **THE COURT:**  As of what?  Was it 2001?

24       **MR. MIRENDA:**  Yeah, 2001.  Click-to-call has been

25  around for many, many years.  The plaintiffs have it as part of

**PROCEEDINGS**

1    their -- one of the trade secrets.  That's why it was

2    discussed.  Mr. Gray acknowledged during his deposition that if

3    something had been disclosed in a patent, it would not be a

4    trade secret.  So that's the relevance of this.  And --

5            THE COURT:  All right.  So let me just jump in.

6    Where do you say that you think it came up?  So it was not in

7    the interrogatories, but where did it come up?

8            MR. MIRENDA:  It was produced as a document in

9    discovery.  It was disclosed in response to a different

10   interrogatory that asked generally about Orange's history.  The

11   fact that Orange had a click-to-call patent was disclosed in

12   response to a different interrogatory.

13           THE COURT:  Which interrogatory was that?

14           MR. MIRENDA:  That was Interrogatory Number 5, which

15   said that since 2000, Orange had worked on projects involving

16   the ability to call individuals without knowing their phone

17   numbers.  And they'd owned patents in that area.  The patent,

18   itself, was produced in discovery.

19       And then it was the subject of inquiry at Mr. Telesocial's

20   expert, Mr. Gray's, deposition.  He was shown the patent.  He

21   was asked questions about the fact that if something had been

22   disclosed in a patent, it would, by definition, not be secret.

23   And he agreed with -- you know, obviously, agreed with that

24   proposition.

25       So that's the only purpose for it.

PROCEEDINGS

1        **THE COURT:**  All right I may have misapprehended that

2   record.  I thought it had not been disclosed at all.  Is that

3   right, Mr. Briggs?

4        **MR. BRIGGS:**  They did disclose it, Your Honor --

5   that's correct -- but not in response to this interrogatory.

6        And this interrogatory's very clear.  It asks Orange to

7   identify all patents related to social calling.

8        And now the way they want to use it -- Mr. Mirenda just

9   said this.  He wants to use it to show that one of our social

10   calling trade secrets had some feature that was in the -- in

11   the prior art.  So they are now taking the position that this

12   patent is related to social calling, but it was never in the

13   interrogatory response.

14        **THE COURT:**  Well, you had it.  You had the patent.

15   Correct?

16        **MR. BRIGGS:**  We did have the patent.

17        **THE COURT:**  And you had deposition testimony about

18   the patent?

19        **MR. BRIGGS:**  There was some deposition testimony, but

20   they -- but they never took the position --

21        **THE COURT:**  You weren't sandbagged by not having it.

22   You had it.

23        Now, whether they classified it in the right interrogatory

24   response is a very different issue from never having disclosed

25   it, and then springing it out on you after discovery's passed.

**PROCEEDINGS**

1    So I'm going to -- I may flip on this, but I'll just look

2 at this again.  I mean, I'm going to look at this again, but if

3 it turns out that I'm satisfied that it was disclosed, maybe in

4 a different interrogatory, but in an interrogatory, and was the

5 subject of deposition testimony, and in plaintiff's possession,

6 I'm probably not going to grant that motion.  I had

7 misunderstood the record.  I thought it had not been disclosed

8 at all.  A little slip-up under the wrong interrogatory number

9 is not enough.  I mean, you have it.

10    Look.  This is a very practical issue.  Did you have the

11 data and the evidence, or didn't you?  If you didn't, you win,

12 because you got sandbagged, and we're not going to let that

13 happen.  If you did have it, but it got to you in a way that

14 was not specifically in the path that you think is best, you

15 still had it in hand.  You're going to lose.  Okay?  All right.

16 I'll take another look at that.

17    And Telesocial Number 6.  Discovery one.  You know, it's

18 granted in part, but the rule's going to be what I just

19 articulated.  If a technical antecedent or some other project

20 was disclosed in discovery, then it's fine.  It can come in.

21 If it wasn't, it's not going to come in.  Okay?  I can't tell.

22 It's too hard for me to tell on these exhibits who did what

23 when, so we'll have to let the evidence unfold at trial; but if

24 it turns out that somebody starts talking about something that

25 is news to Telesocial, then it's not going to be allowed in.

**PROCEEDINGS**

1    **MR. BRIGGS:**  Yeah.  And can I clarify the purpose of

2  this motion *in limine*?

3    **THE COURT:**  Sure.

4    **MR. BRIGGS:**  We asked a very specific interrogatory

5  asking Orange how they developed the Party Call product.

6    **THE COURT:**  Yes.

7    **MR. BRIGGS:**  Which is the product that we claim has

8  been -- misappropriated Telesocial's trade secrets.

9    **THE COURT:**  Right.

10    **MR. BRIGGS:**  And they gave us a response.  And they

11  indicated in that response that the product was derived from a

12  product called "Viadeo," in part.  They didn't mention any

13  other products, at all.

14     And so what we -- what the purpose of this motion *in

15  limine* is, is we just want to prevent them from coming to

16  trial, and then having their witnesses say that they derived

17  Party Call from all of these other products that they've thrown

18  out during the course --

19    **THE COURT:**  I'm agreeing with you.  That's my order.

20  It wasn't disclosed.

21    **MR. BRIGGS:**  Okay.  Thank you, Your Honor.

22    **THE COURT:**  Now let me be clear.  If it wasn't

23  disclosed in Interrogatory 8 --

24     (Reporter requests clarification.)

25    **THE COURT:**  It's not in interrogatory 8, but it is

 1  disclosed in Interrogatory 15 -- I'm making numbers up --

 2  you're not going to take that position.  I'm not going to hold

 3  that position.  All right?

 4       If you had it and you knew about it -- I don't care what

 5  the conduit is -- it's going to be fair to raise at trial.  But

 6  if it did not come up, then it will not be allowed in evidence.

 7  All right?  The evidentiary bar is for one purpose, alone.  And

 8  that is to prevent people from being ambushed.  You can't say

 9  you're ambushed when you had the stuff in hand, even though it

10  didn't come to you in exactly the way you asked for it.  If you

11  have it in hand, you have it in hand.  And we're not advancing

12  on the head of formatting pins to try to exclude evidence.  All

13  right?  So that will be the rule.

14       Now, if this comes up, you just need to make a brief

15  comment to me, and I will resolve it out of presence of the

16  jury.  Now, you need to be prepared to show me exactly what it

17  was that was not disclosed, or what was disclosed.  All right?

18  Don't just tell me this happened.  You need to show me a

19  document or deposition testimony or something else that I can

20  look at and have an evidentiary basis, other than argument, to

21  make the decision.  Okay?

22       All right.  So I think that's it for the motions *in*

23  *limine*.  Is that right?  Any other ones out there?  No?

24       All right.  Let's do the jury instructions.  I'm just

25  going to do the disputed ones today, and then we're going to

**PROCEEDINGS**

1   work on getting a final set.

2       Now, what I do also is -- as every other trial judge does,

3   I do a preliminary set at the beginning.  And I'm going to ask

4   you to put that together for me by the end of week, as well.

5   We'll get to that, but that's just the introductory things.

6   What is evidence?  Burden of proof.  You know, some of the

7   basics.  None of the legal things.  We'll do that a little bit

8   later.

9       In the meantime, here are the disputed jury instructions.

10      Disputed Instruction Number 3.  I'm not going to give

11  that.  I don't think it's necessary, and I don't think it's --

12  it's not involved with the rules, so that is out.

13      Instruction Number 24.

14      By the way, if I miss any of the disputed ones, just let

15  me know.

16      So 24 and 28, which we'll get to in a moment.

17      You know, I -- so -- Orange, your only objection to

18  Telesocial's version of 24 is the lack of the Terms of Use

19  language.  Is that right?

20          **MR. MIRENDA:**  That's correct, Your Honor.

21          **THE COURT:**  Okay.  Now, Mr. Briggs, I just -- I'm

22  having a little trouble understanding where you're going to go

23  with the Terms of Use.

24          **MR. MYRE:**  Your Honor.  Your Honor, if I may --

25          **THE COURT:**  Yes, of course.

**PROCEEDINGS**

1          MR. MYRE:  David Myre.

2          THE COURT:  Yep.

3          MR. MYRE:  I think the problem with --

4          THE COURT:  Come up, up, up.

5          MR. MYRE:  Okay.  Thank you.

6     I think we heard your Terms of Use ruling loud and clear

7  last -- two weeks ago, but the problem that we have with the

8  proposal that they've made for their jury instruction is

9  they've basically taken a ruling in *Facebook* that was fact

10 specific, and made it a general rule.  And the statement that

11 they've --

12         THE COURT:  There's a -- I need more clarity, first,

13 on what you all are going to do with this Terms of Use

14 agreement.  I mean --

15         MR. MYRE:  Your Honor, I don't -- it's not our

16 intention to say that just because they breached the Terms of

17 Use, that is enough to get it over the line of a CFAA, or the

18 California --

19         THE COURT:  I'm being imprecise.

20    What is the alleged breach?  How did they breach the --

21 what is your theory about how they breached the Terms of Use?

22         MR. MYRE:  Sure.  So there's a couple different

23 provisions in there.

24    One was about reverse engineering portions of the

25 Telesocial API.

1          THE COURT:  Right.

2          MR. MYRE:  And then using that to essentially

3   unfairly compete with Telesocial.  And that's a second

4   provision in there that says, *Don't use our API to*

5   *reverse-engineer it and compete with us*.  So those are the

6   general bases for the breach claim.

7          THE COURT:  All right.  That is -- I had suspected

8   that was going to be your answer.  I'm glad you confirmed that.

9      There's just no way that those breaches are going to

10  amount to a CFAA violation.

11         MR. MYRE:  I understand that.  I understand that,

12  Your Honor.

13         THE COURT:  They just can't.

14         MR. MYRE:  But I think that they're -- and the case

15  that we cite is *Oracle* on this point.  And what that case says

16  is that when you look at the course of conduct that a company

17  engaged in -- and one of those things is they explicitly

18  breached the Terms of Use, and another one of those things is

19  they, you know, went behind -- I think in that case, it's that

20  they downloaded things illegally; and they also tried to

21  basically cover their tracks when breaking into the system.

22     And what the Court said is, *When you look at that as a*

23  *whole, that can be sufficient to say -- to be essentially*

24  *exceeding authorized access*.

25         THE COURT:  No.  I'm with you on that, but -- so --

1            **MR. MYRE:**  And so the reason --

2            **THE COURT:**  -- the two things you've outlined are not

3 going to be, in and of themselves, the basis for a CFAA or

4 California state law breach claim --

5            **MR. MYRE:**  Agreed, Your Honor.

6            **THE COURT:**  -- or access claim --

7            **MR. MYRE:**  Agreed.

8            **THE COURT:**  -- or hacking claim.  I'm telegraphing.

9 You understand what I'm saying.  Okay.

10       So with that in mind, I have a proposal.  So I think the

11 defendants' language is overbroad, and doesn't track

12 Ninth Circuit precedent -- particularly *Facebook* -- accurately,

13 so I'm not going to use that language, but here is my proposal.

14 We'll use Telesocial's version of 24.  And we will add

15 somewhere in there this language.  *In this case, if defendants*

16 *were authorized to access a computer, they did not exceeded*

17 *their authorization simply because they used the information on*

18 *the computer in a way that was not authorized by the Terms of*

19 *Use for Telesocial's API.*

20       Okay?  I think that's fair.  So I think that addresses the

21 defendants' concern.  You know, if you breached the ToU, you

22 don't want to necessarily have the jury immediately assume that

23 you were hacking, which is a fair point.

24            **MR. MIRENDA:**  Absolutely, Your Honor.

25            **THE COURT:**  And plaintiffs agree.  Is that right?

<u>PROCEEDINGS</u>

1          **MR. MYRE:**  Sorry.  What was the question again?

2          **THE COURT:**  If they simply breached the ToU --

3          **MR. MYRE:**  It would not be a violation of the CFAA.

4    I agree with that.

5          **THE COURT:**  I do think it's fair to advise the jury,

6    so I think that language does it.  All right?

7       So I'm going to have an amended set of these come out,

8    which you're going to help me with.  I will put that language

9    in there, and you can reflect on it, and give me some feedback

10   a little bit later.

11         **MR. MYRE:**  Sounds good.

12         **THE COURT:**  I think that's the appropriate way of

13   resolving that.

14      Now, with respect to the state-law analog, I think it's --

15   they're not the same claim.  They are two different bodies of

16   law.  *Nosel* (phonetic) and *Facebook* do not construe the

17   California state statute.  Nevertheless, I do think, just for

18   consistency and to avoid any kind of a jury slip-up, we should

19   use the same Terms of Use language in both locations.  Okay?

20   Any objection to that?

21         **MR. MIRENDA:**  No objection, Your Honor.

22         **MR. MYRE:**  No objection.

23         **THE COURT:**  Okay.  So that's what we will do on that

24   issue.  Now, for Number 28, which is the intent to defraud, I'm

25   going to stick with the Model Instruction.  The good-faith

1    issue is, I think, already baked into the idea of intent, so

2    you can certainly argue that; but I'm not going to supplement

3    the Model Instruction with that.

4        Jury Instruction Number 33 -- that's the one that we will

5    add the -- that's the California Data Access and Fraud Act.

6    We'll add the Terms of Use language to that.

7        Let's see.  Now, getting to the breach-of-contract claim,

8    Number 47, I am not going to give Number 47.  That's the one

9    offered by the defendants.  I think it's unnecessary and

10   potentially confusing.

11       But for the damages portion, I am -- this is -- disputed

12   Instruction 51, starting with Telesocial's version.  You know,

13   the special damages under the CACI need to be put into evidence

14   and defined by the Judge before we offer that to the jury.  So

15   I'm not -- I'm not going to spell out here exactly what it is

16   the jury should consider until I hear the proof at trial.  And

17   then we're going to give a very precise list of the special

18   damages that there is an evidentiary basis for the jury to

19   consider.  So that's going to be a little bit of the

20   placeholder instruction, but I'm not going to give the version

21   that is currently proposed by Telesocial.  It will be subject

22   to that revision as we get through trial.

23       And then there's a second version of 51 on lost profits

24   specifically, and that one I'm just not getting.  How?  What

25   are the conceivable lost profits in breach of the ToU?

PROCEEDINGS

1        **MS. CANDIDO:**  Your Honor, I believe the potential

2   lost profits --

3        **THE COURT:**  I mean, you know if you're selling

4   things, I get it; but these are Terms of Use.  And I just -- I

5   can't see what lost profit is traceable to the breach of a

6   Terms of Use agreement.  Any thoughts?

7        **MS. CANDIDO:**  We have thoughts, Your Honor.  And --

8        **THE COURT:**  Instruction withdrawn?

9        **MS. CANDIDO:**  I think we would actually like to

10  reserve this for proof at trial.

11       **THE COURT:**  No.  That's not going to work.  You need

12  to tell me now why it should be good.  I don't see any legal or

13  evidentiary theory, whatsoever, that would allow lost profits

14  to be attributed to the breach of the API Terms of Use.  Tell

15  me why I'm wrong.  Take a moment.  Go ahead.

16  (Discussion off the record.)

17       **MS. BEA:**  Your Honor, I'm going to see if I can help

18  address this issue.

19       **THE COURT:**  All right.

20       **MS. BEA:**  Renee Bea.

21      In part, the Terms of Use have provisions that instruct

22  that a user cannot misuse the API or reverse-engineer the API.

23  When we are talking about a software product that is put out on

24  the market, one of the last lines of defense for a software

25  company is this kind of a provision.

**PROCEEDINGS**

1        And, in fact, Terms of Use in the marketplace are used to

2    protect against these kinds of anticompetitive actions.  And so

3    it's conceivable -- and what we will introduce evidence of at

4    trial is that, in conducting these violations of the Terms of

5    Use, which certainly dovetail with other claims and other

6    conduct that will be presented at trial, if you take the

7    software product, reverse-engineer it, and market it out to the

8    world as your own, you deprive the software company of its

9    opportunity to profit off of its own product.

10            **THE COURT:**  But I thought Orange's product was Party

11   Call.

12            **MR. MIRENDA:**  Yes, Your Honor.

13            **THE COURT:**  I thought they didn't sell a single one.

14       Did you sell that to anybody?

15            **MR. MIRENDA:**  No, Your Honor.  Never launched.

16            **THE COURT:**  So what are the lost profits?

17            **MS. BEA:**  Your Honor, I think what is being mixed

18   together is unjust enrichment which would disgorge profits, and

19   what we're talking about, which is actual damages for which you

20   can show:  But for your conduct, I would have earned these

21   profits.

22            **THE COURT:**  We're all on the same page.  If they sold

23   something unjustly, you get that.

24       But you also have to show that you lost a sale.

25       Now, you can't lose a sale when your competitor never made

1  a sale.

2          **MS. BEA:**  I believe you can, Your Honor.  And I think

3  what the evidence will show is --

4          **THE COURT:**  Who did you lose in sales?  Who said,

5  Gosh.  *We would have purchased that product, but Orange has* --

6      What?  Party Call?

7          **MR. MIRENDA:**  Party Call, Your Honor.

8          **THE COURT:**  *-- so we're not going to buy yours.*

9      I haven't seen a lick of evidence that you all lost an

10  actual or even a proposed sale.

11          **MS. BEA:**  Well, Telesocial -- first of all, they --

12  Orange should not be able to benefit from taking the

13  technology, and then botching it.  They didn't make a sale, but

14  we'll introduce evidence that that's their own fault.

15      In the hands of Telesocial, with their knowledge about --

16  because they actually were a tech company that actually knew

17  how to make this product and knew how to get it out there,

18  Telesocial would have made sales.  It would have been able to

19  penetrate this market.

20      And we're not talking about just Party Call.  That is

21  somewhat of a misnomer in this case.

22      The backbone -- the core technology -- is the social

23  calling technology, which is private-facing APIs.  I'm not a

24  coder, so that's the best as I can explain it; but Party Call

25  was one user application that was possible on that platform,

**PROCEEDINGS**

1   which, yes, they blatantly reverse-engineered and marketed as

2   their own, but it goes beyond Party Call.  It goes to the API.

3          **THE COURT:**  All right.  You're going to have to -- it

4   can't just be:  It stands to reason we had a great product, and

5   nobody bought it; therefore, it must be Orange's fault.  That's

6   not going to be enough to get any damages; specifically

7   lost-profit damages.  Okay?

8       So if you're telling me you're going to have a witness on

9   the stand who's going to say something to the effect of, *I had*

10  *five meetings set up, and when Orange made its announcement*

11  *with Facebook, all those meetings were canceled, and all of*

12  *those meetings were directed to negotiating the license for*

13  *this product,* then maybe we'll let it in, depending on what the

14  facts show.

15      But if you're planning just to have the founder come in

16  and say, *This was a great product.  It was going to change the*

17  *world.  And I couldn't sell a copy*, and that's it, that's not

18  going to be enough.  Okay?  That is not a sufficiently concrete

19  and nonspeculative basis for getting damages, including lost

20  profits.

21      So I will somewhat take this under consideration,

22  depending on proof at trial; but I think you have a tall

23  mountain to climb to show that there is a reasonable basis for

24  the jury to decide that profits were lost from the breach of

25  the ToU.  All right?  So we'll do that.

<u>PROCEEDINGS</u>

1          MS. BEA:  I understand, Your Honor.  And --

2          THE COURT:  By the way, you all have this ritual

3    incantation at the end of each proposal about, *Please don't*

4    *speculate*.  That will be said once, and not again.  So all of

5    that will be excised from the individual jury instructions.

6          MS. BEA:  Thank you, Your Honor.  And I just want to

7    clarify.  So will this be an instruction that's reserved until

8    after the presentation of evidence?

9          THE COURT:  We'll do it at the close of the case.

10          MS. BEA:  Right.  Okay.

11          THE COURT:  I'm sure there will be various

12    directed-verdict or JMOL motions along the way.

13          MS. BEA:  All right.  Thank you.

14          THE COURT:  All right.  So that one will be under

15    reserve.

16          MS. CANDIDO:  Your Honor, sorry.  I don't want to

17    interrupt your flow --

18          THE COURT:  Yes.

19          MS. CANDIDO:  -- but on 52 and 53 --

20          THE COURT:  I haven't gotten there yet.

21          MS. CANDIDO:  Oh, sorry.

22          THE COURT:  Are we doing 52 or 53?

23          MS. CANDIDO:  They're stipulated instructions, but I

24    noticed a typo, so I just wanted to point that out.  Those are

25    breach --

**PROCEEDINGS**

 1          **THE COURT:**  Tell you what.  Here.  Let me see -- oh,

 2   go ahead.  Go ahead.

 3          **MS. CANDIDO:**  Those are breach-of-contract

 4   instructions, but that is missing from the heading.  All of the

 5   other ones do say "Breach of Contract" in the heading.

 6          **MR. MIRENDA:**  Ah.

 7          **THE COURT:**  Oh, I see.  I see.

 8          **MS. CANDIDO:**  So I just wanted to --

 9          **THE COURT:**  If I don't remember to add that --

10          **MS. CANDIDO:**  We'll fix it in the next go-around.

11          **THE COURT:**  Actually, I'm going to have you fix them.

12   Just make sure you fix that.  Okay?

13          **MS. CANDIDO:**  We'll try.  Thank you.

14          **THE COURT:**  Okay.  Let's get to -- oh, Number 60.

15   That is not in the model rules -- the Model Instructions.  I'm

16   not going to give that.  I think it's also unnecessary.

17      Number 65.  I am going to stick with CACI 4409, to the

18   letter.  So that means two things.

19      First, there's no reasonable-royalty instruction here, and

20   you need to have that.  So 4409 has a reasonable-royalty

21   provision.  And I am going to have you add that.

22          **MR. MIRENDA:**  Your Honor, if I may, because the

23   Kearl -- because of your ruling on the Kearl motion, I think

24   the reasonable-royalty piece of the plaintiff's claim dropped

25   out.

**PROCEEDINGS**

1    **THE COURT:**  No, I don't think that's right.

2    Reasonable royalty does not require expert testimony.  You can

3    have fact witnesses come in and lay the basis for reasonable

4    royalty.

5        How do they do that?

6        Well, for example, they might say, *We've had three license*

7    *negotiations, and we were offered this amount of money*.  Now,

8    maybe those never came to fruition, but it's at least some

9    evidence for someone to say, *All right*.  *They have had some*

10   *benchmark, or they had some other evidence that will come in*.

11   Reasonable royalty is not dependent on expert testimony.  So --

12   and I do think we need it, because when you get to this with

13   Foster's, I'll save it for him, but I am going to add that.

14       Now with respect to apportionment, you know, apportionment

15   make sense to me if Orange actually sold the product and had a,

16   you know, reasonable claim that the product was your trade

17   secrets plus something else.  And you need to carve that up.

18       You didn't sell anything, so I'm not sure what the

19   apportionment is supposed to go to.

20       **MR. MIRENDA:**  It sort of goes in the reverse,

21   Your Honor.  If they're going to come in and say that the

22   royalty that they were entitled to is for some universe of

23   things, that universe of things needs to be apportioned between

24   the trade secrets that I say they can prove that were

25   misappropriated, versus all of the other things that go into

**PROCEEDINGS**

1  that product, that go into that -- you know, the bundle of what

2  becomes the object of the license.

3          **THE COURT:**  What other things?

4          **MR. MIRENDA:**  Hopefully I made that clear.  Maybe I

5  should say that again?

6          **THE COURT:**  Your draft doesn't say that.

7      You say Telesocial must separate or apportion Orange's

8  profits.

9      That's not what you're saying now.

10     I mean, your draft says separated out.

11     There are no profits.  Right?

12         **MR. MIRENDA:**  That's correct, Your Honor.

13         **THE COURT:**  So why did you all suggest that?

14     Withdraw it?

15         **MR. MIRENDA:**  Withdrawn.

16         **THE COURT:**  Okay.  That's withdrawn.

17     Now, whether there's other apportionment, we'll see.  And

18  apportionment is something that may be an issue.  We're just

19  going to have to keep that reserved; but what threw me off was

20  the defendants' proposed version of apportionment didn't make

21  any sense to me, because you keep telling me you didn't sell

22  anything.  So --

23         **MR. MYRE:**  I think it came in the context of the lost

24  profits proposed instructions that Telesocial had had.

25     In response, our view was, *Well, if there is going to be a*

1  *lost profits, then it needs to be apportioned*; but Your Honor

2  is right.  It all sort of collapses, because the lost-profits

3  piece doesn't exist.

4          **THE COURT:**  That will be deemed withdrawn by the

5  defendants.  Okay.  Not the concept.  If we need apportionment,

6  we'll deal with it -- but as drafted in defendants' Instruction

7  65.

8          **MR. MIRENDA:**  Thank you.

9          **MS. CANDIDO:**  Your Honor, I think we don't need to go

10  into it now because we're not going to address it now, but I

11  would just state that we disagree with the applicability of

12  apportionment, especially defendants' assertion of patent

13  concepts of apportionment to trade secrets.  I -- they're

14  relying entirely on patent law.  I don't think the concepts

15  carry over to trade secrets in the same way.

16          **THE COURT:**  Well, there is a body of law that is

17  separate and apart from *Georgia Pacific* and patent law that

18  says you do have to have some apportionment.  And that is just

19  basic damages.  It's not patent driven.

20      Now, whether we end up doing it or not -- we're going to

21  have to see what happens at trial.  Okay?

22          **MR. MIRENDA:**  Thank you, Your Honor.

23          **THE COURT:**  I think that's it for the disputed

24  instructions.  Did I miss any?

25          **MS. CANDIDO:**  I think that's right.  I think the

1  remainder of the damages one relates to the speculation issue

2  --

3          MR. MIRENDA:  As long as it's said in one place,

4  Your Honor.

5          THE COURT:  So what I'd like you to do is -- you both

6  worked well on this.  So if you would provide a set.  Okay?

7      Now, number it the right way.  Right now, you know, just

8  number it in sequential order.  And revise it in a way that's

9  consistent with sample.  The first instruction is Instruction

10  Number 65.  All right?

11          MS. CANDIDO:  Sorry.

12          THE COURT:  Just start it with 1, sequentially all

13  the way through.  You'll have a minute notes tomorrow or

14  Monday, which will guide; will help refresh you on what we

15  discussed today.  And then write up a set that is consistent

16  with what I've ruled on today.  Okay?

17          MS. BEA:  I want to make sure I'm not making an

18  assumption.  Disputed Jury Instruction Number 66 is also on

19  deck, but I assume you want to resolve that along with --

20          THE COURT:  Sixty-six?

21          MS. BEA:  That is the instruction as to lost business

22  value.

23          THE COURT:  Oh, yes.

24          MS. BEA:  I assume we can probably resolve that along

25  with --

1          THE COURT:  We're going to have that discussion now.

2      By the way, the royalty language is in 4409.  Okay?

3          MS. CANDIDO:  We had actually negotiated at one point

4  a set of royalty --

5          MR. MIRENDA:  Yes, that were based on that.

6          MS. CANDIDO:  -- so we can put that back in the next

7  draft.

8          THE COURT:  If you both agree, that's fine; but if

9  you don't agree, I'm going to use what --

10          MS. CANDIDO:  It was based off of that --

11      (Simultaneous colloquy)

12          MR. MIRENDA:  -- it's 4409.  Tied to the case.

13          MS. CANDIDO:  Okay.  We're good on that.

14          THE COURT:  Okay.  Who is going to discuss Mr. Foster

15  with me?

16          MS. DURIE:  I will, Your Honor.

17          THE COURT:  All right.  Ms. Bea, I'm going to start

18  with you.  I am just having a hard time understanding the

19  damages case.

20      Now, before anybody overreacts -- I'm not saying that you

21  will -- if there is a misappropriation, we're going to have to

22  figure out some remedy.  Okay.  This is not going to be a wrong

23  without a right.

24      The problem I'm having is, given the facts of this case.

25  A very-early-stage company.  Unproven, untested technology.

1    And basically, one, it appears to be, as far as I know, one

2    potential suitor; the firm of the defendant.  A valuation of

3    actual loss to Telesocial seems very hard to do in a

4    nonspeculative fashion, without getting too far afield, which I

5    think Mr. Foster does.  Gains to Orange seem to be nonexistent,

6    because they never sold the product.  And it looks to me like

7    reasonable royalty is probably going to be your best bet.

8        Now, that's all a long lead-in into why Mr. Foster is not,

9    in my view, fitting the bill on what the damages are going to

10   be.

11       Now, I have no complaint, as I said last time, with his

12   qualifications.  He's an eminently qualified person in his

13   field.  There's nothing disqualifying about his background.

14   There's nothing disqualifying about his method.  For what it

15   was, his method was fine.

16       The problem is it's just not fitting a reasonable

17   nonspeculative measure of damages in this case.  The lost

18   enterprise value projected into the future -- it's just not a

19   cognizable trade-secrets breach or misappropriation remedy.

20       So what have I missed?

21       **MS. BEA:**  Your Honor, I think that the case *Vehicular*

22   *Technologies* is actually instructive.  In that case the

23   plaintiff's damages expert explicitly offered a similar measure

24   to Professor Foster's, in that he -- and this is a quote from

25   the case -- "He computed the worth the business would have

1  had" -- end quote -- at a future date, absent the defendant's

2  misconduct in that case.  That's precisely what we're doing

3  here.

4      The Court noted that *Vehicular* -- similar to what

5  Telesocial will present, *Vehicular* presented evidence that with

6  without defendant's tortious conduct, it would have been able

7  to pursue a prosperous business in social-calling technology.

8          **THE COURT:**  Let me just jump in on that, because we

9  carefully considered that case.  Now, it's an unpublished Court

10  of Appeals case, as you know.  There's nothing inherently wrong

11  with that, but it's not particularly persuasive.  It's not

12  something that appears to have been -- it's certainly not

13  published in a way that endorses it.  And it certainly hasn't

14  been followed in any other case that I'm aware of in

15  California; and you haven't shared any with me.

16      The problem I have is I think you're reading way too much

17  into that.  I mean, I think there was a much more solid factual

18  foundation for the $17 million that eventually get awarded here

19  that went right to Tractech -- or whatever the defendant's

20  name -- is tortious conduct in a way that you're not -- you

21  don't have that same sort of factual link here.  So I don't

22  think that case stands for the proposition that you're

23  suggesting.

24      I'm particularly skeptical about -- just to jump ahead, in

25  case you're going there, the *Electronic Funds* case.  I mean,

1   that case does not say anything close to what you all proposed.

2   That case, in fact, expressly says, *Plaintiffs have cited no*

3   *legal authority to support a damage award equaling the current*

4   *value of defendant's business, and we are aware of that.*   I

5   mean, it says exactly the opposite of what it was presented to

6   me to mean by Telesocial.

7       So, you know, you're zero and two on the cases.  And I'm

8   not seeing any case that allows you to get this kind of model

9   that Mr. Foster would like to present to the jury.  So what's

10  wrong with the reasonable royalty?  Why can't you just go with

11  that?  I mean, that is the default.  If you can't show actual

12  damages and actual losses, and you can't show that the

13  misappropriater has, you know, received ill-gotten gains

14  because those numbers are too hard, reasonable royalties --

15  they're exactly for that.  You don't -- you know, you don't

16  need to have an expert for that.  You can have people come in

17  and say, *Here's what we think the license would have been, and*

18  *here's why.*"

19          **MS. BEA:**  Your Honor, at this stage the question is

20  whether or not Telesocial's entitled to present evidence of

21  lost business value at trial.  And certainly that's plaintiffs'

22  burden, is to go and prove that.

23      But Telesocial doesn't --

24          **THE COURT:**  You're wanting to do it through an

25  expert.  So there is a *Daubert* door you have to walk through

PROCEEDINGS

1    first.  Okay?  And Mr. Foster --

2              MS. BEA:  Yes, and I would like to address that.

3              THE COURT:  Mr. Foster -- first, as an initial

4    proposition, he's coming up with a damages theory that is not

5    within mainstream trade-secrets damages measures.  It is not

6    based on actual loss to Telesocial.  It is not based on any

7    actual gain to Orange.  And it is not a reasonable royalty.  So

8    already he's way outside the box for what is conventional

9    trade-secrets damages.

10         He compounds that by saying, *Well, I'm going to look at*

11   *Telesocial in X period of time down the road, and use that*

12   *future value, which is dependent on these two completely*

13   *speculative events happening along the way, to come up with my*

14   *valuation*.

15         That's just too far out of the field.

16             MS. BEA:  Your Honor, I'd like to address both those

17   points in reverse order, if we can start with --

18             THE COURT:  Sure.

19             MS. BEA:  -- the notion that Professor Foster's

20   projecting into some long distance in the future.

21         Actually, Orange's misappropriation conduct occurred over

22   a period of many, many months.  And Professor Foster's estimate

23   of Telesocial's value, absent that misappropriation, is pinned

24   right in that time period when the misappropriation was

25   occurring, and takes into account not just the first access and

1  the second access and the copying that happened in September,

2  but the pervasive copying that happened through November, and

3  culminated with a global presentation.

4      **THE COURT:**  Where does it say that?

5      Because I see Mr. Foster being asked on page 6 of his

6  report to provide an estimate of Telesocial's value as a

7  company, assuming liability, and that the following two events

8  would have occurred.  It would have entered into a contract

9  November 2012 with Orange; and they would have completed a

10  Series B financing, you know, sometime after that, with some

11  unknown finance entity.

12      That's a far cry from saying in November of 2012, here is

13  my view of what Telesocial was worth as a company.  Period.

14      So if he said that, you know, I might be inclined to let

15  you roll the dice a little bit; and if I am satisfied at trial

16  that he had the basis for it, I might let it go.

17      I'm not ruling out lost business, per se.

18      Business.  Okay?

19      But the person that you have designated to be your witness

20  on that isn't testifying on lost business, per se.

21      He's testifying on:  Here's what Telesocial would have

22  looked like if, in addition to being the victim of

23  trade-secrets misappropriation, these two other highly

24  speculative events occurred downstream; and possibly downstream

25  by a matter of a year or two.

**PROCEEDINGS**

1        That's just not -- it's not just not within the realm of

2   reliable, nonspeculative, reasonable basis for damages.

3             **MS. BEA:**  Your Honor --

4             **THE COURT:**  Now, is he able to say -- does he say --

5        Now, let me pause for a moment.

6        Anything to add, Ms. Durie?

7             **MS. DURIE:**  No, Your Honor.

8             **THE COURT:**  Is he able to say -- is there anything in

9   there?  I mean, I've read this thing.  And you tell me if I've

10  missed it.  If he has said somewhere, *Well, here is*

11  *Telesocial's value as of this date in 2012.  And, you know,*

12  *there it is*, I mean, I think that's about all you can do,

13  because the rest of these opinions are off the board.

14            **MS. BEA:**  I understand.  Professor Foster did

15  actually address this during his deposition.  I apologize I

16  don't have the cite, but he was asked to point that.  And he --

17  he addressed that in November 2012.

18            **THE COURT:**  What did he say?

19            **MS. BEA:**  Was the time period.

20            **THE COURT:**  What did he say?

21            **MS. BEA:**  He said he was measuring as of November

22  2012, taking into account that period of time --

23            **THE COURT:**  I mean, is it in his report?  Is it in

24  this?

25            **MS. BEA:**  I mean, perhaps not as clearly as it would

**PROCEEDINGS**

1    be helpful for the Court right now, but --

2              THE COURT:  Is there anything in here that really

3    says that?

4              MS. BEA:  Where he --

5              THE COURT:  Can you just talk about the actual -- his

6    estimation of the actual value as of November 2012 or sometime

7    in 2012 without conditionals?  Hypotheticals?  Anything?  Does

8    he ever say that anywhere?

9              MS. BEA:  I don't want to speculate for you.  I

10   thought that was addressed this his report.  It was my

11   understanding of his opinion.  And I know it was addressed

12   during his deposition.

13             MS. DURIE:  Your Honor, I took Professor Foster's

14   deposition.  He did not offer an opinion that was not

15   predicated on the assumption that there was a Series B round,

16   and that there was some transaction with a major telco carrier.

17   His opinions were all predicated on these hypotheticals having

18   come to pass.

19             THE COURT:  Is that right, Ms. Bea?

20             MS. BEA:  Yes.  Those two hypothetical assumptions

21   are assumptions that he made in forming his opinion.  His

22   opinion focuses on a valuation based on those assumptions.  And

23   I grant Your Honor it will be Telesocial's burden at trial to

24   prove that those assumptions are not speculative; but those are

25   factual assumptions.  And those issues of fact cannot be

1  resolved on a *Daubert* motion.

2          **THE COURT:**  Well, that's not quite right.  They have

3  to be -- it has to be a valid, reasonable, and reliable expert

4  opinion before it's admitted.  And the first measure of that

5  is:  How does this fit the case?

6      And he's not within the ballpark of any of the mainline,

7  well-established measures of trade-secrets damages, as we've

8  already discussed.  So I just really --

9          **MS. BEA:**  Your Honor, the --

10         **THE COURT:**  I can't see what he's going to do.

11     Now, you don't need an expert.  I've been clear about

12 this.  Someone can come in -- your CFO, your CEO or founder,

13 whoever, a venture capitalist who has a good view of the

14 company from direct investment.  That person can come in and

15 say, *Here's what the company was worth.*

16     How do I know that?

17     *Well, we had 100,000 shares, and we were selling them for*

18 *$4 a pop.*

19     I mean, that's a perfectly fine measure of:  Here's where

20 we think the company was.  If anything, it would be

21 conservative, because it may not take into account certain

22 other factors that a person might use to reasonably address

23 that figure.  You can do that.  You can have people come in and

24 say all of the things I talked about earlier.  *We had ten*

25 *meetings lined up.  And as soon as Party Call on Facebook hit*

1 *the scene, people canceled, and we lost all of that*

2 *opportunity*.  You can have that kind of thing, too.

3      I had a patent trial here where the experts were

4 disqualified, and the plaintiff put on a *Georgia Pacific* case,

5 no less.  Sixteen factors, with no experts, and they won.  And

6 I sustained the award.

7      So you don't have to have experts, but Mr. Foster is just

8 not going to do it.  So his testimony is going to be excluded

9 for lack of physical damages in the case.

10           **MS. BEA:**  Thank you, Your Honor.

11           **THE COURT:**  All right.  I think that does it.  Is

12 there anything else I can help you with today?

13           **MS. BEA:**  Can I ask for clarification actually?

14           **THE COURT:**  Yes.

15           **MS. BEA:**  You said earlier in this discussion that

16 you're not precluding the measure of lost business value, per

17 se.  Does that mean as to Instruction 66 -- Jury Instruction

18 66, you are preventing that as a measure of --

19           **THE COURT:**  I will leave an open mind.  If it is

20 given to me special -- you know, not special -- but given the

21 specific facts of this case, if it turns out this was a nascent

22 company with one big idea, and that's it, and one big idea was

23 misappropriated, and as a result of that, the company lost all

24 its investments or everybody withdrew, knob gave them money, it

25 had to close its doors --

**PROCEEDINGS**

1      Oh, by the way, I'm just talking off the top of my head.

2          **MS. BEA:**  I understand, Your Honor.

3          **THE COURT:**  None of this is carved in stone.  This is

4   all subject to briefing and refinement.

5      -- then, you know, it's probably within the realm of

6   possibility that a jury could hear that, and make a reasoned

7   and reasonable estimate of damages, but you're going to have to

8   have facts that support all of that.  It cannot just be an

9   interested party, like an investor or founder, coming in and

10  saying, *This was $100 million idea.  And we never made a penny.*

11  *Consequentially, we're owed $100 million.*  That's just not

12  going to work.

13         **MS. BEA:**  Okay.

14         **THE COURT:**  Okay?

15         **MS. BEA:**  I think one remaining issue that would need

16  to be resolved then, only because it's been raised in

17  discussions on the pretrial papers with defendants -- I just

18  want to confirm that that also means that their experts that

19  are rebuttal experts to Professors Kearl and Foster are also

20  excluded as a consequence.  They were never disclosed as

21  affirmative experts, only --

22         **THE COURT:**  Rebuttal experts, then there's nothing to

23  rebut.  I mean, is there anything else that those people say?

24  They weren't called for any other reason; were they?

25         **MR. MIRENDA:**  Well, I think, Your Honor, I guess it

 1   would depend on what latitude Your Honor gives to the lay

 2   witnesses to testify as, you know, sort of pseudo experts; that

 3   there might be a reason to --

 4        (Simultaneous colloquy)

 5        THE COURT:  They're not testifying as pseudo experts.

 6   You get that concept?  No one is a closet, covert, special-ops,

 7   undesignated expert.  That's not happening.

 8        They are testifying as one thing only:  Percipient fact

 9   witnesses.  That's it.

10        You got two flavors.  There's nothing in between.  There's

11   no DMZ where someone can kind of, you know, crawl under the

12   barbed wire and be a semi expert.  That's not happening.

13   There's no semi or pseudo in this courtroom.  You're either a

14   fact witness or you're an expert.  That's it.  So if they're

15   just rebuttal people, I don't think you need it.

16        MR. MIRENDA:  That's fine, Your Honor.

17        THE COURT:  Anything else?

18        Yes.  Come on up.

19        MR. BRIGGS:  Your Honor, I wanted to raise one issue

20   with respect to the witnesses that Orange is planning on

21   bringing to trial.

22        THE COURT:  Can I jump in for one moment?  Is the

23   "Orange," or "Orange"?

24        MR. MIRENDA:  Yes.  All of the emphasis -- including

25   the company employees, use both pronunciations.

 1              THE COURT:  What do you want me to say?  I'll let you

 2   decide.   "Orange" or "Orange"?

 3              MR. MIRENDA:  Orange, I think, Your Honor.

 4              THE COURT:  Orange?  All right.  Good.  All right.

 5   Witnesses.

 6              MR. MIRENDA:  Individual defendants piece first, or

 7   the witness list?

 8              MR. BRIGGS:  Let me go through the witnesses first.

 9        So they've indicated to us that they plan on bringing 13

10   witnesses live to trial.  We would like to call six of those

11   witnesses in our case; but they've informed us that three of

12   the six witnesses that we would like to call will not be

13   available during the first week, which is the week of April

14   10th, which is when we're going to be putting on our case.

15        And one of the reasons we've heard for one of the

16   witnesses is that her daughter is having surgery.  And we

17   completely understand that.  And we can probably have her go

18   the following Monday.  But the other two witnesses we would

19   like to have come testify, live.

20        And we believe that they should come the prior week,

21   because, you know, this trial's been scheduled for

22   approximately six months now.  And we think it's unfair if they

23   only have their witnesses come to testify live during their

24   case, but not during our case.

25              THE COURT:  Let me just jump in on this.  I'm glad

1 you mentioned this.  I will address that.

2      We're not bifurcating the case into two cases-in-chief, so

3 a witness comes once.  And you do everything you do with that

4 witness, and that's it.  Okay.  So there's no cross; wait a

5 week; and then defendants call the witness back for direct.

6 It's not going to happen.

7      So it's going to be --

8      And spare yourself also the beyond-the-scope objection,

9 because there's not going to be any beyond-the-scope.  All

10 right?  It just doesn't happen when I set it up this way.  So

11 you have them here, and that's it.

12      There will be a point where the plaintiff is done, and you

13 will tell me "We rest" at that point; but at that point, about

14 80 percent probably of the case is going to be over for

15 everybody, because the witnesses are going to be here.  So they

16 won't be coming in their case.  It just might be not be fitting

17 your narrative timeline, which is an issue.

18      Why can't those two people be here earlier?

19          MR. MIRENDA:  Well, Your Honor, the two particular

20 people both have family conflicts for that week of the 10th,

21 which was what we informed Telesocial of.  I think that --

22          THE COURT:  Are they named defendants?

23          MR. MIRENDA:  No, Your Honor, they're not.  They're

24 witnesses.  They're not defendants.  And --

25          THE COURT:  Are they available on video?

**PROCEEDINGS**

1          **MR. BRIGGS:**  I think one of the two is a named

2   defendant.  Ms. Benrikhi.

3          **MR. MIRENDA:**  Yeah.

4          **THE COURT:**  One named defendant and one third party?

5          **MR. MIRENDA:**  And one third party.

6          **THE COURT:**  Would you be happy doing them by video?

7   Is that adequate for the plaintiff?

8          **MR. BRIGGS:**  Well, given Your Honor's ruling on that

9   second issue that we were going to raise, you know, the number

10  of times a witness testifies --

11         **THE COURT:**  It's one and done.  That's it.  There's

12  no comebacks.

13         **MR. MIRENDA:**  That was our view.  It should be one,

14  done.

15         **THE COURT:**  But if they have two people on your team

16  who are important to your case, we have to accommodate them.

17         **MR. MIRENDA:**  Well, I appreciate that, Your Honor.  I

18  think once the threshold has been crossed that it's, you know,

19  one witness, and done, I think the realistic course of their

20  case is going to take us beyond Friday, in any event; that is,

21  we're talking about whether these two witnesses testify as the

22  eighth and ninth witnesses that we call, or as the 11th and

23  12th witnesses that they call.

24         **THE COURT:**  Well, Mr. Briggs has the right to present

25  his case in the format he wants.  I mean, are these people that

1  you want early for some reason?

2          MR. BRIGGS:  Actually, those two witnesses were ones

3  that we wanted earlier in the case.

4          THE COURT:  All right.  Okay.

5          MR. BRIGGS:  And we can make the exception with

6  Ms. LeDrogo, but for all three, it really puts a burden on our

7  case and our ability to present the case we want to present.

8          THE COURT:  You know, trial is an inconvenience for

9  everyone, starting with the jury.  And I --

10         MR. MIRENDA:  I understand, Your Honor.

11         THE COURT:  It's just a reality of life that when

12  trial's been set for many, many months, it's very hard for me

13  to say, you know, an undefined family obligation is going to be

14  a barrier to getting the case-in-chief done.  And I just --

15      You know, surgery?  Fine.  We all agree.

16      Is it Ms. LeDrogo?

17         MR. BRIGGS:  Yes.

18         THE COURT:  Family medical problem?

19         MR. MIRENDA:  Yes, Your Honor.  Exactly.

20         THE COURT:  We're not going to force that issue.

21      But the other two are going to have to be here.  You're

22  going to have to make it work.  It's not fair to the plaintiff

23  to have two key witnesses come at the tail end of their case.

24  It throws the whole thing off.  That's just not reasonable.

25  We've known about this for -- I think it's been more than six

1   months.  It's been at least six months.  So you're going to

2   have to tell them.  Look.  You blame me.  *The old judge in*

3   *San Francisco said you have to be here*.  Okay?  All right.

4        Anything else I can help you with?

5            **MR. MIRENDA:**  Then there's a sort of a second issue,

6   Your Honor, with respect to individual -- number of individual

7   defendants.  The plaintiffs have offered a conditional offer to

8   dismiss certain of the individual defendants, on the condition

9   that the other defendants not ask them questions about whether

10  they were defendants, and whether they had been dismissed.

11  That issue obviously goes to their credibility.

12       The situation that it puts us in -- because, as the Court

13  knows and as Telesocial knows, we represent the group of the

14  company and all of the individuals -- is that a conditional

15  offer like this raises a potential conflict situation.  And so

16  we would need to arrange --

17           **THE COURT:**  A client conflict?

18           **MR. MIRENDA:**  As between an individual who's been

19  offered a dismissal conditioned on another defendant who's

20  going to remain in the case agreeing to limit their examination

21  of that person as a witness.  That's the offer that they've

22  made.  And it puts us in this -- you know, it happened a couple

23  days ago.  It puts us in this potential conflict situation.  As

24  a matter of professional responsibility, we feel like we need

25  to have the individuals get independent counsel on whether or

**PROCEEDINGS**

1    not to accept that offer.  And the other defendants, of course,

2    have to decide whether they're going to agree or not.  Since we

3    represent them all, we can't advise each of them as against the

4    other.  So the conditional nature of offer puts us in this

5    difficult position.  And we wanted the Court's guidance on how

6    to deal with that, you know, given --

7            **THE COURT:**  Let me just make sure I understand.

8        So the deal's going to be:  Telesocial will drop, let's

9    say, five people, so long as none of the remaining witnesses

10   mention their name?  Is that the deal?

11           **MR. BRIGGS:**  (Shakes head from side to side).

12           **MR. MIRENDA:**  So long as none of the remaining

13   defendants ask those people who come to testify -- those

14   now-dropped defendants -- ask them, *Were you named as a*

15   *defendant?*

16       *Yes.*

17       *Were you dismissed from the case?*

18       *Yes.*

19       You know, questions about the fact that they were

20   defendants, and recently dismissed, which --

21           **THE COURT:**  How would that even come up?

22           **MR. MIRENDA:**  Well, it goes to the -- potentially

23   goes to the credibility of the witness.

24           **THE COURT:**  Just don't bring it up.  Why would you

25   bring that up?

<u>PROCEEDINGS</u>

1      **MR. BRIGGS:**  No.  We don't want to bring that up.

2  We're concerned that they may bring it up.  For example, there

3  are 12 individual defendants.

4      **THE COURT:**  Right.

5      **MR. BRIGGS:**  We're making a good-faith effort to

6  narrow this case before trial.

7      **THE COURT:**  That's perfectly reasonable.

8      **MR. BRIGGS:**  So we want to just keep the key people

9  in.  There are four of them.  So we've offered to drop eight of

10 them.  We just want to make sure that Orange or perhaps the

11 other defendants don't make reference to the jury that these

12 other people were once defendants, and we dropped the case

13 against them.

14     **THE COURT:**  What's wrong with that?  Why would you

15 even bring that up?  I'm --

16     Let me make life easy.  You're barred from saying that.

17 It's totally irrelevant.  And potentially that should solve any

18 conflict issue, even if a conflict -- I'll let you decide that.

19 I don't have any idea, but no one is going to comment on any

20 dismissed defendants.  That's just not appropriate.  Okay?  So

21 I think that solves the problem.

22     All right.  So who are the eight you're dismissing?  Just

23 at some point, file something.  Okay?

24     **MR. BRIGGS:**  We're working on a stipulation with

25 them, but it got hung up because of this issue.

PROCEEDINGS

```
 1            THE COURT:  You don't need a stipulation.  Just say
 2   The following defendants are voluntarily dismissed.  Give me
 3   their names.  You don't need anything else.
 4        Anything else I can help you with?
 5        Yes.
 6            MS. CANDIDO:  Very minor issue.  So reading Your
 7   Honor's Standing Order about the exhibits, we just wanted to
 8   make sure we were very clear with respect to just tabbing or
 9   stickering the exhibits.
10            THE COURT:  Tabs.
11            MS. CANDIDO:  Your Honor --
12            THE COURT:  Sticks?
13            MS. CANDIDO:  -- are electronic versions of the --
14            THE COURT:  Oh.  You mean for the marker?
15            MS. CANDIDO:  For the exhibit stickers or tabs; the
16   indication of the number on the exhibit.  You don't require an
17   actual physical sticker?  You're okay with an electronic --
18            THE COURT:  This is beyond the Judge's skill set.
19        Ms. Clark, what do we usually prefer?
20            THE CLERK:  The label needs to say --
21        Have you seen the --
22            MS. CANDIDO:  Yeah.  As long as it says what it says,
23   it doesn't have to be an actual, like --
24            THE CLERK:  No.  If you want to incorporate it in the
25   document, as long as it's not covering --
```

**PROCEEDINGS**

1      **MS. CANDIDO:**  There was something the way the

2    language written that we were being a little hypersensitive

3    about it sounding like it required a sticker.

4      **THE CLERK:**  Yeah.  Just don't cover anything.  That's

5    fine.

6      **MS. CANDIDO:**  We're good with that.

7      **THE CLERK:**  Okay.

8      **MS. CANDIDO:**  The only other question was:  To the

9    extent that the defendants are going to be examining Orange

10   witnesses in the plaintiff's case beyond the scope of their

11   direct, and effectively putting on their direct in our case,

12   does Your Honor's rulings regarding the disclosure of direct

13   exhibits apply then to the defendants, as well?

14     **THE COURT:**  Witnesses show up once.  Okay?  You're

15   going to disclose who's doing what when a day and a half

16   before?  I can't remember my order.

17     **MS. CANDIDO:**  Two days before.  4:00 p.m.

18     **THE COURT:**  You're going to share the exhibits and

19   work out any objections to the extent you can.  And if you

20   can't, you're going to share them with me that morning, and

21   I'll quickly go through them.  We can do that.  If not, you can

22   do it on the stand.  There's no "beyond the scope."  We're just

23   going to get it done.  Okay?  You know, nobody stands on the

24   case-in-chief thing anymore.  We just don't do that in federal

25   court.  Okay?  All right.

PROCEEDINGS

1        **MS. CANDIDO:**  It's a two-way street, is what I'm

2   confirming.

3        **MR. MIRENDA:**  I think we understand that.  And I

4   guess the related question there -- in terms of the travel for

5   witnesses traveling from France, if we were to know the

6   sequence of when or the day on which the plaintiffs expect to

7   call them.  And we're talking about the two witnesses who are

8   now going to come that first week.

9        **MS. CANDIDO:**  We can work that out.

10        **MR. MIRENDA:**  We just need to have enough advance

11   notice, so we can arrange for the hotels and planes.

12        **THE COURT:**  I think that's fair.  Just project to the

13   best of your ability for these two people maybe specifically.

14   Okay?  So whatever you can work out.  I mean, you both seem to

15   have gotten along well, so make it happen.

16     Now, so you're going to call 13 witnesses?

17        **MR. MIRENDA:**  We're bringing all of the Orange

18   witnesses; both the ones that plaintiffs have identified, and

19   the ones that we've identified.  There's a substantial overlap.

20        **THE COURT:**  But excluding the eight.  Right?  The

21   eight are now off the table.  The eight defendants that are

22   being dismissed?

23        **MR. MIRENDA:**  Right.  Several of them are still

24   coming as witnesses, Your Honor.  They have to be able to talk

25   about the activity.

**PROCEEDINGS**

1          THE COURT:  Okay.  All right.

2          MR. MIRENDA:  So we've provided the Witness List.

3   There's, I think --

4          THE COURT:  Are the depositions in English or --

5          MR. MIRENDA:  -- a total of 26 witnesses, with a

6   substantial amount of overlap.

7          THE COURT:  Are the depositions in English or French?

8          MR. MIRENDA:  They're primarily in French,

9   Your Honor.

10          MS. CANDIDO:  With translation.

11          THE COURT:  With English subtitles?

12          MR. MIRENDA:  It's -- they're coming.  They're going

13   to come.  It's very difficult.  They're very slow.  Long gaps

14   in the --

15          MR. MYRE:  They speak in French.  It's translated.

16   You know, I ask a question in English.  Translator translates

17   it into French.  French witness answers a question in French.

18   Translator translates it into English.

19          THE COURT:  English subtitles in case people --

20          MR. MIRENDA:  I think the answer was that there

21   weren't going to be any video depositions, because all of the

22   people were coming in person.

23          THE COURT:  Oh.

24          MR. MIRENDA:  We were trying to avoid the idea of

25   having to present long videos to the --

1          THE COURT:  So the witnesses are going to be using a

2    translator?

3          MR. MYRE:  That's correct.  Same format as the

4    deposition, which might take some time.

5          THE COURT:  How many witnesses need that?

6          MR. MIRENDA:  I don't know, off the top of my head,

7    Your Honor.

8          MR. MYRE:  Thirteen.

9          MR. MIRENDA:  Maybe ten or twelve.

10         THE COURT:  Out of 26?

11         MR. MIRENDA:  Out of 26, approximately.

12         MR. BRIGGS:  This is one reason in our pretrial

13   statement we asked for 21 hours per side rather than your

14   default time.

15         THE COURT:  Let's just see how it goes.  Okay?  Plan

16   on 16.  And if it turns out to be painfully slow, I may revise

17   that.  Okay?  But let's just bank on 16.

18      You know, I have had trials with non-English-speaking

19   witnesses, and it actually goes a little bit faster than you

20   might think.

21         MR. MIRENDA:  I would expect it could, Your Honor.

22         THE COURT:  Is it the case -- this may not be a

23   detail than we need, but is it the case where some of the

24   witnesses actually have some English skills; they're just not

25   fully confident?

1    **MR. MIRENDA:**  Yes, Your Honor.  I think there are a

2  range of people.  Some are much more confident, and would try

3  to testify significantly in English.  And others --

4    **THE COURT:**  So maybe one of the witnesses will get

5  80 percent of the question, does not want to do it in English,

6  to be accurate, but is going to be able to snap right out; not

7  be hung up on a translation?

8    **MR. MIRENDA:**  Exactly.  And then, you know, whatever

9  technical questions or -- you know, we lawyers sometimes ask

10  complicated questions that are difficult to translate.  So they

11  might need a little bit more help there.  But yeah, I think so.

12    **THE COURT:**  Okay.  All right.  So by Thursday, then,

13  I'll get the revised full set of jury instructions.  And I want

14  also a set of the preliminaries.  I will give you a case

15  citation or two to look at.  And we can use those as models for

16  the preliminaries.  I will give you my revised *voir dire* --

17  proposed *voir dire* sometime next week.  The Verdict Forms I

18  need to do a little bit of work on, but I will do those, as

19  well.  And you're going to give me a joint case statement for

20  the venire panel by next Thursday.

21    **MR. MIRENDA:**  Yes.

22    **THE COURT:**  And I think that's it.

23    Is there anything else?

24    **MR. MYRE:**  Yeah.  There's one more related to this

25  translation issue.  There's an issue if with the exhibits.

1          THE COURT:  In French?

2          MR. MYRE:  Yeah.  So there's two different ones.

3      One set is when we took these depositions back in

4  September.  We translated a couple hundred documents.  So we

5  have certified translations behind the actual French document

6  that's produced by Orange.

7      They objected on the record at deposition to some of the

8  transcripts [sic] -- or to some of the translations, but then

9  never took it any further.  And this is, again, back in

10 September 2016.

11     We understand now that they're going to come back and try

12 to change some of the translations that were actually used with

13 the deponents.  They're in the record.  This is what the

14 person --

15         THE COURT:  Well, it's a little late.

16         MR. MYRE:  I agree, Your Honor.

17         MR. MIRENDA:  Your Honor, I really do need to address

18 this, because that's -- regrettably, that is not an accurate

19 description of what occurred during the depositions.

20         THE COURT:  These are September 2016 depositions?

21         MR. MIRENDA:  These depositions in the past -- in the

22 fall.

23     Back in May when we were organizing to take 16 depositions

24 in France, we proposed to Telesocial that they -- that we work

25 out translation issues.  We understood they were going to be

**PROCEEDINGS**

1   using documents at these depositions; that we work out

2   translation issues.  We proposed we do that.

3       They did not take us up on that proposal.  Instead, they

4   came to the depositions with French documents with partial,

5   incomplete English translations.  Not certified.  No indication

6   of who the translator was, or what the translator's

7   qualifications were.

8       We immediately objected to those documents.

9       In every deposition there were extensive discussions.

10      I'll give you one example.  There's -- this was

11  Mr. Johnson.  *I should mention there's a translation of a*

12  *French e-mail, in part, on the front part of this exhibit.*

13      Then I'm -- this is actually me.

14      *I'm going to object.  Obviously, we've raised this issue a*

15  *number of times.  We object to the translations; the English*

16  *translations.  This hasn't interfered with the progress of the*

17  *depositions, but I think -- as I think I agreed with Mr. Briggs*

18  *or Mr. DeFranco back in the first depositions, we are going to*

19  *work out what the translations would be.*

20      So the witnesses looked at the original French.  All of

21  the witnesses are French.  They're reading their original

22  e-mails.  They weren't relying on the translations in the

23  depositions.  So the depositions went forward.

24          **THE COURT:**  What is the issue?

25          **MR. MIRENDA:**  What they would like to do is present

1   to the jury these false --

2             **THE COURT:**  No, no, no.  Only certified translations.

3             **MR. MYRE:**  They were all certified, Your Honor.

4             **THE COURT:**  They have to be certified for the

5   United States District Court; not just certified by a good

6   speaker of Berlitz.

7             **MR. MYRE:**  Understood, Your Honor.

8             **MR. MIRENDA:**  We have not seen any certifications.

9             **THE COURT:**  You need a Court-certified interpreter to

10  do this.

11            **MR. MYRE:**  I understand, Your Honor.  And we have

12  one.

13            **MR. MIRENDA:**  They did not provide us with

14  certifications or certified translations back then.  They still

15  haven't provided us with --

16            **THE COURT:**  Well, you have until April 10th.  Now, if

17  there are documents in French that you intend to use, get the

18  certification process worked out now.

19            **MR. MYRE:**  Understood.

20            **THE COURT:**  I will not accept anything that is a

21  unilateral translation.  It has to be a Court-certified

22  interpreter, and you all agree on it.

23      If you don't agree on it, then I'm just going to do

24  whatever that translator said if that translator's certified.

25            **MR. MIRENDA:**  So we'll raise whatever objections, if

1    there are particular ones, once we see the certified

2    translation.

3            THE COURT:  Get whatever exhibits you plan to use,

4    and make sure you get a certified English translation.

5            MR. MYRE:  Yes.  So that raises a second issue, you

6    know.  Trials in 17 days.  And we -- you know.

7            THE COURT:  It's a lifetime.

8            MR. MYRE:  Yeah.  And they have a number of exhibits

9    on their list.

10           THE COURT:  You might even settle.  You have 17 days

11   to settle.

12           MR. MYRE:  There are a number of exhibits on their

13   list that are in French, because they produced them in French.

14   And they tell us that they're translating them.

15       We still have never seen them.  So I have never been able

16   to read one of those documents.

17           THE COURT:  The order is:  Get all of your

18   French-document translations done in the next 17 days.  So when

19   you walk in on Monday, the 10th, it's all in the bag.  You just

20   pull them out and say, "Here is" -- you stand up and I will

21   tell the jury, *This is an agreed-upon, certified translation.*

22   *And bank on it.*  That's what you are you going to do.

23           MR. MYRE:  Understood.  I think the broader issue

24   here.

25           THE COURT:  I have some French skills.  I will not

**PROCEEDINGS**

1  wheel them out, because they're rusty.  It's not that hard to

2  translate.  This is not the type of language where there is

3  immense ambiguity between French terms and English terms.  So

4  this shouldn't be that hard.

5           **MR. MYRE:**  I think the bigger issue is a preparation

6  issue, Your Honor.  If I don't get them until the day before

7  trial, and I don't have any French skills --

8           **THE COURT:**  You're going to work that out over the

9  next 17 days, which means you're going to share with each

10  other.  *Here's my stack of French documents.*  And Orange will

11  have its stack.  And then you're going to send them to someone.

12  And you're going to say, *Please produce a certified*

13  *French-to-English translation.*

14           **MR. MIRENDA:**  We've already started that process,

15  Your Honor.

16           **THE COURT:**  It has to be Court certified.  All right?

17           **MR. MIRENDA:**  Absolutely.

18           **THE COURT:**  Can't be someone who's bilingual.  I've

19  had a problem with this.  It has to be Court certified.  So if

20  you have trouble with that, we can find a list for you. Do you

21  already have somebody?

22           **MR. MIRENDA:**  Yes, Your Honor.  We're using Geotech

23  (phonetic) service.

24           **THE COURT:**  So then just do that.  And if you

25  prefer -- I would do it earlier rather than later.  You work

**PROCEEDINGS**

1  out the timing.  It's up to you.  Okay?  But you both have the

2  same statements.  Okay?

3      But I'm going to be short-tempered -- I'm just telling you

4  now -- if someone gets up and says, *This is the wrong*

5  *translation*.  I don't want to burn jury time on that.  This is

6  easy.  French to English is a snap.  Okay?  So just get it

7  done.  This is not a complicated, you know, East Asian

8  language, and it has difficulties.  I've had that situation.

9  This is not it.  Okay?

10           **MR. MIRENDA:**  Thank you, Your Honor.

11           **MR. MYRE:**  Understood, Your Honor.

12           **THE COURT:**  Anything else I can help you with?

13      Okay.  I will see you on April 10th.

14      (At 11:53 a.m. the proceedings were adjourned.)

15  I certify that the foregoing is a correct transcript from the

16  record of proceedings in the above-entitled matter.

17

18

19  _____   March 24, 2017

20  Signature of Court Reporter/Transcriber   Date
   Lydia Zinn

21

22

23

24

25